**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| THADDEUS JAMES THOMAS, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| SHANTAY BRAME ADAMS, et al., | :     Civil Action No. 10-5026 (DRD) |
| | : |
| Defendants. | : |
| | : |
| | : |
| RONALD NASH, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :     Civil Action No. 10-2113 (DRD) |
| | : |
| CHRIS CHRISTIE et al., | : |
| | :     **OPINION** |
| Defendants. | : |
| | :     **APPLIES TO BOTH ACTIONS** |

**Appearances:**

Lawrence S. Lustberg, Esq., Gibbons P.C.
    1 Gateway Center, Newark, New Jersey 07102
    for Thaddeus James Thomas, Plaintiff
Michael R. Yellin, Esq., Cole, Schotz, Meisel, Forman & Leonard, P.A.
    Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601
    for Ronald Nash, Plaintiff

David L. Dacosta and Daniel M. Vannella, Esqs.,
    Office of the New Jersey Attorney General
    Department of Law & Public Safety and R.J. Hughes Justice Complex,
    25 Market Street, Trenton, New Jersey 08625
    for Defendants Christopher J. Christie, Paula T. Dow, Gary M. Lanigan,
    Jennifer Velez, John Main, Jonathan Poag, Merrill Main, Shantay Braim Adams
    and Jackie Ottino

**Debevoise**, Senior District Judge:

Moving to dismiss Plaintiffs claims, pursuant to Rule 12(b) of the Federal Rule of Civil Procedure, Defendants essentially maintain that Plaintiffs failed to state a plausible claim against them simply because Defendants are high-ranking supervising officials, and Plaintiffs' facts lack the *particularities* of Defendants' decision-making process and actions. This Court disagrees and will deny Defendants' motions, in part, and grant them in part.

## I.    BACKGROUND

Both Plaintiffs are civilly committed sexually violent predators ("SVPs") confined under the New Jersey Sexually Violent Predator Act ("NJSVPA"), N.J. Stat. Ann. § 30:4-27.24. Both are now housed at the Special Treatment Unit ("STU") of the East Jersey State Prison ("EJSP"). See County of Hudson v. State Dep't of Corr., 2009 N.J. Super. Unpub. LEXIS 1188, at *2 and n.2 (N.J. Super. Ct. App. Div. Apr. 22, 2009).[1]  Prior to being confined at the EJSP, the SVPs, Plaintiffs included, were confined at a Hudson County facility: at Kearny. See id. at *2-4. Since the events underlying the SVPs' transfer from Kearny to the EJSP STU are relevant to the issues at bar and have already been adjudicated in the state courts, with the DOC having had a full and fair opportunity to present its facts with regard to the DOC's obligation to find – and its search for – a transferee facility, it appears warranted to replicate the state courts' findings in detail:

---

[1] "In 1998, the Legislature enacted the [NJSVPA], which authorized the involuntary civil commitment of persons found to be [SVPs].  The [NJSVPA] define[d an SVP] as 'a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality . . . that makes the person likely to engage in acts of sexual violence if not confined . . . for . . . treatment.'  The [NJSVPA] placed with the Department of Corrections ('DOC') the responsibility of operating a facility for 'the custody, care and treatment' of SVPs." County of Hudson, 2009 N.J. Super. Unpub. LEXIS 1188, at *2 and n.2  (citations omitted, footnote incorporated).

In April 1999, the DOC designated the Kearny facility, which at the time housed 311 minimum security inmates, as the only available site for the temporary housing of SVPs. A few months later, the County of Hudson . . . obtained an order that required the DOC to show cause why . . . the DOC [should not be] enjoined from designating the Kearny facility as a location for the housing of SVPs. The trial court . . . entered a judgment . . . in favor of the County [but] stayed execution of the warrant of removal . . . until September 29, 2000. On September 22, 2000, one week before the stay expired, Governor Christine Todd Whitman invoked her emergency powers, pursuant to the Disaster Control Act, and entered Executive Order 118. [T]he Kearny facility [was, under the Order,] designated as a facility appropriate for the temporary housing of SVPs by the DOC . . . until . . . other temporary facilities capable of and appropriate for the housing of all individuals committed pursuant to the [NJSVPA were located] or until a permanent facility capable of accommodating this population [was] constructed and operational. . . . On June 1, 2004, the County and the DOC filed a stipulation . . . not to challenge Executive Order 118 until December 31, 2006. When that deadline passed – and another year as well – without an indication from the DOC as to when the SVPs would be removed from the Kearny facility, the County filed [another legal action. Eventually, the DOC and County agreed that the DOC would produce] the record . . . sufficiently demonstrat[ing] what the DOC has done since 2000.

. . .

The record . . . demonstrate[d] that the DOC has been active but not forceful – or, at least, not effectual – in finding a . . . solution . . . . In August 1998, an architectural firm presented a plan to the DOC for the construction of a new 300-bed special treatment unit. State officials thereafter toured Minnesota's SVP facility, identifying several aspects of that facility that might prove beneficial to the DOC's existing proposal. Consideration was given in September 1998 to building a facility on the grounds of [EJSP] at an estimated cost of $ 20,000,000. Questions arose about the sufficiency of the estimate, followed by objections from the Township of Woodbridge, which commenced litigation and obtained an injunction halting the project. The following month, discussions began in other locations. A site in Maurice River Township was identified as having potential, but was eventually opposed by the township. And, in June 1999, a location in the Borough of Chesilhurst was considered. However, when State officials advised that a public hearing on the subject would be conducted, local residents and officials expressed intense opposition. Little occurred with regard to the creation of a new facility until 2001 when the Department of Treasury requested that the architectural firm update and revise its 1998 study. The firm conducted a series of programming workshops with various officials in an attempt to reach a consensus on the program's needs; its comprehensive plan was presented on February 7, 2002. That plan estimated the cost of the structure at more than $ 65,000,000. The firm also estimated that the 455-bed facility would require twenty-five acres

and estimated the entire cost of the project, including planning, design, construction, permitting and other costs, at more than $ 82,000,000. The plan was viewed as too expensive. In January 2006, the proposal was reconsidered. By that time, the cost estimate had risen to more than $ 114,000,000 and was again deemed too expensive. Meanwhile, the adaptation of existing facilities was also explored. Starting in 2002, each of the DOC's facilities was examined and reviewed for this purpose and each deemed unsuitable for a variety of reasons. The DOC considered its Central Reception and Assignment Facility ("CRAF") in Trenton, determined it required major improvements to all its buildings, as well as a 17,030 square foot extension at a total cost of more than $ 17,000,000, and then realized that utilization of CRAF would give rise to a need to find alternate housing for CRAF's inmates. Utilization of the Mid-State Correctional Facility was complicated by the fact that the facility [was] located on federal property. As part of its realignment and closure of Fort Dix, the federal government imposed upon the property it had transferred to the DOC several conditions, which apparently raised concerns about a reversion of the property should it be used to house SVPs. The DOC also harbored concerns about the facility's size and perimeter security. The grounds of the Albert C. Wagner Youth Correctional Facility in Bordentown consisted of one structure found to be too large (consisting of 846 beds), and other structures found too small. The Adult Diagnostic and Treatment Center in Avenel, which is the State's only sex offender prison, was considered. But the proposed facility, if located there, would require subdivision from the remaining population [under the state law], and another location for the prisoners there housed. [In fact, a]ny use of existing correctional facilities would [have] necessarily require[d] the relocation of current inmates, which [would] generate[ an additional] cost to the DOC. The DOC also found problems with Bayside State Prison in Leesburg and Ancora Psychiatric Hospital in Winslow Township [since] Bayside consist[ed] of a 1,221-bed facility, deemed too large for the SVP population, and a farm with open barracks and cottage-type housing units, [was] deemed too insecure for these purposes. Ancora consist[ed] of two separate housing units, with a total of 350 beds, separated by a walking and open recreation space, [and also was] deemed insecure and unsuitable. The DOC reconsidered CRAF in 2006 [but] Jones Farm, a 282-bed satellite unit of CRAF was rejected as too small. On the other hand, [the EJSP] in Rahway, New Jersey State Prison in Trenton, Northern State Prison in Newark, Riverfront State Prison in Camden, and Edna Mahan Correctional Facility in Clinton, were considered too large. The main structure of Mountainview Youth Correctional Facility in Annandale was also considered too large, and its two satellite facilities were considered too small. Other existing facilities presented similar problems. It is not surprising, in light of the nature of the assorted insufficiencies of the DOC's many facilities, that the County compares the DOC's dilemma in identifying an appropriate site to Goldilocks' quandary in "The Story of the Three Bears." That is, the DOC has found some facilities too large, some too small, none just right.

[As years went by], the DOC continued to explore its options, the level of opposition to any chosen locale was met with vociferous opposition. In May 2007, the DOC reconsidered its existing facilities and focused in particular on South Woods State Prison in Bridgeton, which was designated in 2003 as a location for the transition of inmates convicted of sex offenses. This proposal was met with an immediate objection from the Cumberland County Board of Chosen Freeholders. In a letter to the DOC Commissioner, the Freeholders indicated that they were "furious" the DOC was again considering placing the facility in Cumberland County, that in 2000 "our entire County was enraged that an ill-conceived plan was afoot to house sexual predators in Maurice River Township," and that seven years later, the [DOC] "once again targeted" Cumberland County for the placement of the facility at South Woods State Prison.

The DOC has also explored the possibility of privatizing the housing of SVPs. The record [however] reveal[ed] that those efforts were initially clouded by litigation and [never] resulted in any concrete proposal. . . . [In sum, it became clear to the DOC and the state courts that] the vast majority of this State's citizens strongly approve[d] . . . the housing of civilly-committed SVPs where they may be treated until conditions exist for their release – but not in their town.

Id. at *2-16 (citations, brackets and footnotes 2, 3 and 5 omitted, footnote 4 incorporated).

Noting that "Newton's First Law of Motion states that an object in motion tends to stay in motion[,] and that an object at rest tends to stay at rest unless acted upon by a net external force, [and thus, if the state courts were to] fail to exert [their] own external force, the matter [of transferring the SVPs out of Kearny would] remain at rest for the indefinite future," the state courts directed the DOC to transfer the SVPs, regardless of all financial/logistical difficulties and local opposition. Id. at *17-19. That decision was entered on May 18, 2009, and "allow[ed the DOC] one year from [that day] for compliance [with the state court's order]." Id. at *19. Having to scramble for a swift solution, the DOC revisited its above-detailed options and, seemingly finding its previously-twice-rejected option of transferring the SVPs to the EJSP the most viable, called all Kearny SVPs for a meeting on March 17, 2010, and informed them that they would be moved to the EJSP for housing at the STU being carved out of the EJSP's main facility.

The two matters at bar ensued, both commenced pro se.

The complaint submitted by Thaddeus James Thomas ("Thomas") in the wake of that March 17, 2010, meeting, asserted two lines of claims. One alleged that the transfer to the EJSP STU, if executed, would subject him to confinement in prison-like conditions since that STU, being carved out of the EJSP, would be structured and administered like a correctional facility, not a medical facility for treatment of mental patients. The other line of claims alleged that, in light of what Thomas understood to be a projected disparity between the levels of treatment at Kearny and at the STU, his transfer to the STU would either wholly deprive him of or markedly reduce his mental treatment indispensable for his recovery.

Thomas' latter claim seemingly proved prophetic.

Thomas' next submissions notified the Court that the SVPs' transfer to the STU did take place, and that his mental therapy was halted during the transfer period. Soon thereafter, he filed a supplement clarifying that his mental therapy resumed shortly after his arrival to the STU, but the extent/frequency of that therapy was indeed markedly lower than that provided at Kearney.[2] Then, Thomas submitted an amended complaint asserting that he was placed in a segregated housing unit ("SHU") created within the STU, and that placement fully eliminated his access to any mental therapy. Meanwhile, the complaint filed by Ronald Nash ("Nash") similarly suggested reduction in Nash's mental therapy upon his arrival to the EJSP STU and, in addition, repeated other claims raised in Thomas' submissions.

On October 15, 2010, this Court issued an opinion and accompanying order addressing the claims raised in all Nash and Thomas' pro se submissions.

---

[2] Thomas' supplement also asserted many other claims. See infra, this Opinion, note 3.

The Court noted that the claims based on the brief gap in therapy associated with the transfer from Kearney to the EJSP STU were facially without merit, while the claims based on reduction/change/elimination of mental therapy were sufficiently pled to survive sua sponte dismissal.[3] This Court, therefore, directed the Clerk to appoint pro bono counsel for each Plaintiff and ordered both counsel to file amended pleadings elaborating on Plaintiffs' individual reduction/change/denial of medical-care claims.[4] Such amended complaints were duly filed, and Defendants timely moved for dismissal of Plaintiffs' claims under Fed. R. Civ. P. 12(b). Being further re-briefed, pursuant to the Court's order, those filings are now before this Court.

## II.    THE PARTIES' POSITIONS

Thomas' and Nash's respective challenges could be subdivided into three distinct groups. One group could roughly be defined as claims asserting overall inadequacy of treatment administered by the DOC to all SVPs held at Kearny/EJSP STU. See Thomas v. Adams, Civil Action No. 10-5026, Docket Entry No. 26, at 11-13 (asserting that "[t]he number of mental health staff failed to keep pace with the increase in the number of [the SVPs]," "[t]herapy groups increased to a size where they are no longer effective," "[g]roup therapy no longer afforded treatment tailored to [each SVP's] mental health needs," "[the] DOC officials now have a much greater role in the facility," "[the] DOC officers . . . now oversee mental health treatment [and]

---

[3]  The Court also dismissed Plaintiffs' claims asserting that their placement in prison-like conditions violated their rights. Analogously, the Court dismissed Plaintiffs' challenges based on reduction in recreational activities. The Court also dismissed Plaintiffs' claims asserting that, as a result of their transfer, they were prevented from "ordering" personal belongings from outside sources. Finally, the Court dismissed Plaintiffs' access-to-the-courts claims as facially meritless.

[4]  The Court takes this opportunity to thank both counsel for their dedication to the public cause and protection of their clients' rights, and for their valuable service to this Court.

often actively interfere with this treatment and impede its progress by . . . harassing and degrading [the SVPs]," "the prison-like conditions [of the STU] – caused both by the nature of the physical facility, which was designed to serve as a high-security prison administrative segregation unit, and by the conduct of the staff – undermines the ability of [the SVPs] to receive adequate treatment"); accord Nash v. Christie, Docket Entry No. 22, at 10-11 ("At the STU, [mental therapy] groups have gotten larger and meet . . . less frequently [which] decreas[es] their effectiveness and/or render[s] them entirely ineffective," "[t]he group therapy sessions at the STU improperly group together [SVPs] with a variety of mental health disorders that require distinct treatment regimens," "[t]he group therapy sessions address topics irrelevant to the purpose of [some SVPs'] involuntary commitment [hence rendering these sessions a waste of these SVPs' time," "DOC officers . . . are present in and/or oversee . . . group therapy sessions, undermining the sessions' therapeutic value," "[the SVPs are] not sufficiently informed of the therapy agendas and specific goals of [their] treatment program[s]," "[the SVPs have] not been provided with any meaningful feedback regarding [their] individual mental health progress").

The other group consists of Plaintiffs' individualized claims asserting that their own, *prescribed* mental treatment was provided at Kearny but became denied/reduced/changed for *non-medical* reasons upon their transfer to the STU/SHU. Toward that end, Thomas stated that, "after serving some ten years in criminal custody [after his] 1990 sexual assault conviction," he has spent more than a decade in civil detention housed at Kearny and then the STU. Thomas, Civil Action No. 10-5026, Docket Entry No. 26, at 9. According to Thomas' allegations, he was receiving several types of prescribed therapy while he was housed at Kearny and therapy "included 'process group' [and] several treatment 'modules' addressing specific issues such as

Page 8 of 55

substance abuse or anger management, each of which proceeded in phases in accordance with

[Thomas'] individual's progress." Id. at 10. The Kearny treatment proved highly beneficial to

Thomas and, "by the time he was transferred out of Kearny in May 2010, he had completed

several modules with above-average or average marks." Id. Yet, upon being placed at the STU,

he "has been offered no more than 3 hours of treatment per week, [i.e.,] less than one-third of the

treatment that he had received at Kearny." Id. at 12. Moreover, the reduced treatment offered to

Thomas at the STU took "no account of the treatment that he had completed [in Kearny]" since it

"required [him] to start from square one." Id. at 12-13. Worse over, "if a [prescribed] treatment .

. . session happen[ed] not to be offered on the [SHU grounds, where Thomas became confined

soon after his transfer to the STU, that mental treatment became] simply not available to . . .

Thomas." Id. at 12, n.1. Consequently, Thomas claims that he has effectively had no mental

treatment "since May 2011, . . . due to ongoing construction [at the SHU] that has left no space

available for treatment [on the SHU grounds]." Id. Put another way, he asserts that he was

denied all mental treatment simply because the DOC officials either did not or could not

complete their construction tasks in time.

Nash's re-pled claims as to the reduction of his *prescribed* mental treatment largely

mimic those of Thomas: short of the claim as to complete denial of treatment. Although Nash is

confined within the EJSP STU general population (not at the SHU), according to his pleadings,

> [d]espite the treatment progress made by Nash at . . . Kearney . . . , the . . . DOC . .
> . has disregarded any treatment already completed by Nash prior to his arrival at
> the STU. Nash had, for example, successfully completed anger management
> therapy at . . . Kearney . . . , yet was placed in the lowest level of the anger
> management module at the STU. In fact, at the STU, Nash has not received more
> than three hours of therapy per week . . . . At . . . Kearney . . . , Nash received, on
> average, 10 hours of therapy per week.

Nash, Docket Entry No. 22, at 9.

The third group of Plaintiffs' claims is painted in large strokes since it broadly asserts that the "treatment [is] now provided by social workers and recreation staff rather than by psychiatrists, psychologists and social workers . . . , as at Kearny." Thomas, Civil Action No. 10-5026, Docket Entry No. 26, at 11; accord Nash, Docket Entry No. 22, at 9-10 ("At . . . Kearney, . . . Nash received treatment from psychiatrists, psychologists and social workers. At the STU, Nash's treatment . . . is only provided by social workers and/or recreation staff"). Being stated in those terms, these claims leave the Court guessing whether Plaintiffs' *prescribed* mental therapy was such that it *had* to be administered by "psychiatrists, psychologists and social workers" or, in alternative, it was such that it could be "provided by social workers and/or recreation staff."[5]

Plaintiffs named nine Defendants in this matter: Christopher J. Christie ("Christie," Governor of the State of New Jersey), Paula T. Dow ("Dow," a former Attorney General of the State of New Jersey, who became the First Deputy General Counsel for the Port Authority of New York and New Jersey on January 10, 2012, and later that year became a Superior Court Judge in the Family Court Division in Burlington County), Gary M. Lanigan ("Lanigan," Commissioner of the DOC since March 2010), Jennifer Velez ("Velez," Commissioner of the New Jersey Department of Human Services since 2007), John Main ("John Main," Director of the New Jersey Department of Human Services), Jonathan Poag ("Poag," Director of the

_____

[5] Thus, this group of claims falls somewhat between Plaintiffs' allegations with regard to: (a) the alleged overall inadequacy of mental treatment administered to all SVPs at Kearny/ EJSP STU; and (b) Plaintiffs' individualized challenges to the above-detailed denial/reduction/ change of their own prescribed mental treatment for non-medical reasons that took place upon their transfer to the EJSP STU/SHU.

Division of Mental Health Services), Merrill Main ("Main," Clinical Director of the EJSP SHU),

Shantay Braim Adams ("Adams," Assistant Director of the EJSP SHU) and Jackie Ottino

("Ottino," Program Coordinator of the EJSP SHU). See Nash, Docket Entry No. 11.[6]  No

subordinate officer of the STU/SHU was ever named as a Defendant, and Plaintiffs' allegations

have been consistently devoid of facts suggesting that wrongful acts by any subordinate officer

were the cause of Plaintiffs' individualized injuries, i.e., the injuries not shared with other SVPs.

Defendants moved for dismissal of Plaintiffs' claims. These motions (and Defendants'

replies to Plaintiffs' opposition to these motions, as well as Defendants' sur-replies filed under

this Court's order directing further re-briefing) articulated one key argument and two secondary

ones. See Thomas, Civil Action No. 10-5026, Docket Entries Nos. 16, 28 and 29; see also Nash,

Docket Entries No. 18, 28. On the one hand, Defendants maintained that Plaintiffs' allegations

failed to state a plausible claim within the meaning of Rules 8(a) and 12(b), as clarified by the

relevant Supreme Court and Court of Appeals' decisions, since all Defendants here were

supervising/high-ranking officials who, by definition, were not involved in the day-to-day

operations of the EJSP STU or the SHU within the STU.

In addition to this argument, Defendants asserted that: (a) they were entitled to qualified

immunity; and (b) Plaintiffs' challenges were facially insufficient to avail Plaintiffs to permanent

injunctive relief upon final resolution of the matters at bar.

---

[6] During the course of these litigations, "[P]laintiff[s] concede[d] that [they] ha[d] no
claim for damages against . . . Christie or . . . Dow, [who became] sued [only] in their official
capacities," i.e., only for injunctive relief. Thomas, Civil Action No. 10-5026, Docket Entry No.
26, at 26, n.5. The remaining seven Defendants remained sued for both injunctive and monetary
relief, i.e., in their individual as well as official capacities.

## III.   CLAIM PRECLUSION CONSIDERATIONS

The litigation here has been taking place not only in the aftermath of state litigation in County of Hudson, 2009 N.J. Super. Unpub. LEXIS 1188, but also against the backdrop of another long-running litigation: in this District. Almost a decade prior to the SVPs transfer to the EJSP STU, i.e., shortly after Governor Whitman's entry of Executive Order 118 (under which the SVPs became temporarily housed at Kearny), a certain SVP commenced a § 1983 action challenging sufficiency of the overall mental treatment administered at Kearny. See Alves v. Main, 2012 U.S. Dist. LEXIS 171773, at *8, 15-16 (D.N.J. Dec. 4, 2012); see also Alves, et al v. Ferguson, et al, Civil Action No. 01-0789, Docket Entry No. 1.  By 2005, about "30 additional cases" raising analogous challenges were administratively consolidated with that seminal matter. See Alves, 2012 U.S. Dist. LEXIS 171773, at *17, 26-27.  By 2012, the volume of those claims became such that a class was certified to address the alleged overall inadequacy of mental treatment administered to all SVPs by the DOC, be it at Kearny or – during the last stages of the Alves class action – at the EJSP STU.  See Alves v. Ferguson, Civil Action No. 01-0789 (D.N.J.).

Since Plaintiffs' joint amended complaint contained, inter alia, a few passim allegations as to the overall inadequacy of mental treatment administered at the EJSP STU, in October 2011, this Court – mindful of the then-ongoing Alves litigation – severed *those* Plaintiffs' allegations into a separate matter and directed consolidation of that separate matter with the Alves class action.  See Thomas v. Christie, Civil Action No. 10-5026, Docket Entry No. 17, at 2 ("[T]he Alves matter [is] a series of cases concerned with the alleged insufficiency of overall medical treatment received by [the] SVPs . . . , Plaintiffs are SVPs, and their amended complaint raised,

inter alia, a line of challenges virtually indistinguishable from the issues . . . litigated in Alves").
In contrast, the instant matters were "reserved for . . . Plaintiffs' . . . individualized[] lines of
[constitutional] challenges . . . predicated on . . . the alleged [denial, change or] reduction in
medical treatment Plaintiffs have been receiving [after the transfer]." Id. at 2-3. The Court's
order to that effect was entered in October 2011.

Half a year later, i.e., in March 2012, the Alves class action was settled after hard-fought

negotiations. See Alves v. Main, 2014 U.S. App. LEXIS 5234 (3d Cir. 2014). The Court of

Appeals described that process as follows:

> [those s]ettlement negotiations began in 2005 . . . . [By 2008], the parties reached
> an impasse in settlement talks on the issue of adequate treatment. Counsel for
> both the [SVPs] and the State . . . jointly recommended . . . an expert proposed by
> the State. On April 3, 2008, the District Court issued an order appointing [that
> expert] as Joint Neutral Expert and [directed her to] assist in the negotiations [by]
> submitt[ing] an extensive report suggesting a number of changes to improve the
> treatment at the STU, based on her professional opinion. The parties executed a
> formal Settlement Agreement [which] was approved by the District Court . . . .
> While the Agreement implements many of [the Joint Neutral Expert's]
> recommendations, it [did] not address certain of her concerns. [Some SVPs]
> object[ed] . . . argu[ing] that the Settlement was not fair, adequate, or reasonable
> because (1) it violate[d] the "minimally adequate" constitutional standard [since it
> did] not implement all of [the Joint Neutral Expert's] suggestions, and (2) the
> Settlement [was] illusory [since it was] contingent on discretionary state funding.

Id. at *4-5.

The Court of Appeals dismissed the attack by the SVPs who challenged the Alves

Settlement and pointed out that the Settlement was a disposition qualitatively different from a

judicial resolution of any SVP's individualized *constitutional* claims. See id. at *7-11 ("[The

SVPs'] arguments are based on the false premise that [the Expert's] evaluation utilized the

*constitutional standard* and conclusively determined which [modalities of the] STU treatment . .

. fell below *that* standard.  [However, the Expert] *did not even use the constitutional standard*, but instead her own expert opinion of how the STU should be run") (emphasis supplied).

Thus, upon the Alves Settlement, Plaintiffs' claims that had been consolidated with Alves, i.e., their challenges to the alleged *overall inadequacy* of mental treatment administered at Kearny/EJSP STU, became fully extinguished and barred for the purposes on any litigation, including the matters at bar.  See id. at \*11 ("[I]f funding is not secured [to furnish the settlement-based overall mode of mental treatment], Plaintiffs may declare any affected provisions 'void' and resume [their Alves] litigation with respect to that provision").  In contrast, Plaintiffs' *individualized constitutional* claims reserved here remained unaffected by the Alves Settlement or the Settlement's references to the SVPs' transfer from Kearny to the EJSP STU. These reserved claims have remained as intact as if all SVPs stayed at Kearny, and the Kearny officials would have denied/reduced/changed Plaintiffs' mental treatment for non-medical reasons.  Cf. Blunt v. Lower Merion Sch. Dist., 2014 U.S. App. LEXIS 17629 (3d Cir. Sept. 12, 2014).[7]

---

[7] In Blunt, the Court of Appeals, reflecting on the res judicata effect that a class action settlement might have on claims separately raised by one of class members, explained that:

claim preclusion, formerly referred to as res judicata, gives dispositive effect to a prior judgment if a particular issue, [even if] not litigated, could have been raised in the earlier proceeding.  Claim preclusion requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privi[]es; and (3) a subsequent suit based on the same cause of action.  In analyzing whether these three elements have been met, we do not apply this conceptual test mechanically, but focus on the central purpose of the doctrine, to require a plaintiff to present all claims arising out of *the same occurrence* in a single suit.  In so doing, we avoid piecemeal litigation and conserve judicial resources.  We further have explained that we take a broad view of what constitutes the same cause of action and that res judicata generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims.  In analyzing essential similarity, we

## IV.    RULE 12 STANDARD OF REVIEW

The standard a court applies on a motion for judgment on the pleadings under Rule

12(b) is the same standard the court applies to screen the pleadings for <u>sua</u> <u>sponte</u> dismissal

under 28 U.S.C. § 1915(e)(2)(B)(ii), which – in turn – derives from Rule 8(a).  <u>See</u> <u>West Penn</u>

<u>Allegheny Health System, Inc. v. UPMC</u>, 627 F.3d 85, 98 (3d Cir. 2010); <u>Spruill v. Gillis</u>, 372

F.3d 218, 223 n. 2 (3d Cir. 2004); <u>Shane v. Fauver</u>, 213 F.3d 113, 115 (3d Cir. 2000).

In harmony with the aim of the Federal Rules of Civil Procedure, which is "to secure the

just, speedy, and inexpensive determination of every action and proceeding," <u>see</u> Fed. R. Civ. P.

1, Rule 8(a) has been modestly asking a pleader for a "short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  These words, known as

---

consider several factors: (1) whether *the acts complained of and the demand for
relief are the same*; (2) whether the *theory of recovery is the same*; (3) whether the
witnesses and *documents necessary at trial are the same*; and (4) whether the
*material facts alleged are the same.*  . . .  A claim extinguished by <u>res</u> <u>judicata</u>
includes all rights of the plaintiff to remedies against the defendant with respect to
all or any part of the transaction, or series of connected transactions, out of which
the action arose.  . . .  [A] judgment pursuant to a class settlement can bar later
claims based on the allegations underlying the claims in the settled class action. . .
. [The] rule . . . serves the important policy interest of judicial economy by
permitting parties to enter into comprehensive settlements that prevent relitigation
of settled questions at the *core* of a class action.

2014 U.S. App. LEXIS 17629, at *63-66 (citations, quotation marks, brackets, indentation and
heading omitted, emphasis supplied).  Since constitutional claims ensuing from a change in
treatment of a particular SVP for non-medical reasons were never at the *core* of <u>Alves</u>, and since
Plaintiffs did, indeed, raise *all* their claims in a single pleading, <u>Alves</u> has no preclusionary effect
here: it would be wholly anomalous of this Court to first direct consolidation of only Plaintiffs'
<u>Alves</u>-like claims and retain jurisdiction over their individualized constitutional challenges, and
then inform Plaintiffs that, upon the Settlement of claims attacking the *overall mode* of mental
treatment, Plaintiffs' *individualized* claims disappeared into the oblivion: all in the name of this
Court's now-found judicial economy.

the "simplified notice pleading requirement," Leatherman v. Tarrant Cty Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993), are the linchpin of this nation's federal practice.[8]

The unobtrusive obligation to "show" entitlement to relief was adopted to ensure that form would never be put over substance. See Conley v. Gibson, 355 U.S. 41, 48 (1957) ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep . . . may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits"). In fact, this substance-over-form concern was the main reason the Conley Court ventured into its discussion of the pleading standard. See id.

Yet, by a peculiar whim of jurisprudential fate, a single sentence in Conley, namely, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," id. at 46 ("Conley passage"), which was a mere expression of the Supreme Court's bewilderment with the dismissive treatment Conley's well-pled facts had received at the inferior courts, somehow succeeded at obliterating the facts, the logic and all other aspects of Conley, and it also nearly annihilated the gist of Rules 8(a) and 12(b).[9]

---

[8] Nowadays, a discussion of the notice pleading requirement is frequently reduced to a mere blurb. Yet, in February 2008, writing the Court of Appeals' first precedential decision reflecting on the Rule 12(b) standard, as it stood clarified in Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), Hon. Richard L. Nygaard reminded the district courts that "[f]ew issues in . . . jurisprudence are more significant than pleading standards, which are the key that opens access to courts." Phillips v. Cty of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).

[9]

[A] good many judges and commentators have balked at taking the literal terms of the Conley passage as a pleading standard. See, e.g., Car Carriers [v. Ford Motor Co.], 745 F.2d [1101,] 1106 [(7th Cir. 1984)] ("Conley has never been interpreted literally" and, "[i]n practice, a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain

Gradually, the Conley passage came to be construed as allowing a pleader to avoid

asserting any facts. With that, even bold, purely self-serving, conclusory expressions of

subjective feeling of injustice/displeasure were transformed into viable "pleadings."[10]  See, e.g.,

recovery under *some* viable legal theory" (internal quotation marks omitted; emphasis and omission in original); Ascon Prop., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1155 (9th Cir. 1989) (tension between Conley's "no set of facts" language and its acknowledgment that a plaintiff must provide the "grounds" on which his claim rests); O'Brien v. Di Grazia, 544 F.2d 543, 546, n.3 (1st Cir. 1976) ("When a plaintiff supplies facts to support his claim, we do not think that Conley imposes a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional . . . action into a substantial one"); McGregor v. Indus. Excess Landfill, Inc., 856 F.2d 39, 42-43 (6th Cir. 1988) (quoting O'Brien's analysis); Hazard, From Whom No Secrets Are Hid, 76 Texas L. Rev. 1665, 1685 (1998) (describing Conley as having "turned Rule 8 on its head"); Marcus, The Revival of Fact Pleading Under the Federal Rules of Civil Procedure, 86 Colum. L. Rev. 433, 463-465 (1986) (noting tension between Conley and subsequent understandings of Rule 8).

Twombly, 550 U.S. at 562 (brackets and ellipses omitted); see also infra, this Opinion, note 10.

[10]  This unfortunate fascination with the Conley passage achieved the very ill the Conley Court hoped to prevent: it put a hollow pleading form over its factual substance. Notably, Conley itself had nothing in common with a factless-pleading scenario: the Conley allegations were extremely well-developed. See Conley, 355 U.S. at 46 ("[T]he complaint alleged, [inter alia, that the plaintiffs] were discharged wrongfully by the Railroad and that the Union, acting according to plan, refused to protect their jobs as it did those of white employees or to help them with their grievances all because they were Negroes. If these [factual] allegations are proven there has been a manifest breach of the Union's statutory duty to represent fairly and without hostile discrimination all of the employees in the bargaining unit"). Moreover, "the Steele, Graham, and Howard cases," i.e., the cases upon which Conley relied, see id. at 45, also dealt with excellently developed factual allegations. See Brotherhood of R. Trainmen v. Howard, 343 U.S. 768, 770 (1952) ("In summary the complaint alleged: Negro employees such as respondent constituted a group called 'train porters' although they actually performed all the duties of white 'brakemen'; the Brotherhood of Railroad Trainmen, bargaining representative of 'brakemen' . . . , had for years used its influence in an attempt to eliminate Negro trainmen and get their jobs for white men who, unlike colored 'train porters,' were or could be members of the Brotherhood; . . . the Brotherhood finally forced [the] discharge [of] the colored 'train porters' and filled their jobs with white men who, under the agreement, would do less work but get more pay"); Graham v. Brotherhood of Locomotive Firemen & Enginemen, 338 U.S. 232, 249 (1949) ("Twenty-one Negro firemen . . . employed by southern railroads[] brought this suit against . . . the Brotherhood

Arthur R. Miller, Simplified Pleading, Meaningful Days in Court, and Trials on the Merits:

Reflections on the Deformation of Federal Procedure, 88 N.Y.U.L. Rev. 286, 365-66 (2013)

("[Under the Conley passage,] the pleader merely had to say that she felt aggrieved and state

what was desired - something . . . analogous to [the statement made by Charles Dickens'

character] Oliver Twist [who merely uttered], 'Please, sir . . . I want some more gruel'")

(footnote and brackets omitted).

Once the possibility of commencing a legal action governed by the Conley passage

standard came about, loose pleadings devoid of facts became all too common, contributing to the

flood of litigation which swelled judicial dockets and caused parties who suffered true injuries

long delays in vindication of their rights.[11]

---

of Locomotive Firemen and Enginemen . . . . The complaint alleges in substance that the
Brotherhood is an exclusively white man's union and, as it includes a majority of the craft, it is
possessed of sole collective bargaining power in behalf of the entire craft including the Negro
firemen in consequence of the Railway Labor Act. It has negotiated agreements and
arrangements with the southern railroads which discriminate against colored firemen, who are
denominated "not-promotable" while white ones are "promotable." The effect of the agreements
is to deprive them, solely because of their race, of rights and job assignments to which their
seniority would entitle them. Many Negro firemen have been thus displaced or demoted and
replaced by white firemen having less seniority. . . . It is needless to recite additional details of
the present case"); Steele v. Louisville & N. R. Co., 323 U.S. 192, 194-97 (1944) (offering
*almost three pages* of facts so well-detailed and exceedingly thorough that this factual predicate
is too extensive to be either reproduced or even summarized in this already lengthy footnote).

[11] See, e.g., Avery Katz, The Effect of Frivolous Suits on the Settlement of Litigation, 10
Int'l Rev. L. & Econ. 3 (1990); D. Rosenberg and S. Shavell, A Model in Which Suits Are
Brought for Their Nuisance Value, 5 Int'l Rev. L. & Econ. 3 (1985); see also Lawrence C.
Marshall et al., The Use and Impact of Rule 11, 86 Nw. U. L. Rev. 943 (1992); accord Robert G.
Bone, Modeling Frivolous Suits, 145 U. Pa. L. Rev. 519, 528-29, 538-41 and accompanying
notes (1997); see also Murakush Caliphate of Amexem Inc. v. New Jersey, 790 F. Supp. 2d 241,
267 (D.N.J. 2011) ("This Court does not know why [plaintiffs] have chosen to file their
labyrinthine, multi-defendant actions in federal courts over the years, or why they have elected to
file the instant matter . . . . These litigants have exacted and will continue to exact a heavy price
on the finite resources of this District Court and other federal courts at district level and, hence,

Since the existence of pleadings excesses was insufficient to prevent abuses based on the

Conley passage, the need for a tool facilitating judicial separation of the chaff of baseless

pleadings from the wheat of bona fide claims became evident when courts began expressing their

ire with the "mumbo jumbo" offered for judicial review. See, e.g., Lesher v. Law Offices of

Mitchell N. Kay, PC, 650 F.3d 993, 1006 (3d Cir. 2011) (Jordan, J., dissenting). Hence, the

Supreme Court clarified, albeit in passing, that – for a plaintiff seeking "more gruel" – "it should

not prove burdensome . . . to provide [the named defendants with] some indication of the [facts]

that the plaintiff ha[d] in mind" in support of his claims against these defendants. Dura Pharms.,

Inc. v. Broudo, 544 U.S. 336, 347 (2005). And, since that brief clarification went, alas, largely

unnoticed, the Supreme Court re-explained, this time in detail:

> We alluded to the practical significance of the Rule 8 entitlement requirement in
> Dura . . . , when we explained that something beyond the mere possibility of loss .
> . . must be alleged, lest a plaintiff with "'a largely groundless claim'" be allowed
> to "take up the time of a number of other people, with the right to do so
> representing an in terrorem increment of the settlement value." . . . As we
> indicated over 20 years ago, "a district court must retain the power to insist upon
> some specificity in pleading before allowing a potentially massive factual
> controversy to proceed." . . . It is no answer to say that a claim just shy of a
> plausible entitlement to relief can, if groundless, be weeded out early in the
> discovery process through "careful case management," given the common lament
> that the success of judicial supervision in checking discovery abuse has been on
> the modest side. And it is self-evident that the problem of discovery abuse cannot

on litigants in other matters as to whom justice will be delayed while those scarce judicial
resources are expended to process [plaintiffs'] bounty") (citing Bethel v. Bosch, 2010 U.S. Dist.
LEXIS 128065, at *13 (S.D. Ala. Dec. 2, 2010) ("The undersigned will not sit idly by as this
District Court is inundated with harassing and vexatious litigation arising from whatever
[plaintiffs'] perceived multimillion-dollar constitutional affront du jour might be"); Miller v.
Donald, 541 F.3d 1091, 1096 (11th Cir. 2008) ("Frivolous and vexatious law suits threaten the
availability of a well-functioning judiciary to all litigants"); Procup v. Strickland, 792 F.2d 1069,
1072 (11th Cir. 1986) (en banc) ("Every lawsuit filed, no matter how frivolous or repetitious,
requires the investment of court time, whether the complaint is reviewed initially by a law clerk,
a staff attorney, a magistrate, or the judge")).

be solved by "careful scrutiny of evidence at the summary judgment stage," much
less "lucid instructions to juries," the threat of discovery expense will push
cost-conscious defendants to settle even anemic cases before reaching those
proceedings.

Twombly, 550 U.S. at 558-60 (citations and internal quotation marks omitted).

Notably, the Twombly Court took pains to point out that the abusive litigation practices

the Court had in mind were rooted solely in the Conley passage, and no other part of Conley was

in need of a clarification, moreover a vacatur. Contrary to what appears to be the unfortunate

popular belief, Conley – that is, the *holding* of Conley (i.e., the application of Rule 8 to Conley's

well-pled facts), as opposed to the abusive uses of the Conley passage – remains good law under

Twombly and its progeny:

> [S]uch a focused and literal reading of Conley's "no set of facts" [is erroneous
> because] a wholly conclusory statement of claim would survive a motion to
> dismiss whenever the pleadings left open the possibility that a plaintiff might later
> establish some "set of [not pled, initially] undisclosed facts" to support recovery.
> . . . [H]ere, the [c]ourt . . . found the prospect of unearthing . . . evidence . . .
> sufficient to preclude dismissal, even though the complaint does not set forth a
> single fact . . . that suggests [a wrong]. It seems fair to say that this approach to
> pleading would dispense with any showing of a "reasonably founded hope" that a
> plaintiff would be able to make a case [because, under this approach the plaintiff
> can succeed by pleading a merely Charles Dickens' type of] optimism . . . .

Twombly, 550 U.S. at 561-62 (citations, brackets and internal quotation marks omitted). While

reduced to terms that could hardly qualify as ambiguous, the Twombly teaching barely took.[12]

_____

[12] Many construed Twombly as limited to antitrust law, and read Erickson v. Pardus, 551
U.S. 89 (2007), as a post-Twombly validation of the Conley passage. While some courts found
such Twombly-Erickson dichotomy unwarranted, see, e.g., Swanson v. Citibank, N.A., 614 F.3d
400, 409- (7th Cir. 2010) (Posner, J., dissenting), others capitalized on Erickson to create a "civil
rights" exception to Rule 8 with regard to pro se and/or incarcerated litigants. See, e.g., Williams
v. City of Milan, 654 F. Supp. 2d 760, 762 (W.D. Tenn. 2009) (contrasting Twombly with
Erickson, which was described as an analysis of "a prisoner's pro se § 1983 civil rights claim," in
order to conclude "that the requirement to plead particular facts [is more] important in 'cases
likely to produce sprawling, costly, and hugely time-consuming litigation'") (quoting Snapp, Inc.

Thus, the Supreme Court revisited the issue once again, in Ashcroft v. Iqbal, this time

spelling out that:

> [u]nder . . . Rule . . . 8(a)(2), a pleading must contain a "short and plain statement
> of the claim showing that the pleader is entitled to relief." As the Court held in
> Twombly, . . . the pleading standard . . . does not require "detailed factual
> allegations," but it demands more than an unadorned,
> the-defendant-unlawfully-harmed-me accusation. A pleading that offers "labels
> and conclusions" or "a formulaic recitation of the elements of a cause of action
> will not do." . . . [A] complaint must contain sufficient factual matter . . . to "state
> a claim to relief that is plausible on its face." A claim has facial plausibility when
> the plaintiff pleads factual content that allows the court to draw the reasonable
> inference that the defendant is liable for the misconduct alleged. The plausibility
> standard is not akin to a "probability requirement," but it asks for more than a
> sheer possibility that a defendant has acted unlawfully. . . . Threadbare recitals
> of the elements of a cause of action, supported by mere conclusory statements, do
> not suffice. Rule 8 [does not set forth a] hypertechnical, code-pleading regime . . .
> , but it does not unlock the doors of discovery for a plaintiff armed with nothing
> more than conclusions. . . . Determining whether a complaint states a plausible
> claim for relief . . . [is] a context-specific task that requires the . . . court to draw
> on its judicial experience and common sense.

556 U.S. 662, 677-79 (2009) (citations and quotation marks omitted); see also id. at 684

(stressing that there could not be an "antitrust" or "pro se civil litigant" exception to the pleading

requirement, since "Rule [8(a)] governs the pleading standard in all civil actions and proceedings

in the United States district courts") (quotation marks omitted).

Unlike the teachings in Dura and Twombly, the Iqbal guidance sunk in.[13]

Perhaps, it sunk in too well and in the way the Iqbal Court never envisioned since,

diametrically changing their course, many a jurist embarked on coining a misreading of Iqbal

---

v. Ford Motor Co., 532 F.3d 496, 502 n.6 (6th Cir. 2008)) (internal quotation marks omitted).

[13] As the Court of Appeals observed, "Iqbal . . . provide[d] the final nail-in-the-coffin for
the 'no set of facts'" abusive uses of the Conley passage, Fowler v. UPMC Shadyside, 578 F.3d
203, 210 (3d Cir. 2009), that were divorced from the *holding* of Conley for almost half a century.

("Iqbal misreading") as divorced from the actual holding of Iqbal (i.e., from the application of Rule 8 to Iqbal's *insufficiently*-pled facts) as the abusive uses of the Conley passage were divorced from the actual holding of Conley. Gradually, the Iqbal misreading became construed as a heightened pleading standard de facto facilitating denial of access to the courts. See, e.g., J. Scott Pritchard, The Hidden Costs of Pleading Plausibilty, 83 Temp. L. Rev. 757, 781 and n.208 (2011) ("Twombly and Iqbal have enabled lower courts to use their [']discretion[' in] . . . dealing with . . . dockets at the expense of judicial access. . . . The [']discretion['] bestowed on lower courts has had the practical effect of officially authorizing the de facto heightened pleading standard").[14]

Nowhere has the Iqbal misreading been more evident and distortive of the letter and spirit of Rule 8 than in the matters containing claims against defendants holding supervisory positions. While, half a century ago, the Conley passage came to be construed as allowing a pleader to avoid asserting any facts, the Iqbal misreading came to be used as a shield that allowed virtually every wrongdoer holding a supervisory position to escape litigation upon claiming "insufficiency of pleading," i.e., upon uttering the hollow phrase which came to mean that a plaintiff, separated from the supervisor-wrongdoer by a few ranks of subordinates, simply had no meaningful way to learn about and plead, without discovery, the *particularities* of the wrongdoer's *exact* conduct.

---

[14] See also Miller, Simplified Pleading, 88 N.Y.U.L. Rev. at 304, 331-32 and n.172 (defining Twombly and Iqbal as "two cases [that brought about] a procedural 'sea change' in [bona fide] plaintiffs' ability to survive the pleading stage," asserting that these cases "have impaired both access to the federal courts for many citizens and the enforcement of various national policies" and misreading Fowler as a decision "explaining that Twombly and Iqbal *abrogated* notice pleading") (emphasis supplied).

Such Iqbal misreading is troubling. The contraction of the Conley holding into the

Conley passage might or might not have done a long term damage. However, the transformation

of the careful, thoughtful and well-grounded holding of Iqbal into the Iqbal misreading threatens

such damage.[15]

Iqbal did not change any aspect of substantive law. Nor did Iqbal create a liability

exception for the defendants fortunate to hold supervisory positions. And, a fortiori, Iqbal did

not change a single word of Rule 8(a) (or Rule 12(b)), or the meanings of these Rules: the actual

*holding* of Iqbal merely elaborated on the Supreme Court's original passim observation in Dura

that "it should not prove burdensome [for a plaintiff] to provide [his defendants with] *some*

*indication* of the [facts] that the plaintiff has in mind," 544 U.S. at 347 (emphasis supplied),

since the Federal Rules have *always* been asking a pleader for a "short and plain statement of the

claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); see Animal Sci.

Prods. v. China Nat'l Metals & Minerals Imp. & Exp. Corp., 702 F. Supp. 2d 320, 380-81

(D.N.J. 2010) (addressing the effect of Twombly on a pleading filed during the Conley reign and

citing Schiller v. Phys. Res. Group, Inc., 342 F.3d 563 (5th Cir. 2003), for the observation that

---

[15] The Iqbal misreading has prompted a surge of criticism of the *holding* of Iqbal from
counsel, judges and academia alike. See Miller, Simplified Pleading, 88 N.Y.U.L. Rev. at 332
and nn.174, 198 (claiming that the "effect [of Twombly/Iqbal] has been so dramatic that cartoons
have appeared showing lawyers complaining to their disappointed clients about having been
'Twomblyed in the Iqbals,'" noting the author's own "less than complimentary views of
Twombly and Iqbal spelled out at length" in another law article and listing legislative initiatives
aiming to circumvent Iqbal); see also Aldrich v. Ruano, 2013 U.S. Dist. LEXIS 94333, at *20-
21, n. 5 (D. Mass. June 24, 2013) ("respected scholars have been virtually unanimous in
condemning the reasoning of Twombly and Iqbal and the violence these decisions do the rules
enabling act process"); Hon. John P. Sullivan, Twombly and Iqbal: The Latest Retreat from
Notice Pleading, 43 Suffolk U. L. Rev. 1 (2009); Mark Hermann et al., Debate, Plausible Denial:
Should Congress Overrule *Twombly* and *Iqbal?*, 158 U. Pa. L. Rev. 141 (2009)). Because of the
Iqbal misreading, the actual *holding* of Iqbal is becoming lost.

"an entry of a binding precedent, [like Twombly or Iqbal] which . . . clarifies – rather than alters

the existing legal regime [like the one ensuing from the Conley *holding*'s elaboration of Rule

8(a)] – cannot qualify as an intervening change in the law [set forth by Rule 8]"), remanded on

other grounds, 654 F.3d 462 (3d Cir. 2011).

Thirty six years ago,

> in Monell [v. Dep't of Soc. Servs., 436 U.S. 658 (1978)], the [Supreme] Court . . .
> concluded that Congress had rejected [the concept of] impos[ing] liability upon
> [supervisory entities] based *purely upon the acts of others*. . . . Section 1983's
> causation language imposes liability on a "person who . . . shall subject, or cause
> to be subjected, any person" to a deprivation of federal rights. Id. That language,
> [however] could not "be easily read to impose liability vicariously *solely on the
> basis of the existence of an employer-employee relationship with a tortfeasor*."
> 436 U.S. at 692.

L.A. County v. Humphries, 131 S. Ct. 447, 451-52 (2010) (emphasis in original, ellipses and

parenthetical explanations omitted).

Thirty six years after Monell, the pleading standard as to supervising officials remains the

same. It is with *that* standard in mind, the Supreme Court addressed those Iqbal claims that were

merely disguised respondeat superior challenges.

In Iqbal, plaintiffs-detainees filed an action under Bivens v. Six Unknown Fed. Narcotics

Agents, 403 U.S. 388 (1971), naming, inter alia, the Attorney General and the Director of the

Federal Bureau of Investigation ("FBI") as defendants. See Iqbal, 556 U.S. at 666.

> [The plaintiffs' pleading] concentrate[d] on [their] treatment while confined . . . .
> The complaint set[] forth various claims against defendants who [were the jailors
> dealing directly with the plaintiffs]. For instance, the complaint allege[d] that
> [these] jailors "kicked [the plaintiffs] in the stomach, punched [them] in the face,
> and dragged [them] across" [the] cell without justification, subjected [them] to
> serial strip and body-cavity searches when [they] posed no safety risk to himself
> or others, and refused to let [them] and other Muslims pray because there would
> be "[n]o prayers for terrorists." [Since these factual allegations were not

challenged, the] allegations against [the Attorney General and Director] are the only ones relevant here. The complaint contend[ed] that [these defendants] designated [the plaintiffs] person[s] of high interest on account of [the plaintiffs'] race, religion, or national origin, [and] "the FBI, under the direction of [the Director], arrested and detained thousands of Arab Muslim men as part of its investigation of the events of September 11." [The complaint] further allege[d] that "the policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by [the Attorney General and Director] in discussions in the weeks after September 11, 2001." Lastly, the complaint posit[ed] that [the Attorney General and Director] "each knew of, condoned, and willfully and maliciously agreed to subject" [the plaintiffs] to harsh conditions of confinement "as a matter of policy, solely on account of [the plaintiffs'] religion, race, and/or national origin and for no legitimate penological interest." The pleading name[d the Attorney General] as the "principal architect" of the policy, and [the Director] as "instrumental in its adoption, promulgation, and implementation."

Id. at 668-69 (original brackets and citations to the docket entries omitted).

The Supreme Court started with a reminder "that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior" and, thus, the plaintiffs had to "plead [facts showing] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. at 676 (citing Monell, 436 U.S. at 691; Robertson v. Sichel, 127 U.S. 507, 515-516 (1888); and Dunlop v. Munroe, 11 U.S. 242 (1812)).

With that, the Supreme Court "turn[ed] to [the specific allegations in the plaintiffs'] complaint," which: (1) offered, as the *sole actual fact* upon which the plaintiffs based the aforesaid conclusions, the statement that "the FBI, [being an entity] under the [supervision of the Director], arrested and detained thousands of Arab Muslim men as part of its investigation of the events of September 11"; and (2) was limited to the plaintiffs' circular, sophistic claim that, if the Attorney General had to be the "'principal architect' of this invidious policy," and the Director

Page 25 of 55

had to be "'instrumental' in adopting and executing it," then it must have meant that the

Attorney General and Director knew of, condoned and agreed to creating and implementing a

policy under which the jailors discriminated, beat and subjected the plaintiffs to harsh conditions.

Id. at 677, 680-81.

The Supreme Court noted that the plaintiffs' conclusions, while reduced to terms loosely

mimicking factual allegations, were – in essence – conclusory speculations, since the wrongs the

plaintiffs suffered could have, just as well, ensued from the jailors' own elections to abusively

implement the Attorney General/Director's wholly benign, non-discriminatory policy.[16]

Thus, the Court dismissed the plaintiffs' *conclusory* allegations noting that, since these

allegations did "not plausibly establish this [invidious policy] purpose," the plaintiffs failed to

"nudge[ their] claims [enough to] cross the line from conceivable to plausible." Id. at 680-81.

> The September 11 attacks were perpetrated by 19 Arab Muslim hijackers who
> counted themselves members in good standing of al Qaeda . . . . It should come
> as no surprise that a legitimate policy directing law enforcement to arrest and
> detain individuals because of their suspected link to the attacks would produce a
> disparate, incidental impact on Arab Muslims, even though the purpose of the
> policy was to target [potential terrorists rather than] Arabs []or Muslims [in
> general. Thus, the arrests overseen by the Director] were likely lawful and
> justified by his nondiscriminatory intent to detain aliens who . . . had potential
> connections to . . . terrorist[s] . . . . [T]hat "obvious alternative explanation" for
> the arrests [cannot be converted into a fact plausibly indicating] the purposeful,
> invidious discrimination [the plaintiffs] asks [the Court] to infer . . . .

Iqbal, 556 U.S. at 682.

---

[16] See Iqbal, 556 U.S. at 682-84 ("[Since the plaintiffs] allege[] that various other
defendants, who [were their jailors], may have labeled [them] person[s] of 'high interest' for
impermissible reasons' . . . [and since] the complaint alleges discrete wrongs – for instance,
beatings – by [the plaintiffs' jailors,] . . . we express no opinion concerning the sufficiency of the
[plaintiffs'] complaint against the defendants who [were their jailors, and we are noting only that
the plaintiffs'] account of [their] prison ordeal alleges serious official misconduct").

Paramount here, nothing in the actual *holding* Iqbal suggested that supervisory officials had to be shielded from suit if a plaintiff was able to assert *facts*, rather than mere speculation, indicative of the supervisors' *inevitable* involvement in the alleged wrong.[17]   In harmony with the limits posed by the actual *holding* Iqbal, the Court of Appeals stressed that a court need not reach the issue of "supervisory liability" if the court "determine[s] that Plaintiffs . . . allege a plausible claim to relief on the basis of the supervisors' 'knowledge and acquiescence . . . or any other similar theory of liability.'"   Argueta v. U.S. Immigration & Customs Enforcement, 643 F.3d 60, 70 (3d Cir. 2011).[18]

---

[17]   This crucial point has seemingly been lost by many who believe that a wrongdoer-supervisor is now predestined to go scot-free unless the supervisor is literally caught red-handed. See, e.g., Rosalie Berger Levinson, Who Will Supervise the Supervisors? Establishing Liability for Failure to Train, Supervise, or Discipline Subordinates in a Post-*Iqbal/Connick* World, 47 Harv. C.R.-C.L. L. Rev. 273, 287 (2012) ("Iqbal [came] to reverse decades of precedent imposing supervisory liability"); Desiree L. Grace, Supervisory Liability Post-*Iqbal*: A "Misnomer" Indeed, 42 Seton Hall L. Rev. 317, 327-28 and n. 82 (2012) ("Some commentators [concluded] that supervisory liability is dead") (citing Howard Wasserman, *Iqbal* III: The Death of Supervisory Liability, PrawfsBlawg (May 19, 2009)); see also Avidan Y. Cover, Supervisory Responsibility for the Office of Legal Counsel, 25 Geo. J. Legal Ethics 269, 286 (2012) ("Lest there be any mistake, . . . the [Iqbal decision] is eliminating . . . supervisory liability entirely") (citation omitted); Kit Kinports, Iqbal and Supervisory Immunity, 114 Penn. St. L. Rev. 1291 (2010) ("Iqbal does indeed go a long way towards withdrawing any constitutional tort remedy against high-ranking government officials"); Comment, Supervisory Liability After *Iqbal*, 77 U. Chi. L. Rev. 1401, 1402-03 (2010) (going as far as to assert that "[some appellate courts] followed Iqbal . . . by abandoning supervisory liability entirely").

[18]   See also Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2012), where the Court of Appeals, being presented with allegations against supervising officials, stressed that

[those allegations gave the Court of Appeals] no occasion to wade into the muddied waters of post-Iqbal "supervisory liability" [simply because n]either the parties nor the District Court mention "supervisory liability" as a possible basis for recovery here. [Plaintiff here] alleges that the named defendants *directly and personally participated in the alleged unconstitutional conduct* [through their decision-making].

The claims in Argueta were building on the "arrests [that had been] made pursuant to the nationwide immigration enforcement strategy announced by . . . the Department of Homeland Security (DHS)." Id. at 63. In some locales, the goal of performing those arrests was utilized to launch a "practice of unlawful and abusive raids of immigrant homes," and "the state of New Jersey [was one of such unfortunate locales, where these unlawful raids were] conducted by Immigration and Customs Enforcement ([']ICE[']) agents [who conducted those raids under the guise of the above-noted] nation-wide program." Id. at 62.

The Argueta plaintiffs, being "the alleged victims of [such unlawful] raids," named, as defendants, a few low-ranking ICE agents and local police officers (who, presumably, conducted the very raids at issue), as well as the ICE itself, two high-ranking officers of the DHS/ICE situated in Washington DC ("DC") and, in addition, the current and former Directors of the New Jersey ICE office. Id. at 62-63. As the plaintiffs in Iqbal, the Argueta plaintiffs: (a) alleged the

---

Id. at 371 (emphasis supplied). In Bistrian, a detainee contended that prison officials housed him in a segregated unit ("SU") and then, being well-aware of the events that placed the detainee at risk of being attacked by other SU inmates, failed to protect him or transfer him to general prison population, thus displaying deliberate indifference to the detainee's risk of injuries that came true. See id. at 358-63. The detainee named, as defendants, the warden and two assistant wardens, two special investigative agents and five correctional officers. See id. at 360, n.3. The officers and investigative agents were involved, albeit to a limited degree, in the events exposing the detainee to the risk at issue, see id. at 360-61, while the warden responded to the detainee's request for transfer to general prison population with a promise that the detainee "would not see the light of day again." Id. at 363. However, since the detainee alleged that all defendants "met on a weekly basis to review the list of inmates in the S[]U and . . . determine [who] would be released from the S[]U and which inmates would remain [in the SU]," id. at 370 (brackets, ellipses and quotation marks omitted), the Court of Appeals read those allegations as sufficiently showing *personal involvement of each defendant*, including the assistant wardens who, it seems, partook *only* in the meetings. Accord Iqbal, 556 U.S. at 683 ("The allegations [that the plaintiffs were beaten because of their race, religion, or national origin], if true, and if [these allegations are supported by facts indicating that beatings were] *condoned* by [the Attorney General/Director], could be the basis for some inference of wrongful intent on the Attorney General and Director's] part" supporting a plausible claim within the meaning of Rules 8 and 12(b)) (emphasis supplied).

factual events that implicated *only* the low-ranking officers; and then (b) attempted to stitch, via

the statistics of raids and arrests, those facts to the plaintiffs' wholly factless, conclusory

conjecture disguised as legal claims against the DC officials/local Directors.[19]

Much like the Supreme Court in Iqbal, the Court of Appeals in Argueta refused to qualify

the plaintiffs' self-serving conjecture as facts envisioned by Rules 8(a) and 12(b), i.e., as actual

facts that plausibly showed the DC officials/local Directors' knowledge and acquiescence:

> [The] allegations specifically directed against [the high-ranking officers] (unlike
> the allegations directed at the agents who actually carried out the raids) described
> *conduct consistent with otherwise lawful behavior.* In other words, a federal
> official specifically charged with enforcing federal immigration law appears to be
> acting lawfully when he or she increases arrest goals, praises a particular
> enforcement operation as a success, or characterizes a home entry and search as an
> attempt to locate someone . . . a fugitive alien[. The high-ranking officers] clearly
> stated . . . that agents were required to obtain consent before entering private
> residences and that all allegations of misconduct were taken seriously and fully
> investigated . . . . Plaintiffs . . . did not . . . identify . . . what exactly [the high-
> ranking officers] should have done differently . . . that would have prevented the
> unconstitutional conduct [of low-ranking officers. Two of the high-ranking
> officers] were charged with supervising the enforcement of federal immigration
> law throughout the country (as well as two other officials responsible for
> supervising such enforcement throughout an entire state). . . . We [have]
> expressly rejected [the] hypothesis that the Governor [or a high-ranking official
> must have] *had personal knowledge* of [every alleged wrong, even if that wrong
> could have been known to that official as a result of been publicized].

___

[19] The "the program [at issue was] directed at apprehending fugitive aliens and especially
aliens with criminal records," and its goal "was . . . to arrest and remove . . . 'fugitives,' [i.e., the]
individuals with outstanding deportation orders." Argueta, 643 F.3d at 63. The plaintiffs alleged
that, since the expected quota of these arrests increased exponentially within just a few years, and
the arrest raids yielding two-thirds of arrestees who did not qualify as such "fugitive aliens," the
policy must have been a pretext for sweeping up large numbers of immigrants. See id. at 63-64
("abusive raids flourished as a predictable consequence of the . . . exponentially-increased
quotas. Under pressure from these quotas [low-ranking] agents . . . disregarded the obligation to
secure a judicial warrant or probable cause in carrying out unlawful entries and dragnet searches
of homes in which the agents only loosely suspect immigrant families may reside") (quotation
marks and citations omitted). The plaintiffs, thus, deduced that "the [high-ranking] officials
[must have] foster[ed] an institutional culture of lawlessness" by coining the program. Id. at 65.

Id. at 75-76 (citations and quotation marks omitted, emphasis supplied).

Thus, on the one hand, Twombly, Iqbal and Argueta indicated that a plaintiff's *conjecture* as to the causal link between the alleged wrong and a particular defendant is facially insufficient to support a constitutional claim. Accord L.A. County, 131 S. Ct. at 451 ("Congress may have thought that it lacked the power to impose that kind of indirect liability" in constitutional tort matters). On the other hand, these decisions also indicated, albeit in dicta, that non-speculative factual allegations evincing a sufficiently exact causal link between a supervising officer and the alleged wrong would state a plausible challenge for the purposes of Rules 8(a) and 12(b).[20]

A recent Court of Appeals' decision in Thomas v. Cumberland Cty, 749 F.3d 217 (3d Cir. 2014), supports this conclusion. There, a prisoner filed a § 1983 suit based on his being attacked by other inmates. See id. at 219. "The attack occurred after a several-minute long verbal argument between [the prisoner] and a group of [other] inmates in the presence of corrections officers" who "could tell that a fight was imminent" but did not interfere until the prisoner suffered an injury that "left [him] with no sight in one eye." Id. at 219-20. The prisoner asserted that the municipality and policymakers at the prison were liable for his injury in light of their "failure to . . . train corrections officers in conflict de-escalation and intervention techniques." Id. at 219.

_____

[20] See Argueta, 643 F.3d at 72 ("We [have] indicated that a supervisor may be liable under § 1983 if he . . . *implements a policy or practice that creates an unreasonable risk of a constitutional violation* on the part of the subordinate and the supervisor's failure to change the policy or employ corrective practices *is a cause* of this unconstitutional conduct") (citing Brown v. Muhlenberg Township, 269 F.3d 205, 216 (3d Cir. 2001), emphasis supplied); cf. Palsgraf v. Long Island R.R. Co., 248 N. Y. 339, 351-352 (1928) (Andrews, J., dissenting) ("What is . . . a proximate cause depend[s] in each case upon many considerations").

Page 30 of 55

Noting that the parties did "not challenge the . . . constitutional violation" of the

prisoner's rights, see id. at 223, the Court focused on the sufficiency of the causal link between

"the officers' failure to take reasonable measures to protect [the prisoner],'" id. (citation and

quotation marks omitted), and the municipality and supervising officials' administrative

decisions that led to "failure to provide pre-service training on conflict de-escalation and

intervention": in order to determine whether "this deficiency in training caused [the prisoner's]

injury." Id. While mentioning that "[a] municipality [or supervising officials could] not be held

liable for the unconstitutional acts of [their] employees on a theory of respondeat superior," the

Thomas Court reminded that "liability is imposed when the policy . . . itself [is such that it]

violates the Constitution or when the policy . . . , while not unconstitutional itself, is the 'moving

force' behind the constitutional tort." Id. (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017,

1027 (3d Cir. 1991) (internal quotation omitted).

With that, the Court of Appeals explained:

Where the policy "concerns [are at the heart of the inquiry], liability under
[S]ection 1983 requires a showing that the [supervisor's action] amounts to
deliberate indifference to the rights of persons [injured as a result of the policy
failure]." Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999) (quoting City
of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989)). . . . "[T]he identified
deficiency . . . must be closely related to the ultimate injury" . . . . Canton, 489
U.S. at 391. . . . "'Deliberate indifference' is a stringent standard of fault,
requiring proof that [the supervising] actor disregarded a known or obvious
consequence of his action." Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v.
Brown, 520 U.S. 397, 410 (1997) . . . [T]he Supreme Court posited in Canton
that in certain situations, [a policy deficiency] "can . . . be 'so obvious,' that [it]
could properly be characterized as 'deliberate indifference' to constitutional
rights" even without a [prior] pattern of constitutional violations. 489 U.S. at 390
n.10. . . . [For instance,] in Berg v. County of Allegheny, the plaintiff was
wrongly arrested pursuant to a warrant that was erroneously issued when a clerk
transposed two numbers. 219 F.3d 261, 266 (3d Cir. 2000). The plaintiff sought
to hold the county liable for its poor training procedures on the warrant-creation

process. Id. at 275. [The Court of Appeals] held that [the policy] employed a design where the slip of a finger could result in wrongful arrest and imprisonment, [and thus presented] an issue of . . . deliberate[] indifferen[ce] to an obvious risk." Id. at 277. The failure to provide protective measures . . . to prevent the mistake was "comparable to 'a failure to equip law enforcement officers with specific tools to handle recurring situations.'" Id. (quoting Bryan Cnty., 520 U.S. at 409). . . . [Here, the inmate is] arguing that a jury could find that the [supervising officers were] deliberately indifferent "when 'patently obvious' standards, widely-accepted national standards and [policy needs] relevant to inmate [constitutional rights] were disregarded . . . ." [Here, such deliberate indifference might have been present because] the risk of [the inmate's] injury [was] a "highly predictable consequence" of the [supervising officers' policy failure. Thus, the inmate's] case [while] not precisely analogous to . . . Berg . . . , [has] enough similarities such that the District Court should not have precluded the factual issues underlying the deliberate indifference determination from going to a jury.

Thomas, 749 F.3d at 222-26 (original brackets omitted).

Hence, Thomas indicates that a supervising official is liable for the wrong resulting from

his/her decisions if those decisions employed a design that plausibly suggested the supervising

official's deliberate indifference to a risk of the very wrong that occurred, i.e., those decisions

were, de facto, the moving force that triggered the inevitable chain of events which, in turn,

produced the constitutional tort at issue.[21]

Nothing bars a plaintiff from establishing such design by asserting the facts qualifying as

circumstantial evidence.[22] Moreover, the language of Iqbal suggests that factual allegations may

_____

[21] Indeed, had the plaintiffs in Iqbal asserted facts showing that, under the supervisors' policy, their jailors had no choice but to beat the plaintiffs, or had the Argueta plaintiffs asserted facts showing that, under the supervisors' policy, the ICE agents had no choice but to raid the homes of those who were lawfully in the country, the complaints in Iqbal and Argueta would have plausibly shown the supervisors' actions incompatible with otherwise lawful behavior.

[22] A plaintiff can rarely obtain facts showing supervising officials' involvement by non-circumstantial evidence, especially if the plaintiff has to perform the formidable task of pleading while in confinement, with limited resources and without pre-pleading discovery. While this Court realizes that some juridical entities, supervisors and their staff may accidently disseminate private, classified or otherwise publically-unavailable information, thus opening it to the use by

be framed *in their entirety* in terms of "circumstantial evidence," i.e., no plaintiff must catch the supervising defendant red-handed in order to state a viable claim. See Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the *reasonable inference* that the defendant is liable for the misconduct alleged") (emphasis supplied, citation omitted); accord W. Page Keeton, Prosser and Keeton on the Law of Torts, §39, 242-43 (5th ed. 1984) ("As long as the conclusion is a matter of mere speculation or conjecture, . . . it becomes the duty of the court to [dismiss the claim.] This does not mean, however, that there must be in every case eye-witnesses of the defendant's conduct. . . . Any . . . fact[] may be proved by circumstantial evidence. This is evidence of . . . a set of facts[] from which the existence of the fact to be determined may reasonably be inferred. . . . Like any other evidence, . . . it may be so unconvincing as to be quite worthless, or it may be . . . overwhelming. The gist of it . . . is the inference . . . . This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion"); cf. McTernan v. City of York, 577 F.3d 521, 530 (3d Cir. 2009) ("'Determining whether a complaint states a plausible claim [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense'") (quoting Iqbal, 556 U.S. 663-64).

---

potential plaintiffs, see, e.g., ATL Practice Pointer: When Emailing Super-Sensitive Settlement Information, Double Check the Recipient List, Above the Law (Feb. 5, 2008) (a lawyer accidently sent the information intended for another counsel to a New York Times reporter); see also Douglas Martin, Jack Anderson, Investigative Journalist Who Angered the Powerful, Dies at 83, The New York Times (Sunday ed.) at 58 (Dec. 18, 2005) ("Mr. Anderson's . . . techniques included eavesdropping, spiriting off classified documents, rifling through garbage (of Mr. Hoover) and sometimes blatant threats"), it appears safe to presume that the draftors of Rules 8 and 12(b) did not expect the litigants to scavenge through dumpsters, engage in illegal acts or simply sit in front of their computers in a hope for an email sent in error.

## IV.   FOURTEENTH AMENDMENT CLAIM AGAINST A SUPERVISING OFFICIAL

The Fourteenth Amendment guarantees that "[n]o State [would] deprive any person of life, liberty, or property without due process of law." U.S. Const., Amend. XIV, § 1. This due process guarantee has a procedural and a substantive component; the former bars punishment without the due process of law while the latter protects fundamental rights so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed." Palko v. Conn., 302 U.S. 319, 325 (1937); see also United States v. Salerno, 481 U.S. 739, 746 (1987) (substantive due process protects the inmates' fundamental rights and, *in addition,* guards the inmates against other government conduct so egregious that it "shocks the conscience").

It is under this umbrella principle the Supreme Court articulated the right of confined mentally retarded persons to receive mental treatment, see Youngberg v. Romeo, 457 U.S. 307, 316, 319 and 322 (1982), and it is under this principle the New Jersey legislature enacted the NJSVPA and the Court of Appeals adjudicated the claims in Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002).

There, the Court of Appeals held that, since the New Jersey's statutory scheme at issue was predicated on the inmate's response to treatment, the statutory regime created a fundamental due process liberty interest, meaning that denial of adequate mental treatment was conscience-shocking.[23]   See Leamer, 288 F.3d at 545-47 ("We have . . . clarif[ied] the liberty interest that is

---

[23]   Having his conviction predate the NJSVPA, the plaintiff in Leamer was not an SVP like Plaintiffs here: he was a still-imprisoned sex offender whose prison confinement and treatment were inextricably linked. His sentencing court had classified him as having a "mental aberration" and in need of "specialized treatment," which automatically subjected him to the maximum incarceration permitted by law unless he was cured prior to that point. Since he could only shorten his incarceration through a successful therapy, which was an "inherent and integral element" of the statutory scheme, the holding of Leamer was invariably construed as applicable

at stake here. . . . As we have indicated, the due process right to treatment here was not a matter of [the inmate's] health or well-being. Rather, the indifference analysis [here] must focus on the challenged abuse of power by officials in denying [the inmate] the treatment regimen that . . .was necessary in order for his condition to improve, and thus for him to advance toward release").[24]

The issue of what treatment is required is both fact-specific and claim-specific, since an alleged deficiency might implicate concerns purely of medical malpractice, i.e., negligence not actionable under § 1983. See DeJesus v. Corr. Med. Servs., 2014 U.S. App. LEXIS 14557, at *10-11 (3d Cir. July 30, 2014) ("When distilled to their core, [the plaintiff's claim] sound[s] in negligence or malpractice . . . . Claims of negligence or medical malpractice do not constitute deliberate indifference"). That said, when a *prescribed* medical treatment is denied, reduced or changed for *non-medical* reasons, including financial, administrative or logistical, the so-denied/

_____

to the SVPs. See, e.g., Graham v. Christie, 2010 U.S. Dist. LEXIS 111006, at *47-48 (D.N.J. Oct. 18, 2010); Harris v. Christie, 2010 U.S. Dist. LEXIS 68086, at *44-45 (D.N.J. July 7, 2010).

[24] As Leamer shows, the fact that an inmate is: (a) a highly problematic mental patient, whose treatment is a medical challenge; and/or (b) placed in a special housing unit, which rendered his mental treatment a logistical challenge, cannot strip the inmate of his fundamental rights. In Leamer, the inmate was initially confined within the general population "at Avenel [and] received regular and intensive therapy, including both group and individual therapy. . . . [Later, he] was placed . . . on [SHU] status . . . because of his 'exhibition . . . of unstable mental . . behavior which suggest[ed] probable harm to inmate [or] to others . . . .' [Specifically, he] 'attempt[ed] to hire a hit-man' [and wrote an expletive] letter . . . to . . . one of [his] therapists. . . . [Eventually, he] was shifted to [a low-level mental treatment] because of 'poor institutional adjustment.' . . . [Because of these changes,] he was not able to attend group therapy. . . . After protests, he was told that he could attend group therapy [but] only with a two-officer escort. . . . He identifie[d] only two occasions on which escorts enabled him to attend a . . . therapeutic group that had sixteen scheduled sessions, and identifie[d] another group to which he was assigned but never escorted. . . . Pervading [his] complaint [was] a profound sense of frustration at being assigned to and maintained on [the SHU] status and eventually on [a low-level mental treatment] status for failing to progress in therapy – yet being unable to attend [and thus progress in] therapy as a consequence of th[ose] status[es]." 288 F.3d at 534.

reduced/changed treatment suggests an act of deliberate indifference and amounts to a violation of both procedural and substantive due process with regard to those mental patients whose sole hope for release hinges on obtaining their prescribed mental therapy. See Leamer, 288 F.3d at 545-47; accord Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993) (relying on Monmouth Cty Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3rd Cir. 1987), for the observation that a claim of "deliberate indifference" does not require a showing of complete failure/refusal to provide medical care, since such claim "could exist in a variety of different circumstances"); White v. Napoleon, 897 F.2d 103, 113 (3d Cir. 1990) ("[the complaint asserts that the doctor] interfered with modalities of treatment prescribed by other physicians, including specialists, even though these modalities of treatment had proven satisfactory.' The . . . complaint, fairly read, suggests that the doctor deliberately treated [the inmate] with an inappropriate drug for no valid [medical] reason. This is sufficient to state a claim for deliberate indifference to serious medical needs [even though the] complaint does not allege that the [inmate's condition] grew worse as a result [since] it does allege . . . that [the inmate] suffered anxiety. [W]e are not prepared to hold that inflicting mental anxiety alone cannot [ever amount to a constitutional violation]").[25]

_____

[25] Lanzaro, Durmer and Napoleon addressed the Eighth Amendment rights of convicted prisoners who are afforded *less* protection than the rights of civilly committed individuals guarded by the higher standard of the Fourteenth Amendment. See Hubbard v. Taylor, 399 F.3d 150, 165-66 (3d Cir. 2005); Natale v. Camden Cty Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003) (relying on City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239 (1983)). Thus, the defendant who acts with deliberate indifference for the purposes of any conditions-of-confinement claim raised under the Eighth or Fourteenth Amendment need not be – and, fortunately, rarely is – a villain deriving sadistic pleasures from the suffering of inmates or civilly committed individuals. See Barkes v. First Corr. Med., Inc., ___ F.3d ___, 2014 U.S. App. LEXIS 17261, at *32 (3d Cir. Sept. 5, 2014); cf. Brown v. Plata, 131 S. Ct. 1910 (2011).

Reading this test in the context of supervisory officials' liability, the Supreme Court

upheld a finding that inmates were entitled to relief from supervisors where: (a) the inmates were

denied the needed/prescribed mental/medical treatment by subordinate prison officers; but (b) the

subordinates had to operate under the circumstances resulting from the decisions made by their

supervisors who had and, thus, could dispense to their subordinates only the financial, physical

and human resources insufficient for the subordinates to properly perform the prodigious task of

providing proper care to the inmates; and, therefore, (c) these subordinates lacked a meaningful

ability to properly perform their duties toward the inmates. See Plata, 131 S. Ct. at 1928-29.[26]

---

[26] Plata involved the issue of whether the remedy of reduction in inmate population was consistent with§ 3626, if utilized to cure Eighth Amendment violations caused by deplorable conditions of confinement triggered by overcrowding (which ensued from the lack of physical, financial and human resources, such as prison space, bedding, doctors, etc.). The Supreme Court held that § 3626 authorized such relief, since a population reduction appeared to be the only remedy capable of curtailing the violations in light of the limited physical, financial and human resources. Thus, the facts underlying Plata were, in some respects, much like to those at bar. There,

> prisons [were] designed to house a population just under 80,000, but [during the decades] the population . . . almost double[d] . . . . [An administrative body] . . . composed of correctional consultants and representatives from state agencies, concluded that [the existing] prisons [were] severely [deficient]. In 2006, the[] Governor . . . declared a state of emergency in the prisons . . . . [The State's supervising] prison officials . . . testified [to that dire emergency]. . . . [The] Chief Deputy secretary of Correctional Healthcare Services, stated that [the deficiency had] negative effects on everybody in the prison system. . . . Prisoners . . . with serious mental illness [did] not receive minimal . . . care. . . . [I]nmates awaiting care [were] held for months in administrative segregation, where they endure[d] harsh . . . conditions and receive only limited mental health services. . . . . . . A [rank-and-file] correctional officer testified that . . . [t]he number of staff [was] inadequate. . . . [The] existing [physical] space and staffing levels were inadequate to keep pace [with increase in prison population]. . . . Prisons had retained more mental health staff, but the growth of the resource had not matched the rise in demand. . . . Prisons were unable to retain sufficient numbers of competent medical staff and would hire any doctor who had a license, a pulse and a pair of shoes. . . . Every day . . . prison wardens and health care managers [had

Page 37 of 55

The Plata Court stressed that

the Constitution demands recognition of [inmates'] rights. . . . To incarcerate, society takes from [inmates] the means to provide for their own needs. [They] are dependent on the State for . . . medical care. . . . Just as [an inmate] may starve if not fed, he . . . may suffer or [be destined to] die [in prison] if not provided adequate [mental] care. . . . If [the supervising officials] fails to fulfill [their] obligation [to ensure that their subordinates could provide the inmates with proper care], the courts have a responsibility to remedy the resulting . . . violation. [While the c]ourts must be sensitive to the [difficulties faced by the supervising officials delegated to ensure inmates'] rehabilitation, as well as [to] the need[s of] prison administrators [who are] faced with the difficult and dangerous task of housing large numbers of [civilly committed who were previously] convicted criminals, [the c]ourts nevertheless must not shrink from their obligation to enforce the constitutional rights of all persons, including [inmates].

Id. (citations and quotation marks omitted).[27]

Reading Leamer, Napoleon and Durmer jointly with the rationale of Plata, this Court

concludes that, if: (a) supervising officials make systemwide determinations; (b) these

determinations become the moving force behind the circumstances under which the subordinate

---

to] make the difficult decision as to which of [their constitutional obligations] they [would] fail to comply with because of staff shortages and patient loads. . . . [While the State aimed to build additional facilities, i]t appear[ed] all but certain that [it would not be able to] complete sufficient construction [to allow the supervising officials] to comply fully with [their constitutional obligations].

Plata, 131 S. Ct. at 1923-28 (noting that "Plaintiffs rel[ied] on systemwide deficiencies in the provision of . . . mental health care that, taken as a whole, subject[ed] . . . mentally ill prisoners . . . to substantial risk of serious harm and cause[d] the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of a maturing society") (citations, quotation marks, brackets and footnotes 2 and 4 omitted, footnotes 1 and 3 incorporated in part).

[27] True, the federal courts presiding over the Plata series of litigations factored in far more lenient injunctive relief deadlines than those allowed to the DOC in County of Hudson, 2009 N.J. Super. Unpub. LEXIS 1188: in Plata, the courts granted the State two years to comply with judicial orders, and then provided numerous extensions facilitating incremental compliance, with the most recent extension of two-months granted as recently as on July 3, 2014. See Plata v. Brown, Civil Action No. 01-1351 (E.D. Cal., N.D. Cal.), Docket Entry No. 2799. On the other hand, the mammoth task faced by the Plata defendants was to remedy a *state-wide prison crisis*.

Page 38 of 55

officers effectively have no choice but to deny/reduce/change an inmate's prescribed medical/
mental treatment for non-medical reasons; and (c) such denial/reduction/change in prescribed
treatment was foreseeable under the systemwide determinations the supervisors made, then the
supervisors are liable to the inmate for his injuries caused by such denial/reduction/change in
prescribed treatment, provided that the inmate draws the requisite "causal link" between the
supervisors' decisions and his injury – by stating facts plausibly establishing the supervisors'
deliberate indifference to the risk of the inmate's injury .[28]

A recent decision by the Court of Appeals details the precise causal link the inmate must
draw to plausibly plead such a claim. See Barkes, ___ F.3d ___, 2014 U.S. App. LEXIS 17261.

In Barkes, the Court of Appeals examined the liability of prison administrators as to the
"claim that serious deficiencies in the provision of medical care . . . resulted in an inmate's
suicide," id. at *1, and noted:

> we have previously identified . . . ways in which a supervisor-defendant may be
> liable for unconstitutional acts undertaken by subordinates. . . . [For instance,]
> liability may attach if they, "with deliberate indifference to the consequences,
> established and maintained a policy, practice or custom which directly caused
> [the] constitutional harm." J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d
> 572, 586 (3d Cir. 2004). . . . "Failure to" claims . . . are generally considered a
> subcategory of policy or practice liability. See Rosalie Berger Levinson, Who
> Will Supervise the Supervisors? Establishing Liability for Failure to Train,
> Supervise, or Discipline Subordinates in a Post-*Iqbal*/*Connick* World, 47 Harv.
> C.R.-C.L. L. Rev. 273, 280 (2012).  In Sample v. Diecks, we recognized that
> "'supervision' entails . . . promulgating rules . . . and responding to unacceptable
> performance . . . through . . . further rulemaking."  885 F.2d 1099, 1116 (3d Cir.
> 1989).  Sample involved an Eighth Amendment claim against a supervisor for

---

[28]  Had it been otherwise, any inmate suffering an injury as a result of the systemwide
determinations made by supervisors would: (a) be predestined to suffer an anomalous "wrong
without a wrongdoer"; and (b) have no choice but to assert claims against the subordinate
officers involved in day-to-day operations while fully understanding that these subordinates had
no choice but to act the way they acted.

implementing deficient policies and being deliberately indifferent to the risk that the policies would result in the deprivation of a constitutional right. Id.; see also Beers-Capitol v. Whetzel, 256 F.3d 120, 133-34 (3d Cir. 2001). We developed a four-part test for determining whether an official may be held liable on a claim for a failure to supervise. The plaintiff must . . . prove that: (1) the policy . . . in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement [a curative] procedure. Sample, 885 F.2d at 1118; Brown v. Muhlenberg Twp., 269 F.3d 205 (3d Cir. 2001). . . . "Sample's four-part test provides the analytical structure [showing that] the deliberate indifference test applied to the specific situation of a policymaker." Whetzel, 256 F.3d at 135. Which brings us to Iqbal. . . . We do not read Iqbal to have abolished supervisory liability . . . . [U]nder Iqbal, the level of intent necessary to establish supervisory liability . . . var[ies] with the underlying constitutional tort alleged. [Where] the underlying tort is the denial of adequate medical care in violation of the Eighth Amendment . . . , the accompanying mental state is . . . deliberate indifference. See Farmer v. Brennan, 511 U.S. 825, 847 (1994). . . . The essence of the type of claim we approved in Sample is that a state official, by virtue of his or her own deliberate indifference to known deficiencies in a government policy . . . , has allowed to develop an environment in which there is an unreasonable risk that a constitutional injury will occur, and that such an injury does occur. Liability in such a situation is, as Iqbal requires, imposed not vicariously but based on the supervisor's own misconduct, because to exhibit deliberate indifference to such a situation is a culpable mental state under the Eighth Amendment. See Starr, 652 F.3d at 1207. Accordingly, we hold that the standard we announced in Sample for imposing supervisory liability based on an Eighth Amendment violation is consistent with Iqbal.

Id. at *19-29 (parenthetical clarifications and citations omitted).[29]

_____

[29] This Court notes Barkes' dictum observation that "excessive force claims are different than [Eighth Amendment] conditions of confinement claims: instead of deliberate indifference, they require a plaintiff to show that officials applied force maliciously and sadistically for the very purpose of causing harm, or with a knowing willingness that harm occur." 2014 U.S. App. LEXIS 17261, at *32 (importing the same mens rea into claims against supervisors, including policy-based claims). However, serendipitously for this Court, the mens rea associated with a Fourteenth Amendment conditions-of-confinement claim of civilly committed individuals (or pre-trial/alien detainees) is identical to the mental state required by the Eighth Amendment. See Cavalieri v. Shepard, 321 F.3d 616, 620 (7th Cir. 2003) (Fourteenth Amendment's due process standard, as applicable to claims of pretrial detainees, is the same "deliberate indifference" standard of the Eighth Amendment); see also Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir. 2011) (same); Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998) (same).

Read against the holdings of Barkes and Sample, the guidance in Plata, Iqbal, Barkes, Argueta, Leamer, Napoleon and Durmer indicates that a plaintiff states a plausible circumstantial-evidence medical care claim against defendants-supervisors if:

(a)    there are facts (either pled or amenable to judicial notice) showing that the supervisors' decisions created an operational regime laden with an unreasonable risk of denial of (or reduction/change in) the plaintiffs' mental care for non-medical reasons, and defendants-supervisors, being aware that their systemwide decisions entailed such risk elected to proceed with an implementation of their decisions (regardless of whether the defendants-supervisors were acting maliciously *or* were prompted to act by unfortunate slew of external economic/socio-political/logistical circumstances); and

(b)    the causal link between these systemwide decisions and denial of (or reduction/change in) the plaintiffs' mental care can reasonably be inferred from the lack of facts indicating that subordinate officers had a meaningful discretion to properly perform their duties under the circumstances ensuing from the operational regime triggered by the defendants-supervisors' systemwide decisions.[30]

With the so-distilled test in mind, this Court now turn to the parties' positions at bar.[31]

---

[30]    A plaintiff is free of the obligation to prove that subordinates committed no wrong: it is sufficient for the plaintiff to aver to the truth of his/her allegations stating no claims against the subordinates. Cf. Lupyan v. Corinthian Colleges, Inc., 2014 U.S. App. LEXIS 15019, at *16-17 (3d Cir. Aug. 5, 2014) ("where [a party is] forced to prove a negative[,] the law has long recognized that such an evidentiary feat is next to impossible") (citing Piedmont and Arlington Life-Ins. Co. v. Ewing, 92 U.S. 377, 380 (1875), that "[w]hile it may be easy enough to prove the affirmative of a question, it is next to impossible to prove the negative") (brackets omitted).

[31]    Whether Plaintiffs here suffered substantial or nominal (or even quantifiable) damages as a result of the alleged denial/reduction of Plaintiffs' mental care is of no relevance to the Rule 12(b) inquiry at hand. See Napoleon, 897 F.2d at 111 ("[As of now, Plaintiff's] allegations are

## V.    DISCUSSION

### A.    Sufficiency of Plaintiffs' Allegations

Being qualified as an SVP "[a]s a result of the [mental] evaluation [he] received, in which

he was diagnosed as having a disorder requiring treatment," Thomas asserts that he began and

continuously kept receiving ten hours of individual and group therapy per week: for a *decade*.

Thomas, Civil Action No. 10-5026, Docket Entry No. 9, at 7-11. Thomas' allegations neither

state nor suggest that such amount of weekly therapy was, somehow, unmoored to Thomas'

initial and/or later-conducted professional mental evaluations and resulting prescriptions.[32]

---

sufficient to state a claim . . . . What damages, if any, flow from the alleged [wrongful] conduct
is an issue for later proceedings"). By the same token, the issue of whether Defendants might
eventually share or shift their liability by impleading other entities, if any (e.g., those that placed
Defendants in the circumstances de facto necessitating their statewide decisions which could not
meaningfully factor in the risk of harm to Plaintiffs), is not before the Court at this juncture.

[32] Put another way, nothing in the pleading suggests that the DOC had provided Thomas
with 5,200 hours of therapy at Kearny for no medical reason or that *any part* of such therapy was
provided to Thomas *without* any mental health prescription (or chain of prescriptions): year after
year, for ten years in a row. See McTernan, 577 F.3d at 530 ("'Determining whether a complaint
states a plausible claim [is] a context-specific task that requires the reviewing court to draw on its
judicial experience and common sense'") (quoting Iqbal, 556 U.S. 663-64); cf. Ware v. United
States, 2014 U.S. Dist. LEXIS 50310, at *29 (D.N.J. Apr. 11, 2014) (citing Thornton v.
Micrografx, 878 F. Supp. 931, 938 (N.D. Tex. 1995), "[t]he court refuses to leave its common
sense at the courthouse step"). Moreover, nothing in Plaintiffs' pleadings suggests that
Plaintiffs' prescribed mental treatment was denied/reduced in accordance with a later-issued
medical prescription. Yet, Defendants urge this Court to presume precisely that. See Thomas,
Civil Action No. 10-5026, Docket Entry No. 28, at 19-20. Citing Inmates of Allegheny Cty Jail
v. Pierce, 612 F.2d 754 (3d Cir. 1979), Defendants maintain that "it is unwarranted to afford
deference to [Plaintiff's prior prescribed] treatment decisions at the pleading sta[g]e because
[there was no] opportunity to conduct discovery to test whether professional [medical] judgment
was in fact exercised [in rendering those prior decisions and, in addition, Defendants prefer to
believe that P]laintiffs have in fact suffered no harm from [reduction in or elimination of their
mental] treatment . . . . [Therefore, Defendants urge this Court to adopt] the *assumption* that [a
valid medical] judgment ha[d] in fact been [directing reduction in or elimination of Plaintiffs'
mental treatment]." Id. (emphasis supplied). That this Court cannot do. To start, the rationale of
Defendants' reliance on Pierce is not immediately obvious to this Court since, there, the inmates

Page 42 of 55

According to Thomas' allegations, his prescribed amount of therapy was first reduced down to one-third (right after he arrived to the STU and without any mental health evaluation finding that Thomas' medical needs would be better or equally well served by such reduced therapy), then his treatment got changed to a lower-level of advancement (again, without any mental health evaluation finding that Thomas' medical needs would be better or equally well served by such lower-level therapy), and finally all his mental treatment became denied: because Thomas was placed in the SHU, and the SHU began undergoing construction works.

In light of these well-pled facts, there appears to be no doubt that Thomas stated a plausible procedural due process claim under Durmer, Napoleon and Lanzaro, and – under Leamer – he also stated a plausible substantive due process challenge.

_____

challenged the method of drug detoxification, pursuant to which they were receiving methadone treatment prior to incarceration and then for six days following the date of confinement, after which the treatment was terminated in light of: (a) the prison *medical* staff's determination that a longer methadone treatment might result in an addiction to this dangerous opioid; and (b) the prison officials' valid concern with contraband methadone. See Pierce, 612 F.2d at 760-61. Here, no statement in the pleading hints that Plaintiffs' reduction in/elimination of mental therapy was a result of any *medical* decision, and this Court fails to fancy how one's mental therapy could be converted into a contraband item. Moreover, Defendants' position that this Court should adopt an assumption that a medical determination was made to reduce/eliminate Plaintiffs' mental treatment or that Plaintiffs suffered no harm from reduction/elimination of their mental treatment is at odds with the requirements of Rules 8(a) and 12(b) and contradicted by Plaintiffs' facts which, at this pleading stage, the Court must accept as true and construe in the light *most favorable to Plaintiffs*. See Erickson, 551 U.S. at 93; Phillips, 515 F.3d at 229. Also, the Court notes, in passing, that a mental injury often differs from a physical one since it might be significantly harder to determine the extent of one's mental deterioration by simple laboratory tests. In other words, if one's kidney is deteriorating, a urinalysis could be conducted to checks the amount of protein, red and white blood cells, and to distill the amount of damage, but if one's psyche is deteriorating, the tests might be much more complex and symptoms far less obvious, i.e., one need not become violent to be injured. Thus, the Court is not entirely clear as to the basis for Defendants' conclusion that Plaintiffs suffered *no* injury upon losing their mental treatment.

The dispute at hand, therefore, is limited solely to sufficiency of the causal link between the deprivation Thomas suffered and the named Defendants.[33]

Defendants maintain that Plaintiffs failed to draw that link since Defendants, being high-ranking supervising officers, played no role in Plaintiffs' day-to-day affairs. This Court disagrees. The inquiry here turns on the inferred nexus between: (a) Defendants' systemwide administrative decisions that were the moving force behind the operational regime created at the EJSP STU/SHU; and (b) the denial of (or reduction/change in) Plaintiffs' mental treatment for non-medical reasons while in confinement at the EJSP STU/SHU.[34]

Had Plaintiffs, being prescribed three sessions of three-to-four hours of dialysis a week, been subjected to a change in their dialysis regimen and started receiving less than a third of that treatment (or no treatment at all) as a result of Defendants' systemwide decisions that would require (or leave no meaningful choice for) the rank-and-file subordinates to reduce/eliminate Plaintiffs' dialysis treatment, the causal link between Defendants' decisions and Plaintiffs' injuries would become obvious as soon as Plaintiffs' blood pressure skyrocketed, their red blood cell count plummeted, they would develop nausea, respiratory problems, etc. Defendants'

---

[33] The same applies to Nash's allegations that, short of complete deprivation of treatment on the basis of SHU construction works, are substantively indistinguishable from Thomas' ones.

[34] The parties' focus on Defendants' decision to *transfer* the SVPs, not on the changes in Plaintiffs' *prescribed* mental care, is unfortunate. Had the state court in County of Hudson, 2009 N.J. Super. Unpub. LEXIS 1188, advised Defendants that all SVPs, Plaintiffs included, could stay at Kearny but, in just one year from the entry of the County of Hudson decision, the facilities at Kearny would be physically reduced and become in dire need of substantial repairs, so they would be insufficient to conduct the prescribed therapy, and the funds would be insufficient to fix the facilities and to maintain the staff of mental professionals serving at Kearny, the outcome of such hypothetical scenario would: (a) differ from the circumstances at hand solely in terms of Plaintiffs' geographical address, which has no legal significance; and (b) by no means would relieve Defendants of their obligation to provide Plaintiffs with their *prescribed* medical care.

systemwide decisions would predestine Plaintiffs to suffer, to have their kidneys injured and to die from kidney failure: graphically and morbidly illustrating the harm Defendants' decisions caused, and Defendants' deliberate indifference to the risk of that very harm.

The same logic applies here.

Here, as a result of Executive Order 118 and the New Jersey courts' rulings, Defendants necessarily had to make a series of systemwide decisions as to the facility for Plaintiffs' housing. See County of Hudson, 2009 N.J. Super. Unpub. LEXIS 1188, at \*2-16; accord N.J. Stat. Ann, 30:4-27.34. Being placed in the circumstances under which they had to make the decision to house Plaintiffs at the EJSP STU, i.e., at the very facility which they already *twice considered and rejected* in light of physical, financial and logistical constraints, see id., Defendants either: (a) knew they were exposing Plaintiffs to the risk of a scenario where, for non-medical reasons, Plaintiffs would be unable to obtain the full amount of their prescribed mental treatment (and, potentially, no treatment at all); or (b) recklessly ignore that risk.

Yet, Defendants decided to proceed with placing Plaintiffs at the STU and, later, with placing Thomas at the SHU. It could reasonably be inferred that this chain of events shows that Defendants acted with deliberate indifference to the risk of denial/reduction/change in Plaintiffs' mental care for non-medical reasons. While this Court is mindful that Defendants might have made their decisions without any malevolence, much like the high-ranking "prison wardens and health care managers" in Plata who "[e]very day [had to] make the difficult decision as to which of [their obligations as to inmates' care] they [would] fail to comply with because of staff shortages" and other financial/ logistical constraints, 131 S. Ct. at 1928, such absence of malice

is of no relevance to this Court's deliberate indifference analysis conducted at this juncture.[35]

Accord Barkes, 2014 U.S. App. LEXIS 17261, at *43 ("[D]eliberate indifference entails

something more than mere negligence, the cases are also clear that it is satisfied by something

less than acts or omissions for the very purpose of causing harm or with knowledge that harm

will result. Deliberate indifference falls somewhere between the poles of negligence at one end

and purpose or knowledge at the other") (citations and internal quotation marks omitted).

The facts before this Court plausibly establish that Plaintiffs met all four elements of the

Sample's test. Defendants' *own* decisions and acts, pled by Plaintiffs and adjudicated in County

of Hudson, causally connected Defendants to the denial/reduction/change in Plaintiffs' mental

care for non-medical reasons. See Barkes, 2014 U.S. App. LEXIS 17261; accord In re NAHC,

Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002) (addressing Fed. R. Evid. 201(b)); Jackson v.

Broad. Music. Inc., 2006 U.S. Dist. LEXIS 3960, at *18 (S.D.N.Y. Jan. 31, 2006) ("the court

may take judicial notice of public records and of 'admissions in pleadings and other documents

in the public record filed by a party in other judicial proceedings") (citations omitted). That

conclusion applies to all Defendants, short of Christie and Doe, i.e., it applies to Lanigan, Velez,

Poag, Main, Adams, Ottino and John Main ("DOC Defendants"), since the decisions and acts at

issue, by their very nature, could not have possibly escaped the scope of the DOC Defendants'

---

[35] Granted that the plaintiff in Bistrian plausibly asserted *all* supervising officers' personal involvement in the alleged wrong by merely pleading that, during the relevant few-months-period, these supervisors met "to review the list of inmates in the STU and . . . determine [who] would be released from the STU and [who] would remain [in the SHU]," id. 696 F.3d at 370, including the warden who merely attended these meetings, this Court has no reason to conclude that the already-adjudicated fact of the decade-long focused search/decision-making as to the facility where Plaintiffs would be placed (as well as Defendants' more-than-a-year-long focused process of supervising preparation and fixing the SHU) fails to show personal involvement of Defendants in the wrongs alleged here.

*personal* responsibilities. See N.J. Stat. Ann, 30:4-27.34 (expressly obligating the *high-ranking officials* of the Department of Corrections, Department of Human Services and Department of Mental Health Services to provide for "the operations of [the] facility designated for the [SVPs'] custody," to "provide . . . for treatment [of SVPs]," to "participate in . . . oversight" of these operations and treatment, and to "appropriately tailor[ the facilities and treatment to] the specific needs of [SVPs]").

In contrast, two Defendants named here do not appear implicated in the decisions or acts at issue. One is Dow, and another is Christie. While Plaintiffs allege that Dow supervised the staff at the Attorney General Office that litigated on behalf of the State during Plaintiffs' civil commitment proceedings (conducted years before the first deadline of the SVPs' transfer out of Kearny was stipulated between the County and the DOC), nothing in Plaintiffs' pleading or in the state court's findings made in County of Hudson, 2009 N.J. Super. Unpub. LEXIS 1188, could fairly be read as a fact stitching Plaintiffs' injuries to Dow. Thus, claims against Dow will be dismissed with prejudice.[36]

Analogously, as to Christie, Plaintiffs failed to "nudge[ their] claims [enough to] cross the line from conceivable to plausible." Iqbal, 556 U.S. at 680-81. Simply put, there is no basis for

---

[36] The rationale of Plaintiffs' request for injunctive relief as to Dow is not immediately apparent to this Court since: (a) Dow stopped holding the Attorney General position on January 10, 2012, and – being a Superior Court Judge in the Family Court Division, cannot offer Plaintiffs any meaningful relief in her official capacity; and (b) even if Dow remained the Attorney General, the only measure she could possibly take would be to direct her staff to refrain from litigating Plaintiffs' re-commitment proceedings (if such are held) or to litigate those proceedings deficiently. Granted that such conduct would necessarily be a violation of the Attorney General's obligation to the State, see Rules of Professional Conduct of the ABA, preamble, parts (2) and (4), and D.R. 1.3 (including comments 1 and 3), this Court's injunctive order directing such odd conduct would be void ab initio, as against public policy. Thus, Plaintiffs' request for injunctive relief cannot possibly salvage their claims against Dow.

this Court to infer that Christie partook in any decision-making processes related to Plaintiffs'
housing at the EJSP STU (or Thomas' placement in the SHU), or in any decisions related to the
preparation/construction/operational regime of the STU/SHU. In fact, this Court cannot rule out
that Christie was and still is wholly unaware of those decisions. Therefore, Plaintiffs' claims
against Christie will too be dismissed.[37]

Furthermore, Plaintiffs' claims asserting *overall inadequacy* of the mental treatment
administered by the DOC, be it as to all SVPs or as to Plaintiffs in their capacity as members of
the SVP population, and be it as to Kearny or as to the EJSP STU, will be dismissed with
prejudice, as barred by the Alves Settlement. See Alves, 2014 U.S. App. LEXIS 5234; accord
Blunt, 2014 U.S. App. LEXIS 17629. Finally, Plaintiffs' broad allegations that their "treatment
[is] now provided by social workers and recreation staff rather than by psychiatrists,
psychologists and social workers [unlike] at Kearny," Thomas, Civil Action No. 10-5026,
Docket Entry No. 26, at 11; accord Nash, Docket Entry No. 22, at 9-10, will be dismissed, albeit
without prejudice, as insufficiently pled. See Iqbal, 556 U.S. at 680-81.[38] Hence, the only claims
sufficiently pled – as of now – are Plaintiffs' individualized allegations raised against the DOC

---

[37] Out of an abundance of caution, this Court will dismiss Plaintiffs' claims against
Christie without prejudice so to ensure both sides' ability to state their facts, if any, showing that
Christie partook in making the decisions that created an unreasonable risk of denial/reduction/
change in Plaintiffs' prescribed mental care for non-medical reasons, and that Christie remained
deliberately indifferent to *that* particular risk. See also, infra, this Opinion, note 40.

[38] Thus, Plaintiffs will be allowed an opportunity to assert their facts, if any, showing that
either all – or at least a portion of – the mental treatment *prescribed to them* was such that it had
to be administered by psychiatrists/psychologists, not by social workers and/or recreation staff,
and that *medical requirement* was not complied with for *non-medical*, e.g., financial, reasons.

Defendants with regard to denial of, or reduction/change in, Plaintiffs' prescribed mental care for

non-medical reasons.

## B.  Injunctive Relief

Defendants' initial position that Plaintiffs were not entitled to injunctive relief was

marred by confusion.  Plaintiffs' re-briefing prompted Defendants to alter their argument after

Plaintiffs' supplemented pleadings clarified that

> [P]laintiff[s'] lawsuit falls squarely within [an] exception [to] the Eleventh
> Amendment [carved as to injunctive relief.  "A] state official in his or her official
> capacity, when sued for injunctive relief, would be a person under § 1983 because
> 'official capacity actions for prospective relief are not treated as actions against
> the State.'" Will v. Mich. Dept' of State Police, 491 U.S. 58, 71 n. 10 (1980)
> (quoting Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985).  Plaintiff[s'] claims
> for prospective relief against the [DOC D]efendants, sued in their official
> capacities, are . . . fully consistent with . . . the doctrine of sovereign immunity.
> Defendants also argue that [P]laintiff[s'] injunctive claims should be dismissed
> because the complaint fails to allege facts sufficient to meet the standards
> governing the award of a preliminary injunction [and Plaintiffs have not] shown a
> reasonable probability of success on the merits" . . . .  This argument is, however,
> without foundation, [since P]laintiff[s never] sought a preliminary injunction. . . .
> On a motion to dismiss, the Court's inquiry is . . . whether the complaint includes
> "sufficient factual matter to show that the claim is facially plausible." Warren
> Gen. Hosp. [v. Amgen Inc.], 643 F.3d [77,] 84 [(3d Cir. 2011)].

Docket Entry No. 26, at 25-25.

Conceding Plaintiffs' legal point as to what the proper inquiry is and that Plaintiffs did

not seek a preliminary injunctive measure, Defendants now contend that "[P]laintiffs cannot

succeed on the merits" since *all* Plaintiffs' claims are facially meritless.  Docket Entry No. 28, at

18 ("[P]laintiffs' . . . substantive claims do not state a claim for violation of a constitutional

right").  However, as the discussion provided supra illustrates, this Court finds that Plaintiffs

sufficiently pled their claims based on Defendants' deliberate indifference to the risk of denial/

reduction/change in Plaintiffs' mental care for non-medical reasons. Therefore, Defendants' contention is incorrect.

That said, Defendants' gracious statement that, "[i]f this Court disagree[s with Defendants' position that all Plaintiffs' claims are facially meritless], Defendants acknowledge that [this case should proceed further, and] discovery [would be needed] to resolve the dispute," id. is sufficient and, therefore, this point need not be hammered at by this Court.[39]

Correspondingly, Defendants' application for dismissal of Plaintiffs' claims seeking injunctive relief will be denied, without more, as to all Defendants short of Dow and Christie.[40]

_____

[39] However, a brief clarification as to the scope of potential injunctive relief is warranted since Defendants appear to be under the impression that such relief, if granted, would direct restoration of Plaintiffs' mental treatment to the "levels that existed at the Kearn[]y Facility." Docket Entry No. 28, at 18. That impression is incorrect and differs from Plaintiffs' request for "access to mental health treatment necessary to achieve meaningful progress toward release." Docket Entry No. 26, at 23. The injunctive relief Plaintiffs might achieve, if they prevail, is restoration of their *prescribed* mental treatment. Moreover, that prescribed mental treatment might, of course, be eventually changed, and many times over, to a different mental treatment, provided that each change in treatment is *medically* prescribed to Plaintiffs after a bona fide evaluation conducted by a mental health professional employed by the DOC or externally retained. See Napoleon, 897 F.2d at 110 (a doctor's disagreement with another doctor's professional judgment is not actionable); but see Pierce, 612 F.2d at 760 (when the appropriate form of treatment involved a discrete medical judgment, the court looks for abuse of discretion by the jail physicians regarding the choice of treatment). Therefore, it appears safe to presume that Thomas' prescribed mental treatment would always exceed the complete lack of treatment he had to endure at the SHU, since the DOC decision to provide Thomas with no treatment whatsoever, in hope that he would, somehow, progress on his own, simply as a result of being confined, cannot be harmonized with either the spirit and letter of the NJSVPA, or with bona fide findings of any responsible mental health professional.

[40] As to Dow and Christie, Defendants' motions will be granted. True, being the State's highest ranking executive officer, Christie is likely to have a theoretical ability to cure all deficiencies in Plaintiffs' medical care, same as he is likely to have a theoretical ability to cure any other deficiency of the functioning of any New Jersey agency. Such theoretical *ability*, however, cannot translate into Christie's legal *liability* absent a showing of Christie's personal involvement in the decisions that caused Plaintiffs' injuries. While it is, indeed, conceivable that a governor might be personally involved in the matters of correctional system administration,

The DOC Defendants may renew that application during the latter stages of these litigation,

provided that the facts developed would warrant such an application.

## C.    Qualified Immunity

The test governing the defense of qualified immunity is long-established:

"Qualified immunity shields government officials from civil damages liability
unless the official violated a statutory or constitutional right that was clearly
established at the time of the challenged conduct." Reichle v. Howards, 132 S.
Ct. 2088, 2093 (2012). The qualified immunity analysis is thus composed of two
constituent questions: first, whether the plaintiff suffered a deprivation of a
constitutional or statutory right; and second, if so, whether that right was "clearly
established" at the time of the alleged misconduct. If the answer to either question
is "no," qualified immunity applies. Id. . . . A right is "clearly established" if, at
the time of the alleged deprivation, "'the contours of the right are sufficiently
clear' that every 'reasonable official would have understood that what he is doing
violates that right.'" [Ashcroft v.] al-Kidd, 131 S. Ct. [2074,] 2083 [(2011)]
(quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Crucial to the
"clearly established" inquiry is the level of generality at which the right is defined.
A constitutional right is not "clearly established simply because of the existence
of a broad imperative like the one against 'unreasonable . . . seizures,'" Schneyder
v. Smith, 653 F.3d 313, 329 (3d Cir. 2011), but nor must there be "a case directly
on point if existing precedent has placed the statutory or constitutional question
beyond debate," al-Kidd, 131 S. Ct. at 2083 (citing Anderson, 483 U.S. at 640).
Rather, the asserted right must be sufficiently bounded that it gives "practical
guidance" to officials on the ground. See John C. Jeffries, Jr., What's Wrong with
Qualified Immunity?, 62 Fla. L. Rev. 851, 854 (2010). Put another way, the right
asserted cannot be so abstract that any transgression violates a clearly established
right, thereby evaporating "the balance between the interests in vindication of
citizens' constitutional rights and in public officials' effective performance of
their duties." Anderson, 483 U.S. at 639 (quoting Davis v. Scherer, 468 U.S. 183,
195 (1984)). The "ultimate question" in the qualified immunity analysis "is

---

see, e.g., Plata, 131 S. Ct. 1910 (Governors Edmund G. Brown, Jr. and Arnold Schwarzenegger
declared a state of emergency with regard to the matters of prison administration that caused a
state-wide crisis and were expressly brought to the Governors' attention), it appears that, here,
Plaintiffs stretched the causal link beyond what the law envisioned when they elected to name
Christie as Defendant in these matters. See Palsgraf, 248 N. Y. at 352 ("What we do mean by the
word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice,
the law arbitrarily declines to trace a series of events beyond a certain point.  . . . We may regret
that the line was drawn just where it was, but drawn somewhere it had to be").

> whether the defendant had "'fair warning" that his conduct deprived his victim of a constitutional right.'" Schneyder, 653 F.3d at 329 (quoting Hope v. Pelzer, 536 U.S. 730, 740 (2002)). The "clearly established" game is won or lost on how broadly or narrowly one defines the right at issue.

Barkes, 2014 U.S. App. LEXIS 17261, at \*45-46 (brackets, ellipses and parenthetical explanations omitted).

Under this standard, the DOC Defendants' qualified immunity argument is halfhearted at best. The substantive issues implicated here are scalpel-narrow and have been subject to extensive "practical guidance" that gave the DOC Defendants "fair warning" for the period ranging from more than a decade, under Leamer, to longer-than-a-quarter-century: under Lanzaro, Napoleon and Durmer. Nothing in the principles clearly established by those decisions could have led the DOC Defendants to believe that denying, reducing or changing Plaintiffs' prescribed mental treatment for non-medical reasons would be anything but a violation of Plaintiffs' constitutional rights, and there should have been not a shred of doubt in the DOC Defendants' minds that such violation would qualify as "conscience shocking" in addition to being an imposition of punishment without due process. And, under Monell, Sample and Whetzel, as well as under Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005), the DOC Defendants had to know, for thirty, twenty, ten and five years, respectively, that legal liability would attach to them for the decisions/acts they would make with deliberate indifference to the risk of constitutional harm those decisions/acts would entail. Hence, stripped of all niceties, the DOC Defendants' qualified immunity argument turns on their self-serving misreading of Iqbal, i.e., on their claim that supervisory officials are necessarily shielded from suit by a plaintiff separated from those supervisors by a few ranks of subordinates, since that the plaintiff cannot be

in privy with the particularities of the supervisors' operations and decision-making processes and, hence, cannot plead those particularities.

Although, as detailed supra, such self-serving misreading of Iqbal has become common among defendants holding supervisory positions and even persuaded a few jurists, see Barkes, ___ F.3rd ___, 2014 U.S. App. LEXIS 17261, at *24 ("Iqbal has . . . [led some jurists to] believe [that it] abolish[ed] supervisory liability in its entirety"), that misreading is *not* the law and never was the law. Thus, this misreading cannot entitle Defendants to qualified immunity.

Iqbal did not involve a change in the Fourteenth or Eighth Amendment regime, nor did Iqbal eliminate the "practical guidance" these bodies of law provided to the DOC Defendants, "fairly warning" them that they could be liable for their decisions and acts evincing deliberate indifference to the risk of harm resulting from denial/reduction/change in Plaintiffs' prescribed mental treatment for non-medical reasons. Not a single statement in Iqbal could have led the DOC Defendants to believe that they would be entitled to violate clearly established sue process law because the Supreme Court offered a clarification as to the pleading requirement of Rule 8(a), or because the DOC Defendants held supervisory positions, or because Plaintiffs – not being in privy with the DOC Defendants' exact operations – could not plead the particularities of the DOC Defendants' decision-making processes or acts. Cf. Iqbal, 556 U.S. at 678; see also supra, this Opinion, note 22. Nothing in Plaintiffs' pleading suggests that they are suing the DOC Defendants "purely upon the acts of others" or "on the basis of . . . an employer-employee relationship [between the DOC Defendants and employed] tortfeasor[s]." Monell, 436 U.S. at 692. The DOC Defendants are the only plausibly-pled tortfeasors here; there no others.

Granted that the governing "body of precedent places [Plaintiffs' claims asserting denial/ reduction/change in prescribed medical care for non-medical reasons] 'beyond debate,'" id. at *54 (quoting al-Kidd, 131 S. Ct. at 2083), this Court concludes that, at this juncture, the DOC Defendants are not entitled to qualified immunity. Hence, Plaintiffs' claims asserting denial/ reduction/change in prescribed medical care for non-medical reasons will proceed to further litigation.[41]

## VI. CONCLUSION

For the foregoing reasons, Defendants' Rule 12(b) motions will be granted in part and denied in part. Defendants' motions to dismiss will be granted as to Plaintiffs' claims asserting *overall insufficiency* of the mental treatment provided to all STU SVPs (or to Plaintiffs in their capacity as members of the SVP population confined at the EJSP STU or at the STU's SHU).

---

[41] Since this Court's determinations turn on questions of law, and it is axiomatic that qualified immunity protects any defendant not only from liability but also from the burdens of litigation itself, see Ball v. Famiglio, 726 F.3d 448, 461 (3d Cir. 2013) (relying on Vaughn v. U.S. Small Bus. Admin., 65 F.3d 1322, 1326 (6th Cir. 1995)), the Court of Appeals would have jurisdiction to address Defendants' interlocutory appeal (that is, in the event Defendants desire to file such an application) under 28 U.S.C. § 1291 and the collateral order doctrine. See Wright v. City of Phila., 409 F.3d 595, 599 (3d Cir. 2005) ("Despite the interlocutory nature of qualified immunity rulings, they are reviewable on appeal where the dispute does not turn upon which facts the parties might be able to prove, but, rather, whether or not certain facts showed a violation of 'clearly established' law"). Thus, this Court will direct the Clerk to administratively terminate this matter for the period of ninety days, cf. Papotto v. Hartford Life & Accident Ins. Co., 731 F.3d 265 (3d Cir. 2013), so to allow Defendants an opportunity to determine whether they wish to seek an appellate review at this juncture and, if not, to enable the parties' reflection on the litigation ahead and to ensure that they would facilitate the efforts of the Magistrate Judge toward a speedy resolution of these matters. In the event no appellate review is sought at this juncture, this Court will direct the Clerk to restore these matters to the Court's active docket in ninety days, with Plaintiffs' pro bono counsels' appointments intact. Conversely, if Defendants elect to seek appellate review, pro bono counsels' appointments will be terminated in ninety days. No statement by this Court shall be construed as obligating/preventing Plaintiffs to/from petition(ing) the Court of Appeals for appointment of pro bono counsel, or as obligating/ preventing Plaintiffs' current counsel to/from accept(ing) or seek(ing) such appointments.

Those claims will be dismissed with prejudice.  Analogously, Defendants' motions will be granted as to all Plaintiffs' claims raised against Dow, and those claims will too be dismissed with prejudice.  Defendants' motions will also be granted as to Plaintiffs' claims raised against Christie and as to Plaintiffs' challenges asserting that their mental treatment has been administered by social workers and/or recreation staff, rather than by psychiatrists/psychologists.  Those claims, however, will be dismissed without prejudice, and Plaintiffs will be allowed to re-plead these claims by asserting their facts, if any, showing: (a) Christie's personal involvement in the particular decisions that caused Plaintiffs' injuries; and/or (b) that Plaintiff's prescribed mental treatment was such that all of it/part of it had to be administered by psychiatrists/psychologists.  Defendants' motions will be denied as to Plaintiffs' claims raised against the DOC Defendants with regard to the DOC Defendants' systemwide decisions that were the moving force behind the operational regime at the EJSP STU/SHU, which caused denial of and/or reduction/change in Plaintiffs' *prescribed* mental treatment for *non-medical* reasons.

An appropriate Order accompanies this Opinion.

**DICKINSON R. DEBEVOISE**
**United States Senior District Judge**

Dated: October 17, 2014