Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

THADDEUS THOMAS,

            **Plaintiff,**

            v.

SHANTAY BRAME ADAMS, et al.,

            **Defendants.**

Civil Action No. 10-5026 (ES) (MAH)

OPINION

FILED UNDER SEAL

SALAS, DISTRICT JUDGE

Before the Court are motions for summary judgment filed by defendants Shantay Brame Adams, Elizabeth Connolly, John Main, Merrill Main, Valerie L. Mielke, Jackie Ottino, Jonathan Poag, Michael VanPelt, Roxanne Vega, and Jennifer Velez (collectively, "DHS Defendants") (D.E. No. 159 ("DHS Defs. Mot.")), defendant Gary M. Lanigan ("Lanigan," and collectively with DHS Defendants, "Defendants") (D.E. No. 163 ("Lanigan Mot.")), and plaintiff Thaddeus Thomas ("Plaintiff") (D.E. No. 165 ("Pl. Mot.")).[1] The Court has considered the parties' submissions in support of and in opposition to the pending motions and heard oral argument on those applications on January 30, 2025. (D.E. No. 188 ("Oral Arg. Tr.")). For the reasons set forth below, the Court **GRANTS** the Defendants' motions for summary judgment and **DENIES** Plaintiff's cross motion for summary judgment.

---

[1]     In his *pro se* complaint, Plaintiff named Michael VanPelt and Roxanne Vega as Defendants; however, the two individuals were omitted from the first amended complaint and the second amended complaint filed by Plaintiff's appointed counsel. (D.E. No. 1 ("Complaint") at 1 & 4–5); D.E. No. 9 ("First Amended Complaint" or "FAC"); D.E. No. 44 ("Second Amended Complaint" or "SAC")). By filing the FAC, Plaintiff abandoned any claims against VanPelt and Vega. *See Lancaster v. N.J. Transit Corp.*, No. 20-1995, 2022 WL 16701907, at *1 (D.N.J. Nov. 3, 2022) (citing *Palakovic v. Wetzel*, 854 F.3d 209, 234 n.26 (3d Cir. 2017)).

## I.    BACKGROUND

### A.    Factual Background[2]

Unless otherwise noted, the following facts are not in dispute. In 2001, Plaintiff was involuntarily committed as a sexually violent predator ("SVP") to the Special Treatment Unit ("STU") at the Northern Regional Facility in Kearny, New Jersey ("Kearny") by the State of New Jersey under the New Jersey Sexually Violent Predator Act ("SVPA"), N.J. Stat. Ann. § 30:4-27.24. (DHS Defs. SUMF ¶¶ 7–8; Pl. SUMF ¶ 1; Lanigan Resp. to Pl. SUMF ¶ 1; DHS Defs. Resp. to Pl. SUMF ¶ 1). This case involves challenges under the United States and New Jersey Constitutions to decisions related to the 2010 transfer of Plaintiff and other SVPs confined in the STU under the SVPA from Kearny to the East Jersey State Prison ("EJSP"), and the resulting changes in mental health treatment provided at EJSP.

At the time of the EJSP transfer, Lanigan served as the Commissioner of the New Jersey Department of Corrections ("DOC"), and DHS Defendants held supervisory positions at the New Jersey Department of Human Services ("DHS"). (Pl. SUMF ¶¶ 2 & 4–8; Lanigan Resp. to Pl. SUMF ¶ 2; DHS Defs. Resp. to Pl. SUMF ¶¶ 3–8). Connolly and Velez are former Commissioners of DHS; John Main is the former Chief Executive Officer of DHS; Mielke is the Assistant Commissioner of the DHS Division of Mental Health and Addiction Services ("DMHAS"); Poag is a former Director of DHMAS; Merrill Main ("Dr. Main") served as the Clinical Director of the STU until he retired in 2020; Adams is the STU Site Director, and Ottino was the STU Program Coordinator until 2023. (Pl. SUMF ¶¶ 4–8; DHS Defs. Resp. to Pl. SUMF ¶¶ 4–8).

---

[2]    The Court gathers the following facts primarily from DHS Defendants' statement of undisputed facts (D.E. No. 162 ("DHS Defs. SUMF")), Lanigan's statement of undisputed facts (D.E. No. 163-14 (Lanigan SUMF")), Plaintiff's statement of undisputed facts (D.E. No. 165-25 ("Pl. SUMF")), his response to Lanigan's and DHS Defendants' factual statements (D.E. No. 165-26 ("Pl. Resp. to Lanigan SUMF"); D.E. No. 168 ("Pl. Resp. to DHS Defs. SUMF")), and Lanigan and the DHS Defendants' respective responses to Plaintiff's statement of undisputed material facts (D.E. No. 166-3 ("Lanigan Resp. to Pl. SUMF"); D.E. No. 170 ("DHS Defs. Resp. to Pl. SUMF")).

2

### 1.    DHS's Sex Offender Treatment Program

The sex offender treatment program administered by DHS provides a therapeutic treatment milieu for SVPs.. (DHS Defs. SUMF ¶ 9; Lanigan SUMF ¶ 24; Pl. Resp. to Lanigan SUMF ¶ 24; Pl. Resp. to DHS Defs. SUMF ¶ 10).  This milieu consists of several structured components or activities, including process groups, psychoeducational groups, which are known as modules, vocational rehabilitation programs, structured recreational activity, self-help groups, and paid institutional work.  (DHS Defs. SUMF ¶ 9; Lanigan SUMF ¶ 24; Pl. Resp. to Lanigan SUMF ¶ 24; Pl. Resp. to DHS Defs. SUMF ¶ 10).  While residents' functioning and behavior in all areas are significant to SVPs' recovery, the process group sessions and the modules are the two core components of sex offender treatment at the STU.  (DHS Defs. SUMF ¶ 10; Pl. SUMF ¶ 37; Pl. Resp. to DHS Defs. SUMF ¶ 10; Lanigan Resp. to Pl. SUMF ¶¶ 34 & 37; DHS Defs. Resp. to Pl. SUMF ¶¶ 34 & 37).

Process groups involve group psychotherapy.  (DHS Defs. SUMF ¶ 12; Pl. Resp. to DHS Defs. SUMF ¶ 12).  They provide a forum for residents to develop and demonstrate explicit indicators of treatment progress, such as admitting to offenses without denial, rationalization, or excuses, using words that accurately reflect resident behavior, and recognizing the factors contributing to the residents' behavior.  (DHS Defs. SUMF ¶ 13; Pl. Resp. to DHS Defs. SUMF ¶ 13; Lanigan Resp. to Pl. SUMF ¶ 34).

The modules are educational programs on specific topics.  (DHS Defs. SUMF ¶ 15; Pl. Resp. to DHS Defs. SUMF ¶ 14; Lanigan Resp. to Pl. SUMF ¶ 36).  Dr. Main testified that residents generally do not need to take all modules to obtain discharge from the STU.  (DHS Defs. SUMF ¶ 16; D.E. No. 167-1, Ex. C-1 ("Dr. Main Dep. Vol. I") to Certification of Counsel ("Cert. of Counsel") at 43:25–44:5).  However, he acknowledged that some modules, including relapse

prevention and anger management, are "core" modules that a resident must complete before discharge. (Dr. Main Dep. Vol. I at 43:25–44:5, 45:6–10 & 172:12–18). Dr. Manuel Iser, a clinical psychologist at the STU who treated Plaintiff, stated that residents must complete every module, particularly the relapse prevention modules, to progress through the stages of treatment and obtain release. (Pl. Resp. to DHS Defs. SUMF ¶ 16; D.E. No. 167-3, Ex. D ("Dr. Iser Dep.") to Cert. of Counsel at 42:12–19).

### 2. Plaintiff's Treatment History at Kearny

At Kearny, Plaintiff was placed in the Two North housing unit, which was reserved for residents demonstrating advanced behavioral instabilities and disruptive and predatory behaviors. (DHS Defs. SUMF ¶¶ 29–30; Pl. Resp. to DHS Defs. SUMF ¶¶ 29–30). There is evidence that Plaintiff had a predatory and dysfunctional relationship with a much younger resident and engaged in other inappropriate behaviors. (DHS Defs. SUMF ¶¶ 31–33 & 39–40; Lanigan SUMF ¶¶ 7–14; Pl. Resp. to Lanigan SUMF ¶¶ 7–14; Pl. Resp. to DHS Defs. SUMF ¶¶ 31–33 & 39–40). On several occasions between 2001 and 2004, and once in 2008, Plaintiff was assigned to the Restricted Activities Program ("RAP") and Modified Activities Program ("MAP") for institutional violations, including assaulting residents and officers. (DHS Defs. SUMF ¶¶ 39–40; PL. Resp. to DHS Defs. SUMF ¶¶ 39–40).

From 2001 until 2016, Plaintiff remained in Phase Two of the five-phase treatment program.[3] (DHS Defs. SUMF ¶¶ 53–54; Lanigan SUMF ¶ 6; Pl. Resp. to Lanigan SUMF ¶ 6; Pl. Resp. to DHS Defs. SUMF ¶¶ 53–54). In 2010, when he was transferred from Kearny to EJSP,

---

[3]    The treatment program at the STU consists of five phases: (i) Phase One, in which the resident adjusts to being civilly committed; (ii) Phase Two, which focuses on rapport building; (iii) Phase Three, which is the core phase of treatment and is broken up into two subparts (Phase 3A, in which the resident is provided with most of the sex-offender specific treatment, and Phase 3B, which provides a more concentrated therapeutic milieu); (iv) Phase Four, in which the resident proceeds toward discharge planning and works on maintaining treatment goals; and (v) Phase Five, which involves a conditional discharge into the community and outpatient treatment. (DHS Defs. SUMF ¶¶ 20–24; Pl. Resp. to DHS Defs. SUMF ¶¶ 20–24).

Plaintiff had been in Phase Two for approximately nine years. (DHS Defs. SUMF ¶¶ 53–54; Lanigan SUMF ¶ 6; Pl. Resp. to Lanigan SUMF ¶ 6; Pl. Resp. to DHS Defs. SUMF ¶¶ 53–54). Dr. Main explained that this introductory phase is not difficult to satisfy and that nine years is a long time to be in Phase Two. (Dr. Main Dep. Vol. I at 145:3–12 & 154:4–21).

When he arrived at Kearny, Plaintiff was assigned to a process group, and he was also allowed to attend modules offered in Two North. (Pl. SUMF ¶ 48; Lanigan Resp. to Pl. SUMF ¶ 48; DHS Defs. Resp. to Pl. SUMF ¶ 48). Between January 2005 and May 2010, when he was transferred to EJSP, Plaintiff accumulated approximately sixty-seven unexcused absences and twelve self-reported excused absences from his assigned process group. (DHS Defs. Resp. SUMF ¶ 41 & n.4; Pl. Resp. to DHS Defs. SUMF ¶ 41 & n.5). Plaintiff also refused to participate in several MAP/RAP group sessions. (DHS Defs. SUMF ¶ 39 n.3; Pl. Resp. to DHS Defs. SUMF ¶ 39 n.4). Furthermore, Plaintiff did not participate in a module until 2009, when he enrolled in the relapse prevention 1A module and completed an anger management module. (DHS Defs. SUMF ¶¶ 37–38 & 48–49; Pl. Resp. to DHS Defs. SUMF ¶¶ 37–38 & 48–49). As of March 2010, he was enrolled in the relapse prevention 1A and substance abuse modules. (DHS Defs. SUMF ¶ 38; Pl. Resp. to DHS Defs. SUMF ¶ 38).

Plaintiff was transferred from Kearny to EJSP in May 2010. (DHS Defs. SUMF ¶ 76; Pl. Resp. to DHS Defs. SUMF ¶ 76). In a September 2010 report, the Treatment Progress Review Committee ("TPRC") reviewed Plaintiff's treatment history over the previous twelve months. (D.E. No. 167-5, Ex. F ("Sept. 2010 TPRC Rep.") to Cert. of Counsel at Thomas-000256). The TPRC reported that, at Kearny, Plaintiff "attended Process Group consistently," provided his peers with relevant and supportive feedback, and was doing very well in his process group. (Id.). However, it also noted that he had not addressed his sexual assault cycle or relapse prevention

plan, was not currently participating in any self-help group, had not participated in any polygraphs, and that his September 2009 TPRC report stated that Treatment Probation should be considered if Plaintiff failed to re-engage with treatment. (*Id.* at Thomas-000257). Dr. Iser stated in his deposition testimony that Plaintiff was always respectful and always tried to take the "floor" at the process group sessions, while acknowledging that Plaintiff recalled, at their first meeting, they got into an argument, Plaintiff stormed out, and Plaintiff told Dr. Iser to "go fuck [him]self for something." (Dr. Iser Dep. at 91:20–25 & 103:1–7). According to the prior TPRC reports from Kearny, Plaintiff infrequently took the floor at the process group sessions, and Dr. Iser reported that he was not engaged in his treatment. (DHS Defs. Resp. to Pl. SUMF ¶¶ 42–47; Pl. Resp. to DHS Defs. SUMF ¶¶ 42–47). Dr. Main described Plaintiff as one of the most predatory residents in the STU and said that, at the time of the transfer to EJSP, he continued to evince predatory or ▮▮▮▮ characteristics. (Dr. Main Dep. Vol. I at 152:4–14).

### 3.    The Transfer of the STU from Kearny to EJSP

In 1998, the New Jersey Legislature enacted the SVPA, which provides for the involuntary civil commitment of SVPs. (Pl. SUMF ¶ 11; Lanigan Resp. to Pl. SUMF ¶ 11; DHS Defs. Resp. to Pl. SUMF ¶ 11). In 1999, DOC designated Kearny as the only available temporary housing site for SVPs, but Hudson County secured a state court order enjoining its designation. (Pl. SUMF ¶ 12; Lanigan Resp. to Pl. SUMF ¶ 12; DHS Defs. Resp. to Pl. SUMF ¶ 12). The state court stayed execution of the warrant of removal, and the Governor issued an emergency executive order designating Kearny as the temporary location for housing SVPs. (DHS Defs. SUMF ¶ 56; Pl. Resp. to DHS Defs. SUMF ¶ 56; DHS Defs. Resp. to Pl. SUMF ¶ 13).

DOC began a lengthy process to find a new site for the STU. (Pl. SUMF ¶ 13; Lanigan Resp. to Pl. SUMF ¶ 13; DHS Defs. Resp. to Pl. SUMF ¶ 13). One of the sites under consideration

was EJSP, where it was proposed to re-configure the Administrative Segregation Unit ("Ad. Seg. Unit") space to house the residents and to add treatment rooms. (Pl. SUMF ¶ 14; Lanigan Resp. to Pl. SUMF ¶ 14; DHS Defs. Resp. to Pl. SUMF ¶ 14). However, EJSP was rejected as too large. (Pl. SUMF ¶ 15; Lanigan Resp. to Pl. SUMF ¶ 15; DHS Defs. Resp. to Pl. SUMF ¶ 15).

A document was prepared proposing to transfer the STU to EJSP beginning on July 1, 2019. (D.E. No. 165-6, Ex. H ("East Jersey State Prison Option") to Cert. of Counsel at DOC260). The document is undated and does not identify the person or persons who drafted or received the proposal. (*See id.* at DOC259–62). it. It stated that "no real treatment space exist[ed] within the currently configured Ad Seg Unit." (*Id.* at DOC260). The proposal further indicated that such space could be developed by placing either trailer or modular buildings in the parking lot or reconfiguring some of the floor space. (*Id.*). In addition, the East Jersey State Prison Option stated that it would take six months to add the temporary trailer unit space for programming and offices. (*Id.*).

On May 18, 2009, the Appellate Division of the New Jersey Superior Court issued an order directing DOC to relocate the SVPs from Kearny within one year. (Pl. SUMF ¶ 16; Lanigan Resp. to Pl. SUMF ¶ 16; DHS Defs. Resp. to Pl. SUMF ¶ 16). DOC had the authority to move the STU, with the Commissioner of DOC responsible for making the final decision selecting the new site. (DHS Defs. SUMF ¶ 60; Lanigan SUMF ¶¶ 16–17; Pl. Resp. to Lanigan SUMF ¶¶ 16-17; Pl. Resp. to DHS Defs. SUMF ¶ 60). According to the deposition testimony of Michelle Ricci, the DOC's designated representative, the decision to move the STU to EJSP was made by then-DOC Commissioner George Hayman. (D.E. No. 163-6, Ex. B. ("Ricci Dep.") to Decl. of Counsel at 18:12–19:15). Lydell Sherrer, the DOC Deputy Commissioner for Operations, Craig Conway, the Administrator of the Adult Diagnostic Treatment Center ("ADTC"), and Steve Johnson, the

7

Assistant ADTC Administrator were responsible for retrofitting EJSP to accommodate the STU. (Lanigan SUMF ¶ 20; Pl. Resp. to Lanigan SUMF ¶ 20).

Dr. Main testified that DOC was solely responsible for the decision to move the STU to EJSP. (Dr. Main Dep. Vol. I at 112:8–116:19; D.E. No. 167-2, Ex. C2 ("Dr. Main Dep. Vol. II") to Cert. of Counsel at 18:5–19:14 & 24:8–25:8). According to him, DHS learned of DOC's decision to move the STU to EJSP six months after the state court had issued its order. (Dr. Main Dep. Vol. I at 112:8–116:19; Dr. Main Dep. Vol. II at 24:8–25:8). Ricci indicated that the selection of the alternative site was solely made by DOC. (Ricci Dep. at 25:19–26 & 39:16–24). Dr. Main explained that, after receiving notice of the DOC's relocation decision, he raised his concerns with DOC about the lack of treatment space and the "strictly controlled" environment of the space, which was not particularly conducive to a therapeutic milieu. (Dr. Main Dep. Vol. I at 112:8–116:9). DHS called for four treatment rooms to be built at EJSP. (Lanigan SUMF ¶ 25; Pl. Resp. to Lanigan SUMF ¶ 25).

In her deposition testimony, Sherrer testified that she chaired a multi-departmental committee of stakeholders, including representatives from DOC and DHS, convened to comply with the court order. (D.E. No. 165-7, Ex. I ("Sherrer Dep.") to Cert. of Counsel at 24:13–25). She said that it "probably took us a few weeks and then we got DHS involved." (*Id.* at 83:7–11). Sherrer recalled that Dr. Main was "vocal" and "active" on the committee, participated in "numerous" conversations, and provided "valuable input," although she did not remember him expressing any concerns about EJSP's fitness to accommodate the STU. (*Id.* at 53:23–55:15). She further acknowledged that she would not be able to point him out and did not remember Dr. Main's position at DHS. (*Id.* at 53:15–22).

According to Robert Van Tassell, DOC Capital Planning and Construction Project

Manager, the general process for handling design proposals for new capital projects, like the installation of new treatment rooms, would have required approval by both DOC and DHS. (D.E. No. 165-5, Ex. G ("Van Tassell Dep.") to Cert. of Counsel at 18:7–11). "[A]ssistant commissioners [and] directors, from both DHS and DOC," likewise would have decided whether the installation of modular buildings to accommodate DHS office space had to be completed before the transfer. (*Id.* at 20:21–21:9). Van Tassell also recalled sitting in on a couple of meetings with DHS discussing topics such as parking and office space. (*Id.* at 21:10–26).

In a January 29, 2010 email, Sherrer stated that a stakeholder tour of "the proposed new location of the STU" at EJSP was scheduled for February 2, 2010, with a follow-up meeting between DOC and DHS to be held on February 3, 2010. (D.E. No. 65-11, Ex. L ("Sherrer Jan. 29, 2010 Email") to Cert. of Counsel at Supp_DOC00003).

As of January 29, 2010, Lanigan had been briefed on the "East Jersey Prison Option Sex Offender Facility." (D.E. No. 165-11, Ex. M ("Jan. 29, 2010 Email") to Cert. of Counsel at Supp_DOC00005). Lanigan became Acting Commissioner of DOC on February 2, 2010. (D.E. No. 163-10, Ex. G ("Lanigan Answers to First Set of Interrogatories") to Lanigan SUMF ¶ 1). On February 4, 2010, Lanigan was copied on an email from the Deputy Attorney General ("DAG") serving as the Section Chief for Health and Human Services at the New Jersey Division of Law. (D.E. No. 165-12, Ex. N ("Feb. 4, 2010 DAG Email") to Cert. of Counsel at Supp_DOC00006). The email directed Sherrer's attention to "a memorandum identifying issues under discussion in connection with the SVP litigation settlement negotiations that may impact space requirements at the new site or require additional funding." (*Id.*). On the same day, Lanigan emailed Sherrer inquiring about the specific relocation costs for DOC and DHS health staff and residents. (D.E. No. 165-13, Ex. O ("Feb. 4, 2010 Lanigan Email") to Cert. of Counsel at Supp DOC0008).

9

According to a March 15, 2010 email exchange between DOC officials, questions were raised by the union and local DOC personnel about the decision-making process for relocating the STU, and a Kearny chief and an EJSP union representatives allegedly stated that a determination had already been made to move the STU to EJSP. (D.E. No. 165-21, Ex. Z ("Mar. 14, 2010 Emails") to Cert. of Counsel at Supp_DOC0009–10). Although the union alleged that they were provided specific details regarding the move, a DOC official stated that the chief advised staff that the location of the move had not yet been approved and was still under discussion. (*Id.* at Supp_DOC0010). The union was initially advised that there were no official plans and that they would be contacted as soon as any formal information was available regarding "if/when" the move would occur. (*Id.*). Officials were then directed not to disseminate any additional information "locally" because the process was being handled centrally at the direction of Sherrer. (*Id.* at Supp_DOC0009). The last email in this exchange stated that "everything is being coordinated and approved through the COS who is in direct communication with the Commissioner" and that there were no announcements concerning what "will or will not occur with any proposed moves[,] etc.[,] regarding the impending possible move." (*Id.*). It was emphasized that "[t]his is a directive from the Deputy Commissioner." (*Id.*).

On March 26, 2010, Sherrer stated in an email that, "[w]hen the Official Approval is sent out a call will be made to DHS to come to the table," while, "[i]n the interim, informal discussions with DHS continues." (D.E. No. 165-9, Ex. K ("Mar. 26, 2010 Email") to Cert. of Counsel at Supp_DOC0001). At her deposition, Sherrer could not recollect any DHS representatives attending meetings prior to this date. (Sherrer Dep. at 42:1–21).

In May 2010, the STU was moved from Kearny to EJSP. (DHS Defs. SUMF ¶ 59; Pl. Resp. to DHS Defs. SUMF ¶ 59).

### 4.     The Physical Setup of the STU at EJSP and Plaintiff's Housing Assignment

At EJSP, the STU is organized into two general areas: the Annex, which is a more open setting that typically does not house disruptive residents, and the Main, which is organized into four housing units or wings (North, South, East, and West). (DHS Defs. SUMF ¶¶ 63–67; Pl. Resp. to DHS Defs. SUMF ¶ 63–67). Residents on the North, East, and West Units have access to programming provided in other Main units, but South Unit residents generally only have access to programming provided in the South Unit. (DHS Defs. SUMF ¶¶ 67–68; Pl. Resp. to DHS Defs. SUMF ¶¶ 67–68). The South Unit houses the Treatment Readiness Unit (which focuses on preparing residents to engage or re-engage with the sex-offender-specific elements of treatment), consisting primarily of residents who have been assigned to Temporary Close Custody ("TCC"), MAP, or have refused treatment, residents who have difficulties functioning in more open settings, and residents who need to be separated from others because of conflicts or troubling behaviors. (DHS Defs. SUMF ¶¶ 69–73; Pl. Resp. to DHS Defs. SUMF ¶¶ 69–73).

DHS staff (specifically Dr. Main, Adams, and Ottino) decided where SVPs would reside in the STU at EJSP. (D.E. No. 165-15, Ex. Q ("DHS Defs. Answers to First Set of Interrogatories") to Cert. of Counsel ¶ 1). Nonetheless, Dr. Main testified that there was a high degree of cooperation between DHS and DOC regarding housing assignments and indicated it was ultimately DOC's decision where to house a resident because of its obligation to maintain the safety and security of the facility. (Dr. Main Dep. Vol. I at 100:23–101:10).

On May 18, 2010, Plaintiff was placed in the South Unit. (DHS Defs. SUMF ¶ 76; Lanigan SUMF ¶ 29; Pl. Resp. to DHS Defs. SUMF ¶ 76; Pl. Resp. to Lanigan SUMF ¶ 29). Plaintiff was assigned to the South Unit based on his history of disruption, threats and assaults, and his predatory relationship with a much younger resident. (DHS Defs. SUMF ¶ 77; Lanigan SUMF ¶ 29; Pl.

11

Resp. to DHS Defs. SUMF ¶ 77 Pl. Resp. to Lanigan SUMF ¶ 29).

### 5.    The STU Treatment Regimen and Plaintiff's Treatment History at EJSP

The STU committed to maintaining the same core treatment—process groups and modules—after the move to EJSP. (DHS Defs. SUMF ¶ 83; Pl. Resp. to DHS Defs. SUMF ¶ 83). According to Dr. Main, this minimum standard of twice-a-week, ninety-minute process groups and one module was not only always maintained but ultimately exceeded. (Dr. Main Dep. Vol. I at 118:13–22). Plaintiff was assigned to a process group, which was scheduled to meet twice a week for an hour and a half. (DHS Defs. SUMF ¶ 85; Pl. Resp. to DHS Defs. SUMF ¶ 85).

Dr. Main testified that Plaintiff suffered a setback in treatment but indicated that it was not due to inadequate treatment. (Dr. Main Dep. Vol. I at 161:25–162:14). Instead, Plaintiff experienced a "labelling effect" in which he associated his South Unit placement with the fact that the unit also houses residents who refused treatment and demonstrated other behavioral instabilities. (DHS Defs. SUMF ¶ 103; Pl. Resp. to DHS Defs. SUMF ¶ 103; Dr. Main Dep. Vol. I at 158:18–19). Dr. Main also testified "the amount of treatment being provided was still there for [Plaintiff] to do the work" and that, if he had been more resilient, Plaintiff could have used the move to avail himself of the available treatment opportunities. (Dr. Main Dep. Vol. I at 158:4–160:8).

Dr. Main further testified that, while some secondary or tertiary modules were not available, the core modules, including the relapse prevention and anger management modules, were offered to South Unit residents. (Dr. Main Dep. Vol. I at 104:23–105:8). According to Dr. Iser, the modules on the South Unit were limited in comparison to what was available in the other units. (Dr. Iser Dep. at 79:22–25).

Modifications were made to the treatment regimen to accommodate the physical limitations

at EJSP, particularly the lack of designated treatment rooms. (DHS Defs. SUMF ¶ 88; Lanigan SUMF ¶ 26; Pl. Resp. to Lanigan SUMF ¶ 26; Pl. Resp. to DHS Defs. SUMF ¶ 88). Accordingly, while the designated rooms were being built, treatment was provided in the day room. (DHS Defs. SUMF ¶ 89; Lanigan SUMF ¶ 26; Pl. Resp. to Lanigan SUMF ¶ 26; Pl. Resp. to DHS Defs. SUMF ¶ 89). Dr. Main explained that the day room space was not "ideal" because it was being used by officers and other residents, was noisy, and had an echo. (Dr. Main Dep. Vol. I at 95:7–8 & 122:18–123:21). He testified that the non-participants were cooperative, would vacate the area of the day room whenever a group was scheduled to meet, and chairs and tables would be rearranged to create a separated area for the session. (*Id.* at 122:18–123:21). It was Dr. Main's opinion that "the therapists made it work quite well." (*Id.* at 123:4–7). Plaintiff complained that the process group sometimes met in the middle of the room, with the television on and people socializing, and that he could not hear what was being said. (Pl. SUMF ¶ 56; DHS Defs. Resp. to Pl. SUMF ¶ 56).

In 2010 and 2011, several scheduled process group sessions were not held. Plaintiff also did not attend every session. Between the move in May 2010 and the issuance of the TPRC report in September 2010, Plaintiff missed twenty process group meetings. (DHS Defs. SUMF ¶ 100; Pl. Resp. to DHS Defs. SUMF ¶ 100).

The September 2010 TPRC report noted "inconsistency" in Plaintiff's motivation and engagement in treatment between May 2010 and August 2010. (Sept. 2010 TPRC Rep. at Thomas-000264–65). In his August 18, 2010 interview with the TPRC, Plaintiff initially denied that he stopped attending process groups, but he later admitted that he did stop attending the group because ████████████████████████████████████ (*Id.* at Thomas-000258). The TPRC empathized with Plaintiff regarding the changes, but it also expressed its ████████████ ████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████ [4] (*Id.* at Thomas-000265). It further

noted that █████████████████████████████████████████ (*Id.* at

Thomas-000256). The TPRC did acknowledge that he now appeared willing to re-engage in the treatment process, had resumed regular attendance at the process group sessions, and his participation and motivation in his prior two review periods at Kearny were encouraging. (*Id.* at Thomas-000264–65). Plaintiff was encouraged to repeat the relapse prevention 1A module and enroll in the anger management 2 module. (*Id.* at Thomas-000265).

In October 2010, five process group sessions were held, and Plaintiff attended one of them. (Pl. SUMF ¶ 57; Lanigan Resp. to Pl. SUMF ¶ 57; DHS Defs. Resp. to Pl. SUMF ¶ 57). In November 2010, there were four process group sessions. (Pl. SUMF ¶ 58; DHS Defs. Resp. to Pl. SUMF ¶ 58). The September 2011 TPRC report stated that the process group convened three times in December 2010, but, according to the participation notes, there were four sessions that month. (D.E. No. 167-6, Ex. S ("Sept. 2011 TPRC Rep.") to Cert. of Counsel at DHS371; D.E. No. 160-1, Ex. D ("Weekly Grp. Participation Notes") to Cert. of Counsel at DHS950-53). Plaintiff did not attend any of the remaining 2010 process group sessions. (Pl. SUMF ¶¶ 58–59; Lanigan Resp. to Pl. SUMF ¶¶ 58–59; DHS Defs. Resp. to Pl. SUMF ¶¶ 58–59).

The TPRC attributed the reduction in process groups in November and December of 2010 to construction on the South Unit. (Sept. 2011 TPRC Rep. at DHS371). In November 2010, Plaintiff submitted a grievance regarding the cancellation of recreational time, and Adams responded that the yard was closed early for safety reasons because there was a large crane being used to move heavy objects on and off the roof. (DHS Defs. Resp. to Pl. SUMF ¶ 68). Plaintiff

---

[4]     Phase Three of the five-phase treatment program is considered the "core" phase of the program. (DHS Defs. SUMF ¶ 22; Pl. Resp. to DHS Defs. SUMF ¶ 22).

also filed a grievance regarding his inability to join a group held during open recreation in the West Unit, and Adams explained that he could not participate in activities in a different unit.[5] (*Id.*).

In 2011, Plaintiff attended one out of the seven process groups held in January, four out of the five groups in February, three out of the six groups in April, and two out of the three groups held in May. (Lanigan SUMF ¶ 36; Pl. SUMF ¶¶ 61 & 63–64; Pl. Resp. to Lanigan SUMF ¶ 36; Lanigan Resp. to Pl. SUMF ¶¶ 61 & 64–65; DHS Defs. Resp. to Pl. SUMF ¶¶ 61 & 64–65). According to the September 2011 TPRC report, Plaintiff attended three out of the five March process groups (and left one of the groups after fifteen minutes), but the treatment notes showed that he only attended one session in March 2011. (Sept. 2011 TPRC Rep. at DHS372; Weekly Grp. Participation Notes at DHS961-62). The TPRC and Dr. Iser attributed the decline in the number of March 2011 sessions to flooding in the day room. (Pl. SUMF ¶ 63; Lanigan Resp. to Pl. SUMF ¶ 63; DHS Defs. Resp. to Pl. SUMF ¶ 63).

After construction began on the South Unit in May 2011, it was impracticable for Plaintiff's process group to convene formally. (Lanigan Resp. to Pl. SUMF ¶ 71; DHS Defs. Resp. to Pl. SUMF ¶ 66). Accordingly, no formal process groups were held from mid-May 2011 until mid-September 2011. (Pl. SUMF ¶¶ 66–67; Lanigan Resp. to Pl. SUMF ¶ 71; DHS Defs. Resp. to Pl. SUMF ¶¶ 66–67). Instead, treatment providers "called out" process group members, asking them how they were doing, and inviting them to discuss any issues they had. (Pl. Resp. to DHS Defs. SUMF ¶ 93; Lanigan Resp. to Pl. SUMF ¶ 71; DHS Defs. Resp. to Pl. SUMF ¶ 71). According to the treatment notes, there were two June call-outs, two July call-outs, five August call-outs, and two call-outs in September. (D.E. No. 160-2, Ex. B ("June 2011–Sept. 2011 Weekly Grp. Participation Notes") to Cert. of Counsel at DHS977–82). The September 2011 TPRC report

---

[5] According to the treatment notes, two of the November sessions were not held because they fell on public holidays (Veteran's Day and Thanksgiving). (Weekly Grp. Participation Notes at DHS947 & 949).

stated that there were three June call-outs, two call-outs in July, and three call-outs in August. (Sept. 2011 TPRC Rep. at DHS372).

Plaintiff declined almost every invitation to participate in the call-outs. (Lanigan Resp. to Pl. SUMF ¶ 71; DHS Defs. Resp. to Pl. SUMF ¶ 66). On June 6, 2011, he submitted a grievance regarding the cancellation of the process groups because of the ongoing construction. (D.E. No. 165-20, Ex. X ("Grievance") to Cert. of Counsel at DHS543). In response, Adams stated that construction precluded holding process groups in the South Unit, treatment providers were individually making the rounds to each unit to make up for the missed groups, and substantially more treatment space would be available once construction was completed. (*Id.*).

On September 16, 2011, a Senior DAG with the Division of Law emailed Dr. Main and Dr. Brian Friedman, the STU Director of Psychology, requesting information regarding the treatment options in the South Unit compared to the rest of the STU. (D.E. No. 165-14, Ex. P ("Sept. 16, 2011 Emails") to Cert. of Counsel at DHS1767). In response, Dr. Friedman explained that "[w]e have not had a treatment room available to us on the South [U]nit for several months due to construction of new treatment rooms." (*Id.* at DHS1766). He stated that "the cause of all of these disruptions is due to the poor planning by the Department of Corrections." (*Id.*). According to Dr. Friedman, "we have not had a treatment room available to us on the South [U]nit for several months due to construction of new treatment rooms." (*Id.* at DHS1766). He stated that "treatment offerings have been negatively affected by the poor planning by DOC and the reality that DOC has not provided us with an adequate treatment facility as of yet." (*Id.* at DHS1767). However, Dr. Friedman acknowledged that "[Plaintiff's] process group facilitator, Dr. Carlson, just indicated to [him] that [Dr. Carlson] and Dr. Iser have been on the South [U]nit during [Plaintiff's] process group time every Wed[nesday] since construction began and have had [the]

16

group called out and they have met with this process group every time." (*Id.* at DHS1766). He explained that "[o]nce construction is complete we will have 4 treatment rooms on [the] South [Unit]," which "is more than enough treatment room [space] to offer them [South Unit residents] comparable treatment to other Main residents." (*Id.* at DHS1767). Dr. Friedman finally observed that Plaintiff has "never availed himself of treatment offerings and has continued to decline to engage in the offerings that we are still currently able to provide." (*Id.* at DHS1767).

Plaintiff's September 2011 TPRC report found that, before construction began in May 2011, his process group attendance had been sporadic and he had been compliant with his attendance schedule for only three weeks prior to the start date. (Sept. 2011 TPRC Rep. at DHS370–71). The TPRC stated that he "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" (*Id.* at DHS381). It also noted some concerns with Plaintiff's participation at the process groups that he did attend. (*Id.* at DHS371). When he was asked to identify modules in which he wanted to participate, Plaintiff replied, "[n]one," because, when he asked therapists to "put him in his group," they told him "they couldn't because he is on the South Unit." (*Id.* at DHS374). He also reported that no modules were available to him on the South Unit. (*Id.* at DHS380). Although acknowledging the limited availability of modules on the South Unit, the TPRC noted that Plaintiff's peers had chosen to engage with each other and as a group to vent their feelings, seek solutions, and support each other. (*Id.*).

At his deposition, Dr. Iser testified regarding the treatment regimen in 2010 and 2011, although it is not always clear whether he was referring to the process group sessions held in the day room, the call-outs, or both types of treatment. He testified that "we had the treatment – the [p]rocess [g]roups in cages" in a section of the facility called the "flats." (Dr. Iser Dep. at 82:23–

83:10). He said that the setting could have caused confidentiality concerns, although he could not remember any residents "hanging out" by the cages to listen to the sessions. (*Id.* at 83:18–23). Dr. Iser also did not recall residents complaining too much about the setting, but he did state that residents had understandable concerns. (*Id.* at 84:1–2). Asked about his weekly group participation notes from May through September 2011 (*id.* at 85:5–86:22), he testified that "we would call out the residents to meet with them on the flat" and would ask "whether they had any issues to process." (*Id.* at 86:23–25). According to Dr. Iser, some residents had understandable concerns about confidentiality. (*Id.* at 86:25–13). In his personal opinion, this "call-out" arrangement was neither ideal nor an adequate way to provide treatment given the noise and the confidentiality issues. (*Id.* at 87:20–88:12). He was subsequently asked to confirm that it was his personal, and not a professional, opinion that holding process groups in the "day room or the general room" was inadequate treatment. (*Id.* at 133:17–25). Dr. Iser testified that "it's a personal opinion." (*Id.* at 134:1).

Dr. Main testified that, "[a]lthough I would be hard pressed to argue that once weekly Process group [sic] in the day room would be adequate, twice weekly with the individual contacts as are noted in a lot of the progress note [sic] whether [sic] the therapists are going out to ask everyone and sit down if they had any issues that are coming up is adequate, but it's disruptive." (Dr. Main Dep. Vol. I at 151:18–24).

As of September 14, 2011, process group members were still being called out due to the construction project. (Pl. SUMF ¶ 76; Lanigan Resp. to Pl. SUMF ¶ 76; DHS Defs. Resp. to Pl. SUMF ¶ 76). Plaintiff was asked which modules he would like to consider, and he responded that ███████████████████████████████. (June 2011–Sept. 2011 Weekly Grp. Participation Notes at DHS998). The process group formally reconvened on September 21, 2011, and Plaintiff did

18

not attend this session. (Pl. SUMF ¶ 76; Lanigan Resp. to Pl. SUMF ¶ 76; DHS Defs. Resp. to Pl. SUMF ¶ 76).

In 2012, Plaintiff indicated in his TPRC interview that there were "few" or no modules in the South Unit and that they also get postponed. (D.E. No. 167-7, Ex. T ("Sept. 2012 TPRC Rep.") to Cert. of Counsel at Thomas-000274). Plaintiff enrolled in his first module at EJSP in September 2012. (DHS Defs. SUMF ¶ 86; Lanigan SUMF ¶ 35; Pl. Resp. to Lanigan SUMF ¶ 35; Pl. Resp. to DHS Defs. SUMF ¶ 86).

In 2013, Plaintiff was placed on Treatment Probation and then Treatment Refusal, and the treatment team recommended that he be demoted to Phase One. (DHS Defs. SUMF ¶ 115; Pl. Resp. to DHS Defs. SUMF ¶ 115). He was put on MAP from November 2011 to April 2012, and then again from September 2013 to December 2013, because of physical altercations with other residents. (DHS Defs. Resp. to Pl. SUMF ¶ 46). Plaintiff was also put on TCC status because of institutional infractions. (DHS Defs. SUMF ¶ 116; Pl. Resp. to DHS Defs. SUMF ¶ 116).

Since the STU was moved to EJSP, there have been residents who were able to complete all phases of treatment, as well as residents who were released from the STU. (Lanigan SUMF ¶¶ 39–40; Pl. Resp. to Lanigan SUMF ¶¶ 39–40). In 2015, Plaintiff entered a stipulation in his state court civil commitment proceeding agreeing that he continued to be an SVP in need of civil commitment. (DHS Defs. SUMF ¶ 119; Pl. Resp. to DHS Defs. SUMF ¶ 119). He was advanced to Phase Three in 2016. (Lanigan SUMF ¶ 41; Pl. Resp. to Lanigan SUMF ¶ 41).

## B. Procedural History

This case has a lengthy procedural history, with which the parties are familiar, and the Court does not recount it at length here. On October 20, 2014, the Honorable Dickinson R. Debevoise, U.S.D.J., entered an opinion and order granting in part and denying in part Defendants'

19

motion to dismiss Plaintiffs'[6] FAC. (D.E. No. 32 ("Oct. 20, 2014 Opinion"); D.E. No. 33 ("Oct. 20, 2014 Order")); *Thomas v. Adams*, 55 F. Supp. 3d 552 (D.N.J. 2014).

In his order, Judge Debevoise dismissed "all Plaintiffs'[7] claims asserting overall insufficiency of the mental treatment provided to all civilly committed sexually violent predators confined at the [STU at EJSP]" with prejudice. (Oct. 20, 2014 Order at 1). He also dismissed with prejudice all claims against Defendant Paula T. Dow, the former Attorney General of the State of New Jersey, and dismissed without prejudice the claims against Defendant Chris Christie, the then-Governor of the State of New Jersey. (*Id.* at 2). Lastly, Judge Debevoise denied Defendants' motion as to Plaintiffs' claims against Lanigan, Velez, John Main, Poag, Dr. Main, Adams, and Ottino, "to the extent Plaintiffs assert that these Defendants made systemwide decisions that produced the operational regime . . . at the Special Treatment Unit of the East Jersey State Prison, which caused the subordinate officers to deny and/or reduce and/or change Plaintiffs' prescribed mental treatment for non-medical reasons." (*Id.*).

Lanigan, Velez, John Main, Poag, Dr. Main, Adams, and Ottino appealed, challenging Judge Debevoise's denial of qualified immunity. *Thomas v. Christie*, 655 F. App'x 72, 83 (3d Cir. 2016). The Third Circuit affirmed, finding that Judge Debevoise properly denied qualified immunity. *Id.* at 83–87.

Upon return to the District Court, this matter was reassigned to the Undersigned. (D.E. No. 36 ("Dec. 29, 2016 Text Order")). Magistrate Judge Hammer allowed Plaintiffs to file a SAC,

---

[6]   This case was consolidated with an action filed by Ronald Nash ("Nash"), another SVP at EJSP. On October 16, 2018, the Court adopted the Report and Recommendation ("R&R") of the Honorable Michael A. Hammer, U.S.M.J., recommending that the undersigned grant Nash's pro bono counsel's request to terminate its representation and dismiss Nash's claims pursuant to Federal Rule of Civil Procedure 25(a). *Nash v. Christie*, No. 10-2113, 2018 WL 5017753, at *1 (D.N.J. Oct. 16, 2018).

[7]   References to "Plaintiffs" herein refer to both Thomas and Nash, collectively, though "Plaintiff" herein refers solely to Thomas, as Nash is not a party to the instant summary judgment motions since his claims were dismissed back in 2018. *See supra* n.6.

which Plaintiffs filed on March 9, 2017. (D.E. No. 40 ("Feb. 8, 2017 Text Order"); D.E. No. 44).

In their SAC, Plaintiffs bring their action against Defendants under 42 U.S.C. § 1983 and state law to remedy alleged violations of their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the New Jersey Constitution. (SAC at 1 & ¶¶ 7–15). Except for Poag and Velez, who are named in their official capacities only, Defendants are sued in both their individual and official capacities. (*Id.* ¶¶ 7–15). Plaintiffs claim that Defendants' acts and omissions—specifically their deliberate indifference in transferring Plaintiffs to the STU at EJSP despite the known risk that doing so would result in a precipitous decline in the available mental health and their placement of Plaintiff in the South Unit, where access to treatment was severely limited, for nearly six years for non-medical reasons and without a treatment-related justification—have: (i) violated the substantive due process guarantee of the Fourteenth Amendment by depriving Plaintiffs of the prescribed treatment regimen necessary for them to improve their condition and advance toward release ("First Cause of Action"); (ii) deprived Plaintiffs of their prescribed treatment regimen without due process of law in violation of the Fourteenth Amendment's procedural due process guarantee ("Second Cause of Action"); and (iii) violated the New Jersey Constitution by depriving them of their prescribed treatment regimen necessary for them to improve and advance toward treatment ("Third Cause of Action"). (*Id.* ¶¶ 76–86). Plaintiffs seek declaratory, injunctive, and monetary relief. (*Id.*).

Lanigan and DHS Defendants filed separate motions to dismiss the SAC. (D.E. No. 50,; D.E. No. 51). On January 5, 2018, the Court denied their motions to dismiss. (D.E. No. 58 ("Jan. 5, 2018 Order")); *Nash v. Lanigan*, No. 10-2113, 2018 WL 305320 (D.N.J. Jan. 5, 2018).

On February 16, 2024, DHS Defendants, Lanigan, and Plaintiff moved for summary judgment. (D.E. No. 160; D.E. No. 163; D.E. No. 165). The motions are fully briefed. (D.E. No.

161 ("DHS Defs. Mov. Br."); D.E. No. 163-3 ("Lanigan Mov. Br."); D.E. No. 165-1 ("Pl. Mov. Br."); D.E. No. 166 ("Lanigan Reply Br."); D.E. No. 169 ("DHS Defs. Reply Br."); D.E. No. 172 ("Pl. Reply Br.")).

The Court heard oral argument on the parties' summary judgment motions on January 30, 2025. (*See* Oral Arg. Tr.).

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The mere existence of an alleged disputed fact is not enough. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Rather, the opposing or nonmoving party must prove that there is a genuine dispute of a material fact. *Id.* at 247–48. An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A fact is "material" if under the governing substantive law, a dispute about the fact might affect the outcome of the lawsuit. *Id.* Factual disputes that are irrelevant or unnecessary will not preclude summary judgment. *Id.*

On a summary judgment motion, the moving party must first show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to present evidence that a genuine issue of material fact compels a trial. *Id.* at 324. To meet this burden, the nonmoving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Thus, the nonmoving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir.

22

1999).

The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the nonmoving party, *see Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995) and the procedure "is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008) (citing *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)). Cross-motions for summary judgment "are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Lawrence*, 527 F.3d at 310 (quoting *Rains*, 402 F.2d at 245.

## III.    DISCUSSION

Defendants seek summary judgment on Plaintiff's official-capacity claims against them for damages under federal and state law on the grounds of sovereign immunity. (DHS Defs. Mov. Br. at 4–6 & 38–40; Lanigan Mov. Br. at 1 n.2 & 24 n.4). DHS Defendants also contend that there is no private right of action under the New Jersey Constitution, and Lanigan argues that Plaintiff lacks standing to obtain prospective injunctive or declaratory relief under the *Ex Parte Young* doctrine because there is no ongoing violation of federal law. (DHS Defs. Mov. Br. at 37–38; Lanigan Mov. Br. at 24–27). As to the individual-capacity claims for damages under 42 U.S.C. § 1983, Defendants assert that summary judgment should be granted in their favor because the record conclusively establishes that they did not violate Plaintiff's substantive or procedural due process rights under the Fourteenth Amendment and, even if he could establish a due process violation, they are entitled to qualified immunity because the right was not clearly established at the time of

23

the alleged violation. (DHS Defs. Mov. Br. at 6–36; Lanigan Mov. Br. at 5–30). Plaintiff claims that he is entitled to summary judgment on his federal substantive and procedural due process claims, his state constitutional claims, and the issue of qualified immunity. (Pl. Mov. Br. at 22–53). He also argues that he still has claims for injunctive relief against the current DOC Commissioner. (*Id.* at 53–55).

For the reasons stated below, the Court grants Defendants' motions for summary judgment and denies Plaintiff's cross motion for summary judgment.

**A.    Plaintiff's Official-Capacity Claims for Damages (First, Second, and Third Causes of Action)**

Section 1983 imposes liability on "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights . . . secured by the Constitution and laws." 42 U.S.C. § 1983. To be liable under Section 1983, a defendant must be a "person" within the meaning of the statute. *Id.* The Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, a cause of action under Section 1983 "cannot be asserted against the state, its agencies, or its officials acting in their official capacities." *Landi v. Borough of Seaside Park*, No. 07-5319, 2009 WL 606141, at *6 (D.N.J. Mar. 9, 2009).

Like 42 U.S.C. § 1983, the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. §§ 10:6-1 to -2, "premise[s] liability on the conduct of a 'person.'" *Estate of Lagano v. Bergen Cnty. Prosecutor's Off.*, 769 F.3d 850, 856 (3d Cir. 2014) (quoting *Lopez–Siguenza v. Roddy*, No. 13-2005, 2014 WL 1298300, at *7 (D.N.J. Mar. 31, 2014)). "New Jersey district courts have interpreted the NJCRA as having incorporated the Supreme Court's decision in *Will* that, for

24

purposes of § 1983, states and state officials acting in their official capacity are not amenable to suit." *Id.* (citations omitted).

Furthermore, the Eleventh Amendment generally protects non-consenting states from suits brought in federal court by private citizens seeking money damages under either federal or state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Individual state officials are also immune when they "are sued for damages in their official capacity." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

Plaintiff does not respond to Defendants' arguments regarding sovereign immunity. Lanigan, Connolly, John Main, Mielke, Dr. Main, Adams, and Ottino are current (or former) officials with the New Jersey DHS or the New Jersey DOC.[8] (*See* Pl. SUMF ¶¶ 2–6 & 8; Lanigan Resp. to Pl. SUMF ¶ 2; DHS Defs. Resp. to Pl. SUMF ¶¶ 2–6 & 8). Accordingly, the Court grants Defendants' motions for summary judgment and denies Plaintiff's cross motion for summary judgment as to Plaintiff's official-capacity claims for damages against these current or former state officials in his First, Second, and Third Causes of Action.

B.     **Plaintiff's Official-Capacity Claims for Equitable and Declaratory Relief under Federal and State Law (First, Second, and Third Causes of Action)**

Lanigan argues that Plaintiff lacks standing under the *Ex Parte Young* doctrine to obtain prospective injunctive or declaratory relief because there is no ongoing violation of federal law. (Lanigan Mov. Br. at 24–27). Plaintiff responds that he has claims for injunctive and declaratory relief against the current DOC Commissioner because such relief would have concrete practical consequences for the parties. (Pl. Mov. Br. at 53–55). He notes that, in its ruling denying the motions to dismiss the SAC, the Court recognized that the prospective relief that he seeks relates to the conditions at the EJSP STU and his continued involuntary confinement and not just the

---

[8]     Plaintiff sued Poag and Velez in their individual capacities only. (SAC ¶¶ 14–15).

narrow issue of the STU's (and Plaintiff's) relocation to EJSP in 2010. (*Id.* at 54). Plaintiff contends that this ruling is the law of the case. (*Id.*). He further indicates that the Defendants' statements show that clarification of his treatment rights and Defendants' respective responsibilities would have material consequences for his status at the STU. (*Id.*). He offers as examples the deposition testimony of a DOC official that the department is not responsible for tracking how DOC operations may affect STU residents' treatment and Dr. Main's testimony that he could not really answer the question of whether DHS or DOC has the ultimate responsibility for STU housing determinations. (*Id.* at 54–55). According to Plaintiff, Dr. Main's statement demonstrates that the treatment-related conditions can reasonably be expected to recur because the relevant state actors refuse to take responsibility to prevent them. (*Id.* at 55). Lanigan replies that Plaintiff's opposition demonstrates that Plaintiff is not under threat of suffering any immediate or irreparable injury. (Lanigan Reply Br. at 44–46).

Under *Ex Parte Young*, 209 U.S. 123 (1908), the Eleventh Amendment permits suits for prospective injunctive or declaratory relief against a state official in his or her official capacity, for violating federal law because "official-capacity actions for prospective relief are not treated as actions against the State." *Heine v. Comm'r of Dep't of Cmty. Affs.*, No. 11-5347, 2016 WL 7042069, at *6 (D.N.J. Dec. 1, 2016) (citing *Graham*, 473 U.S. at 167 n.14; *Ex Parte Young*, 209 U.S. at 159–60; *Edelman v. Jordan*, 415 U.S. 651, 664–71 (1974)), *aff'd*, 794 F. App'x 236 (3d Cir. 2020)). "A state official is 'stripped of his official or representative character' and thereby deprived of the State's immunity, *Ex Parte Young*, 209 U.S. at 159–60, when he commits an 'ongoing violation of federal law.'" *Waterfront Comm'n v. Governor of New Jersey*, 961 F.3d 234, 238 (3d Cir. 2020) (citing *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55

26

(2011)). As such, a person who is aggrieved may seek prospective relief by suing the official in his or her official capacity. *See id.* (citing *VOPA*, 563 U.S. at 254–55).

"Plaintiffs can therefore bring suit against state officers, but their remedies are limited to those that are 'designed to end a continuing violation of federal law.'" *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 730 F.3d 291, 318 (3d Cir. 2013) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)). In his motion to dismiss the SAC, Lanigan sought the dismissal of Plaintiffs' request for declaratory relief on the grounds that such a claim is only permissible if it was prospective. *Nash*, 2018 WL 305320, at *3. The Court rejected this argument based on "the fact that the transfer decision and treatment disruption are all connected." *Id.* at *4. The Court explained that "it is a reasonable reading of the SAC to find that [Plaintiffs] are seeking prospective relief from all Defendants relating to the conditions at the STU and continued involuntary commitment." *Id.* However, at the summary judgment stage, Plaintiff has failed to present any evidence of an ongoing violation of federal law. *See, e.g.*, *Celotex*, 477 U.S. at 323–24 (the nonmoving party must go beyond the pleadings and point to specific factual evidence showing there is a genuine material issue for trial).

The evidence conclusively establishes that any alleged "treatment disruption" related to Plaintiff's transfer from Kearny to EJSP ended years ago. Specifically, Plaintiff claims that, in 2010 and 2011, the availability of modules was limited, his process group was held in the day room due to the lack of dedicated treatment space, the frequency of process group sessions declined from October 2010 through May 2011, and from the last half of May 2011 through the first half of September 2011, construction prevented formal process groups resulting in the treatment providers infrequently "calling out" the residents. (Pl. SUMF ¶¶ 54, 57–67 & 75). While construction was ongoing as of September 16, 2011, it is undisputed that Plaintiff's process group

27

formally reconvened on September 21, 2011. (Pl. SUMF ¶ 76; Lanigan Resp. to Pl. SUMF ¶ 76; DHS Defs. Resp. to Pl. SUMF ¶ 76). In fact, Plaintiff advanced to Phase Three of the treatment program in 2016. (Lanigan SUMF ¶ 41; Pl. Resp. to Lanigan SUMF ¶ 41).

Accordingly, Plaintiff does not "identify any ongoing conduct by [Defendants] that must be enjoined to ensure the supremacy of federal law." *Christ the King Manor*, 730 F.3d at 319. The law of the case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Mack v. Yost*, 63 F.4th 211, 231 (3d Cir. 2023) (quoting *Farina v. Nokia Inc.*, 625 F.3d 97, 117 n.21 (3d Cir. 2010)). The doctrine "does not prevent a court from deciding a summary judgment motion based on record evidence in a way that differs from previous decisions on allegations in the complaint." *Id.* (citing *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 329–30 (3d Cir. 2016)). Despite the alleged connection between "the transfer decision and treatment disruption," *Nash*, 2018 WL 305230, at *4, there is no record evidence that any disruption has persisted for more than ten years after the transfer. Plaintiff also has not cited to any evidence that the alleged confusion on the part of DOC and DHS officials regarding their respective obligations has continued to cause an ongoing violation of Plaintiff's constitutional rights or will cause him imminent harm.

Defendants additionally note that the *Ex Parte Young* doctrine only applies to alleged violations of federal law. (DHS Mov. Br. at 5; Lanigan Mov. Br. at 25). "The Eleventh Amendment strictly bars suits in federal court against state agencies or state officials for violations of state law, and the *Ex Parte Young* doctrine is inapplicable to such claims." *Borowski v. Kean Univ.*, No. 20-5172, 2024 WL 658262, at *5 (D.N.J. Feb. 15, 2024) (quoting *Larsen v. State Emps.' Ret. Sys.*, 553 F. Supp. 2d 403, 412 (M.D. Pa. 2008)). The Eleventh Amendment bars the official-

28

capacity state law claim for injunctive and declaratory relief against Lanigan, Connolly, John Main, Mielke, Dr. Main, Adams, and Ottino.

For the foregoing reasons, the Court grants Defendants' summary judgment motions and denies Plaintiff's cross motion for summary judgment as to Plaintiff's official-capacity claims for declaratory and injunctive relief against Lanigan, Connolly, John Main, Mielke, Dr. Main, Adams, and Ottino in his First, Second, and Third Causes of Action.

**C.**     **A Private Right of Action under the New Jersey Constitution (Third Cause of Action)**

DHS Defendants argue that Plaintiff's state law claim fails because it is brought directly under the New Jersey Constitution, which does not create a private right of action. (DHS Defs. Mov. Br. at 37–38). Plaintiff asserts that, although the NJCRA was enacted in 2004 to provide one vehicle to bring state constitutional claims, the New Jersey Constitution continues to provide a separate private right of action. (Pl. Mov. Br. at 48–49). In reply, DHS Defendants emphasize that courts in this district have repeatedly recognized that, at least since the enactment of the NJCRA, the state constitution does not provide a private right of action for violations of an individual's due process rights. (DHS Defs. Reply Br. at 41–44). This Court agrees with DHS Defendants that Plaintiff does not have a private cause of action under the New Jersey Constitution.

Plaintiff cites to two New Jersey Supreme Court cases from 1961 and 1978, respectively, which permitted individuals to bring claims directly under the state constitution. (Pl. Mov. Br. at 48–49 (citing *Peper v. Princeton Univ. Bd. of Trs.*, 389 A.2d 465, 477–78 (N.J. 1978); *Cooper v. Nutley Sun Printing Co.*, 175 A.2d 639, 643–44 (N.J. 1961))). In *Scully v. Borough of Hawthorne*, 58 F. Supp. 2d 435 (D.N.J. 1999), the court relied on this case law to conclude that the New Jersey Supreme Court "has held that the Constitution of the State of New Jersey may provide a private cause of action premised upon alleged violations of the State constitution," *id.* at 459 (citing *Peper*,

29

389 A.2d at 475–78).

However, subsequent district court rulings have observed that New Jersey Supreme Court "cases permitting a private right for a violation of an individual's rights under the New Jersey Constitution appear to be limited to employment discrimination under equal protection." *K.J. ex rel. Lowry v. Div. of Youth & Fam. Servs.*, 363 F. Supp. 2d 728, 746 (D.N.J. 2005); *see also Johnson v. New Jersey*, No. 18-11299, 2025 WL 1743626, at *13 (D.N.J. June 24, 2025) (quoting *K.J.*, 363 F. Supp. 2d at 745); *Thomas v. E. Orange Bd. of Educ.*, 998 F. Supp. 2d 338, 354 (D.N.J. 2014) (quoting *K.J.*, 363 F. Supp. 2d at 745–747). Accordingly, "the New Jersey Constitution does not provide a private right of action for violations of an individual's due process or, except for in the employment context, equal protection rights." *Thomas*, 998 F. Supp. 2d at 354 (citing *K.J.*, 363 F. Supp. 2d at 745); *see also Johnson*, 2025 WL 1743626, at *14 (concluding that, because remedies are available to the plaintiff under, inter alia, the NJCRA, it is unlikely that any additional remedy may be inferred under the New Jersey Constitution (quoting *K.J.*, 363 F. Supp. 2d at 747)) *Crane v. Sussex Cnty. Prosecutor's Off.*, No. 08-1641, 2009 WL 1929567, at *7–8 (D.N.J. Jan. 27, 2009) (agreeing with "thoughtful analysis" in *K.J.* that there is no private right of action directly under the due process clause of the New Jersey Constitution or, except in the employment context, for equal protection violations).

In 2004, the New Jersey Legislature enacted the NJCRA, providing "what Section 1983 does not: a remedy for the violation of substantive rights found in [the] State Constitution and laws." *Tumpson v. Farina*, 95 A.3d 210, 223 (N.J. 2014) (citing S. Judiciary Comm. Statement to S. No. 1558, 211th Leg. 1 (May 6, 2004); Press Release, Office of the Governor, Governor's Statement Upon Signing Assembly Bill 2073 (Sept. 10, 2004)). Since 2004, the NJCRA has been recognized as "the vehicle" for state constitutional claims. *Matrix Distribs., Inc. v. Nat'l Ass'n of*

30

*Bds. of Pharm.*, No. 18-17642, 2020 WL 7090688, at *13 (D.N.J. Dec. 4, 2020) (citing *O'Toole v. Klingen*, No. 14-6333, 2017 WL 132840, at *5 (D.N.J. Jan. 13, 2017)), *aff'd in part, rev'd in part & remanded on other grounds*, 34 F.4th 190 (3d Cir. 2022); *see also Johnson*, 2025 WL 1743626, at *14 (quoting *Matrix Distribs.*, 2020 WL 709688, at *13) *Khan v. City of Paterson*, No. 17-5006, 2018 WL 2059550, at *4 n.6 (D.N.J. May 2, 2018) ("However, Plaintiffs do not identify any vehicle, such as the New Jersey Civil Rights Act, by which they bring these claims.").

Plaintiff cites to a post-NJCRA district court decision holding that "[u]nlike violations of the United States Constitution, which are actionable through § 1983, the New Jersey Constitution itself provides a remedy for violations of its provisions." (Pl. Mov. Br. at 49) (quoting *Joyce v. City of Sea Isle City*, No. 04-5345, 2008 WL 906266, at *21 (D.N.J. Mar. 21, 2008), *reconsideration on other grounds granted in part & denied in part*, 2008 WL 2875456 (D.N.J. Jul. 23, 2008)). But the *Joyce* court merely cited to *Scully*, a pre-NJCRA ruling, without acknowledging the enactment of a specific statutory remedy for violations of the New Jersey Constitution or the thoughtful distinction drawn in *K.J.* and subsequent cases between claims arising out of the employment context and other state constitutional claims. *See Matrix Distribs.*, 2020 WL 8090688, at *13; *Crane*, 2009 WL 1929567, at *7–8; *K.J.*, 363 F. Supp. 2d at 745–47. Given the enactment of the NJCRA and the fact that this case does not involve an employer-employee relationship, the Court concludes that Plaintiff does not have a private right of action under the New Jersey Constitution.

In their opening brief, DHS Defendants state that the Court "need not and should not" treat Plaintiff's Third Cause of Action "as brought under the NJCRA." (DHS Defs. Mov. Br. at 38). In his SAC, Plaintiff asserts that he is bringing this action to remedy violations of his rights under the New Jersey Constitution. (SAC at 1). In his Third Cause of Action, he asserts a violation of his

rights to adequate treatment and to pre-deprivation process under the New Jersey Constitution and specifically alleges that he has been deprived of the prescribed mental health treatment regimen necessary for him to improve his condition and advance toward release without due process of law in violation of the New Jersey Constitution. (*Id.* at 16 & ¶ 86). Unlike Section 1983 (*see e.g., id.* at 1 & ¶ 2), the pleading does not cite to the NJCRA. Plaintiff also does not ask the Court to treat his state law claim as a NJCRA claim; instead, he insists that he has a private right of action under the New Jersey Constitution. (Pl. Mov. Br. at 48–49).

The Court therefore refrains from reading the SAC as alleging a claim under the NJCRA. Because of the absence of an applicable right of action, the Court grants Defendants' summary judgment motions and denies Plaintiff's cross motion for summary judgment as to the Third Cause of Action.

> **D.** **The Individual-Capacity Section 1983 Claim for Damages for Violations of the Right to Substantive Due Process under the Fourteenth Amendment (First Cause of Action)**
>
> **1.** **Judge Debevoise's October 2014 Opinion and the Applicable Legal Framework**

In his October 2014 Opinion, Judge Debevoise developed a multi-prong legal framework to evaluate whether Plaintiff's FAC alleged a plausible substantive due process claim for the denial or reduction of the prescribed mental health treatment regimen necessary in order for their condition to improve and to advance toward release. Although, given the different procedural contexts, this prior decision does not mandate entry of summary judgment in Plaintiff's favor under the law of the case doctrine, Judge Debevoise's overall legal approach guides this Court's evaluation whether, based on the record evidence, Plaintiff or Defendants are entitled to summary judgment on Plaintiff's individual-capacity Section 1983 claim for damages for violations of his substantive due process rights under the Fourteenth Amendment. However, certain modifications

32

or clarifications are required to account for the substantiality of the alleged change in the prescribed treatment being provided at the STU and the STU resident's history of treatment refusal.

In *Leamer v. Fauver*, 288 F.3d 532 (3d Cir. 2002), the Third Circuit considered the due process claims of a sex offender sentenced under a since-repealed New Jersey statutory provision to an indeterminate term in which he was to receive specialized mental health treatment and be released only when he was judged capable of making an acceptable social adjustment to the community, *id.* at 534–35. Defining the "exact contours of the underlying right said to have been violated" for purposes of the plaintiff's substantive due process claim, *id.* at 546 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998)), the *Leamer* court indicated that the deliberate indifference standard applied because the persons responsible for the plaintiff's treatment had time to make unhurried judgments, *id.* at 547–58. It further observed that "the indifference analysis must focus on the challenged abuse of power by officials in denying Leamer the treatment regimen that was statutorily mandated and was necessary in order for his condition to improve, and thus for him to advance toward release." *Id.* at 547. "[T]he authorities were not merely supposed to reflect and care, but in addition were to carry out a prescribed course of treatment." *Id.*

In his October 2014 Opinion, Judge Debevoise considered motions to dismiss the FAC for failure to state a plausible claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Thomas*, at 288 F. Supp. 3d at 553. Applying *Leamer* and prior "deliberate indifference" rulings addressing prisoner challenges to medical treatment, Judge Debevoise concluded that, "when a *prescribed* medical treatment is denied, reduced, or changed for *non-medical* reasons, including financial, administrative, or logistical," this denial, reduction, or change in treatment "suggests an act of deliberate indifference and amounts to a violation of both procedural and substantive due process with regard to those mental patients whose sole hope for release hinges on obtaining their

prescribed mental therapy." *Thomas*, 55 F. Supp. 3d at 576 (emphasis in original) (citing *Leamer*, 288 F.2d at 545–47; *Durmer v. O'Carroll*, 991 F.2d 64 (3d Cir. 1993); *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987)). He then adopted the following standard for assessing whether the complaint plausibly pleads a claim against high-ranking officials for the alleged wrongs:

> Reading *Leamer, Napoleon* and *Durmer* jointly with the rationale of *Plata*, this Court concludes that, if: (a) supervising officials make systemwide determinations; (b) these determinations become the moving force behind the circumstances under which the subordinate officers effectively have no choice but to deny/reduce/change an inmate's prescribed medical/mental treatment for non-medical reasons; and (c) such denial/reduction/change in prescribed treatment was foreseeable under the systemwide determinations the supervisors made, then the supervisors are liable to the inmate for his injuries caused by such denial/reduction/change in prescribed treatment, provided that the inmate draws the requisite "causal link" between the supervisors' decisions and his injury—by stating facts plausibly establishing the supervisors' deliberate indifference to the risk of the inmate's injury.

*Thomas*, 55 F. Supp. 3d at 578 (citing *Leamer*, 288 F.2d 532; *White v. Napoleon*, 897 F.3d 103 (3d Cir. 1990); *Durmer*, 991 F.2d 64; *Brown v. Plata*, 563 U.S. 493 (2011)).

According to the October 2014 Opinion, Plaintiff stated plausible procedural and substantive due process claims because the FAC alleged that, at Kearny, Plaintiff continuously received ten hours of individual and group therapy per week for a decade (totaling 5,200 hours of therapy); immediately after his transfer from Kearny to EJSP, the amount of treatment he received was reduced "down to one-third," without any mental health evaluation finding that Plaintiff's medical needs would be better or equally well served by such reduced therapy; his treatment then got changed to "a lower-level of advancement, again without any supporting mental health evaluation"; and "finally all his mental treatment became denied because [Plaintiff] was placed in the SHU and the SHU began undergoing construction works." *Id.* at 580–81 & n.32.

34

Judge Debevoise further determined that Plaintiff adequately alleged the existence of a causal link between the deprivation Plaintiff allegedly suffered and the actions of Lanigan, Velez, Poag, Dr. Main, Adams, Ottino, and John Main, because given the provisions of the SVPA governing the operation of the STU and the officials' obligation to make a series of systemwide decisions as to the facility for Plaintiff's housing under an executive order by the Governor and the New Jersey courts' rulings mandating the STU's relocation, "the decisions and acts at issue, by their very nature, could not have possibly escaped the scope of [their] *personal* responsibilities." *Id.* at 583 (emphasis in original) (citing N.J. Stat. Ann. § 30:4-27.34). Having been "placed in the circumstances under which they had to make the decision to house Plaintiffs at the EJSP STU, *i.e.,* at the very facility which they already *twice considered and rejected* in light of physical, financial and logistical constraints," the defendants either:

> (a) knew they were exposing Plaintiffs to the risk of a scenario where, for non-medical reasons, Plaintiffs would be unable to obtain the full amount of their prescribed mental treatment (and, potentially, no treatment at all); or (b) recklessly ignore[d] that risk. Yet, Defendants decided to proceed with placing Plaintiffs at the STU and, later, with placing Thomas at the SHU.

*Id.* at 582 (emphasis in original) (citing *Cnty. of Hudson v. State Dep't of Corr.*, 2009 WL 1351546 (N.J. Super. Ct. App. Div. Apr. 22, 2009)).

Plaintiff argues that "DHS Defendants' involvement in discussions and their creation of plans to 'fix[] the [STU]' to prepare for treatment fall directly within the scope of activities that the October 2014 Opinion already held sufficient to find them liable for the ensuring reduction in [Plaintiff's] treatment" and "[t]his, of course, is the law of the case, and accordingly is binding on this Court." (Pl. Mov. Br. at 37–38) (citing *Thomas*, 55 F. Supp. 3d at 576; *Hovensa L.L.C. v. Kristensons-Petroleum, Inc.*, 2014 WL 2168162, at *2 (D.N.J. May 23, 2014)). As the Court has noted, *see supra* Section III.B., "when a court decides upon a rule of law, that decision should

35

continue to govern the same issues in subsequent stages in the same case." *Mack*, 63 F.4th at 231 (3d Cir. 2023) (quoting *Farina*, 625 F.3d at 117 n.21). However, the doctrine "does not prevent a court from deciding a summary judgment motion based on record evidence in a way that differs from previous decisions that were based on allegations in the complaint." *Id.* (citing *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 329–30 (3d Cir. 2016)).

There is a "fundamental distinction" between a motion to dismiss and a summary judgment motion. *See Wiest*, 812 F.3d at 330. While at the motion-to-dismiss stage a district court is obligated to accept the factual allegations in a plaintiff's complaint as true, it does not accept mere allegations as true at the summary judgment stage. *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party," who "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Id.* Moreover, "if the non-moving party has the burden of proof at trial, that party must set forth facts sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted).

The October 2014 Opinion framework cannot be applied without substantial adjustments to account for the different procedural posture presented by the parties' summary judgment motions. Plaintiff can no longer rely on the allegations in his pleading but instead must either "put up or shut up" by "set[ting] forth facts sufficient to establish the existence of an element essential that [Plaintiff's] case." *Id.* (citation and internal quotation marks omitted). In fact, at oral argument, Plaintiff's counsel "agree[s] that the Court at this stage is deciding the parties' motion based on the record evidence." (Oral Arg. Tr. at 21:8–9).

Although the October 2014 Opinion thereby does not dictate that summary judgment must

36

be granted in favor of Plaintiff, as modified to fit the present procedural posture, Judge Debevoise's overall approach, properly understood, constitutes an appropriate framework for assessing whether summary judgment should be granted or denied on Plaintiff's substantive due process claim.

Judge Debevoise explicitly applied *Leamer* and well-established black-letter law governing deliberate indifference claims. In *Leamer*, the Third Circuit held that the deliberate indifference standard applied to the plaintiff's substantive due process claim and observed that "the authorities were not merely supposed to reflect and care, but in addition were to carry out a prescribed course of treatment." *Leamer*, 288 F.3d at 547–48. Judge Debevoise reasonably relied on cases, including *Durmer*, *Lanzaro*, and *Napoleon*, addressing prisoner claims of deficient medical care and the liability of supervisory officials, to explain what a showing of deliberate indifference entails (e.g., it requires more than negligence and constitutes a subjective standard of liability). *See Thomas*, 55 F. Supp. 3d at 576; *see also Carson*, 2016 WL 347041, at *3 (quoting Judge Debevoise's "prescribed medical treatment" standard and his summary of the four-part "deliberate indifference" test (quoting *Thomas*, 55 F. Supp. 3d at 576, 578–79)).

Both the Third Circuit and this Court have approved of, and applied, Judge Debevoise's approach. The Third Circuit stated that "[t]he District Court correctly reasoned from our precedent that the standard for holding officials liable in their individual capacity for deliberately indifferently wrongs is whether there is at least circumstantial evidence to plausibly infer that:" (i) they made systemwide determinations; (ii) their determinations became the moving force behind the circumstances under which subordinates had no effective choice but to deny/reduce/change prescribed mental treatment for non-medical reasons; and (iii) such denial/reduction//change was foreseeable given the systemwide determinations. *Thomas*, 655 F. App'x at 84. According to the Third Circuit, "[t]he District Court correctly reasoned from our precedent" in its formulation of

37

this "standard for holding officials liable in their individual capacity for deliberately indifferent wrongs." *Id.* The Third Circuit agreed with Judge Debevoise that Plaintiffs sufficiently pled facts to satisfy this standard. *Id.* at 85–87.

In its January 2018 Opinion denying the motions to dismiss the SAC, this Court similarly concluded that the amended pleading "essentially re-states the facts alleged in the FAC, which has already been determined to sufficiently state a claim by both Judge Debevoise and the Third Circuit." *Nash*, 2018 WL 305320, at *2.

Furthermore, in *Pines, Carson,* and other cases from this District, Judge Debevoise's approach has been applied in the summary judgment context, with, as this Court explains below, some necessary clarifications to consider the substantiality of the alleged reduction or change in treatment and the resident's history of treatment non-compliance. *See Pines v. Davis*, No. 15-0204, 2020 WL 4345312, at *4–5 (D.N.J. July 28, 2020); *Zalazar v. Stem*, No. 16-7092, 2019 WL 1950386, at *5–6 (D.N.J. May 2, 2019); *Carson v. Main*, No. 14-7454, 2016 WL347041, at *2–4 (D.N.J. Jan. 27, 2016).

As this subsequent case law applying Judge Debevoise's approach indicates, the framework implicitly excludes liability for insubstantial changes to the prescribed treatment. In *Pines*, the court explained that, "[u]nderlying the claim recognized in *Thomas*, is the concept that those committed under the SVPA are, at the time of the alleged reduction to treatment, entitled to sex offender treatment, and that the actions of the Defendants *substantially* reduced or prevented that treatment." *Pines*, 2020 WL 4345312 at *4 (emphasis added). More recently, the court in *Sarboukh v. Murphy*, No. 22-1622, 2023 WL 5425622 (D.N.J. Aug. 23, 2023), observed that, "[w]hile Courts in this Circuit have recognized that committed sex offenders do have Due Process rights which require that their treatment not be *meaningfully* curtailed for non-medical reasons,

such rights are only impugned where such reductions are for *a considerable period of time*," *id.* at *5 (emphasis added) (citing *Thomas*, 655 F. App'x at 85; *Thomas*, 55 F. Supp. 3d at 576); *see also Banda v. Adams*, 674 F. App'x 181, 185 (3d Cir. 2017) ("No claim of deliberate indifference is made out where a *significant* level of care has been provided and all that is shown is that the civil detainee disagrees with the health care provider's professional judgment about what constitutes proper care." (emphasis added)); *Fladger v. Hicks*, No. 19-16509, 2021 WL 1345906, *4 (D.N.J. Apr. 12, 2021) ("Neither *Thomas* decision addressed the existence of a plausible claim for relief arising out of incidental reductions of treatment resulting from temporary placement in restrictive confinement such as that raised here.").

In fact, Plaintiff denies "suggest[ing] that a mere shift in treatment would *ipso facto* result in a constitutional violation." (Pl. Reply Br. at 7; *see also* Oral Arg. Tr. at 30:15–17 (Plaintiff's counsel states that "we don't believe that Judge Debevoise's framework was akin to a strict liability standard")). Additionally, the factual allegations in the FAC considered by Judge Debevoise raised the plausible inference of a substantial reduction in, and eventually the complete elimination of, Plaintiff's prescribed treatment, thereby defeating the motions to dismiss the FAC pursuant to Rule 12(b)(6). Specifically, "[Plaintiff] asserts [in the FAC] that he began and continuously kept receiving ten hours of individual and group therapy per week: for a *decade*." *Thomas*, 55 F. Supp. 3d at 580 (citing FAC at 7–11). "According to [Plaintiff's] allegations, his prescribed amount of therapy was first reduced down to one-third (right after he arrived the STU . . .), then his treatment got changed to a lower-level of advancement . . ., and finally all mental treatment became denied." *Id.* at 581; *see also id.* at 581 n.33 (noting that Nash's allegations are substantively indistinguishable, "short of [alleging] complete deprivation of treatment").

In addition, the *Carson* court expressly applied Judge Debevoise's framework and

39

determined that, given the fact that the SVP had always refused treatment since his admission in 1999, he "cannot establish supervisory liability for deliberate indifference to his need for sex offender treatment because he cannot show that he suffered a constitutional injury caused by Defendants' conduct [with respect to the unavailability or reduction of treatment for a four-month period]." *Carson*, 2016 WL 347041, at *3.

Plaintiff acknowledges that "it is true that a plaintiff may not be able to show injury for a reduction in treatment where he consistently always refused treatment." (Pl. Mov. Br. at 34 n.7 (citing *Carson*, 2016 WL 347041, at *3)). However, he asserts that "the extent of Mr. Thomas's injury [resulting from a lack of participation in the treatment] is [not] an element of liability" but instead goes to the amount of damages he suffered. (Oral Arg. Tr. at 26:25–27:10 ("But that the extent of Mr. Thomas's injury, taking into consideration his lack of participation in the call-outs and some of the other groups that were offered, goes to the damages or the injury he suffered but not to the liability of defendants for reducing that prescribed treatment . . .")).

Nevertheless, treatment refusal is relevant to the overarching questions of supervisory liability and whether an SVP presents sufficient evidence of a substantive due process violation under *Leamer*. The *Carson* court explicitly followed Judge Debevoise's multi-prong approach to supervisory liability and considered whether:

> (1) the policy in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk [of constitutional injury]; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement [a curative] procedure.

*Carson*, 2016 WL 347041, at *3 (alterations in original) (quoting *Thomas*, 55 F. Supp. 3d at 578–79). Based on the unrebutted evidence that Carson had always refused treatment since his admission to the STU, the court concluded that "Plaintiff cannot satisfy the elements of a claim

for supervisory liability for a violation of the Fourteenth Amendment." *Id.* ("Because Plaintiff has always refused treatment, there was not an unreasonable risk of a constitutional injury to Plaintiff when treatment when unavailable or reduced for a four-month period."). In addition, it is undisputed that SVPs like Carson and Plaintiff have a right to refuse treatment. *See id.*; (Oral Arg. Tr. at 24:17–19 (Plaintiff's counsel concedes that an SVP has a right to refuse treatment)). A prisoner (or SVP) who has refused food or treatment cannot "then complain that defendants were deliberately indifferent to [ ] medical and nutritional needs." *Carson*, 2016 WL 347041, at *3 (alteration in original) (quoting *Hahn v. Walsh*, 915 F. Supp. 2d 925, 953 (C.D. Ill. 2013), *aff'd*, 762 F.3d 617 (7th Cir. 2014)). Accordingly, the *Carson* court reasonably concluded that "Plaintiff cannot establish a violation of the Fourteenth Amendment Due Process Clause on these facts because it does not 'shock the conscience' that he was denied treatment for four months after he refused treatment for nearly fifteen years."[9] *Id.* (noting that, during the four-month period in 2014, Carson declined to be interviewed by the TPRC and he then continued to refuse treatment through June 2015).

Furthermore, as Plaintiff and Judge Debevoise have indicated, the reason for the treatment refusal may be relevant to the question of liability. In his ruling, Judge Debevoise stated that, "[a]s *Leamer* shows, the fact that an inmate is: (a) a highly problematic mental patient, whose treatment is a medical challenge; and/or (b) placed a special housing unit, which rendered his mental treatment a logistical challenge, cannot strip the inmate of his fundamental rights." *Thomas*, 55 F. Supp. 3d at 575 n.24 (noting that Leamer alleged that he was placed on SHU status because of his misbehavior, was eventually shifted to a lower level of treatment because of poor institutional

---

[9]    Additionally, the FAC filed by Plaintiffs in the current matter did not indicate that Plaintiffs ever refused to participate in treatment. In fact, Plaintiff unambiguously alleged that "he *began and continuously kept receiving* ten hours of individual and group therapy per week" for a decade. *Thomas*, 55 F. Supp. 3d at 580 (emphasis added) (citing FAC at 7–11).

41

adjustment, and, as a result, he was unable to attend group therapy, only escorted to two out of sixteen scheduled sessions of one group, and was never escorted to another group). Likewise, an official evidently may be held liable if an SVP would have participated in the treatment but refused because the treatment was substantially changed for a non-medical reason. (*See* Pl. Mov. Br. at 32–33 (addressing the reasons a resident refused to participate in the treatment, i.e., whether he refused the treatment because it was modified or provided in an inadequate format or environment as a foreseeable result of systemwide determinations)).

In conclusion, to evaluate whether Defendants are entitled to summary judgment on Plaintiff's individual-capacity Section 1983 claim for substantive due process violations under the Fourteenth Amendment, the Court considers whether, considering all record facts and their reasonable inferences in the light most favorable to Plaintiff as the nonmoving party, a reasonable jury could find that: (i) the prescribed mental treatment was substantially denied, reduced, or changed for non-medical reasons; (ii) the Plaintiff would have participated in the treatment if the prescribed treatment had not been substantially denied, reduced, or changed; (iii) the supervising officials made systemwide determinations; (iv) the supervising officials' determinations become the moving force behind the circumstances under which the subordinate officers effectively had no choice but to substantially deny, reduce, or change the resident's prescribed mental treatment for non-medical reasons; and (v) such substantial denial/reduction/change in prescribed treatment was foreseeable given the systemwide determinations the supervisors made.

> 2.    **Substantial Change in Prescribed Treatment for Non-Medical Reasons and Plaintiff's History of Treatment Refusal**

As explained below, a reasonable jury could not find that either the prescribed treatment regimen was substantially reduced for non-medical reasons following his transfer to EJSP, or that, even if there was a substantial reduction, Plaintiff, with his history of refusing treatment, was

injured by this reduction.

### a.    Substantial Reduction in Prescribed Treatment

"Plaintiff's [substantive due process] claim could only succeed if he provided sufficient proof to permit a reasonable juror to find that Defendants *substantially* reduced his sex offender treatment during the period between [May 2010 (the month in which he was transferred to EJSP)] and [September 2011 (when the formal process group sessions resumed)]." *Pines*, 2020 WL 4345312, at *5 (emphasis added). The Court concludes that Plaintiff has failed to provide sufficient proof of a substantial reduction in treatment during this time period.

In general, the parties focus on the process group component of the prescribed treatment as opposed to the modules. But Dr. Main (the STU Clinical Director in 2010–2011) testified that the minimum core standard of twice-a-week, ninety-minute process groups *and one module* was not only always maintained but ultimately exceeded after the move. (Dr. Main Dep. Vol. I at 118:13–22). He stated that, although certain secondary or tertiary modules were unavailable, the core modules were offered to South Unit residents like Plaintiff. (*Id.* at 104:23–105:8). Plaintiff complained to the TPRC that there were no modules in the South Unit, but as reflected in the September 2011 and September 2012 TPRC reports, Dr. Iser (Plaintiff's psychologist), and Plaintiff himself indicated that limited modules were available to South Unit residents. (Sept. 2011 TPRC Rep. at DHS374 & DHS380; Sept. 2012 TPRC Rep. Thomas-000274; Dr. Iser Dep. at 79:22–25).

Plaintiff argues that "[his] treatment staff have readily admitted that Mr. Thomas's treatment was 'reduced,' 'compromised,' and 'negatively affected' as a result of the new facility's shortcomings and the construction." (Pl. Mov. Br. at 26 (quoting Dr. Main Dep. Vol. I at 120:11–13; Sept. 16, 2011 Emails at DHS1767); *see also id.* at 29 (asserting that "DHS treatment staff

43

confirmed that treatment on the South Unit should have been at levels 'comparable' to what non-South Unit residents were receiving" but the treatment on the South Unit "was not even close to comparable" (quoting Sept. 16, 2011 Emails at DHS1766)). With respect to the second component of the prescribed treatment, Plaintiff specifically asserts that the frequency of the process groups between October 2010 and September 2011 "were reduced by approximately one-third for all months, except January 2011 [a month with seven process group sessions], and often reduced by much more than that." (*Id.* at 28 (citing Pl. Mov. Br. at 18 (stating that the number of process groups held per month was decreased by at least 30%)). However, this means that the process groups generally assembled "two-thirds" (or approximately 70%) of the time. The record shows that at least thirty-eight process group sessions were held from October 2010 until mid-May 2011. (Sept. 2011 TPRC Rep. at DHS371–72; Weekly Grp. Participation Notes at DHS950-53 & DHS960–62; Lanigan SUMF ¶ 36; Pl. SUMF ¶¶ 57–59, 61 & 63–64; Pl. Resp. to Lanigan SUMF ¶ 36; Lanigan Resp. to Pl. SUMF ¶¶ 57–59, 61 & 63–64; DHS Defs. Resp. to Pl. SUMF ¶¶ 57–59, 61 & 63–64).

The lack of designated treatment rooms in EJSP required temporary modifications in the setting of the process group sessions, which were conducted in the day room until the designated treatment space was built. (DHS Defs. SUMF ¶¶ 88–89; Lanigan SUMF ¶¶ 26–27; Pl. Resp. to Lanigan SUMF ¶¶ 26–27; Pl. Resp. to DHS Defs. SUMF ¶¶ 88–89). Dr. Main explained that, although the day room was used by correctional officers and other residents, was noisy, and had an echo, other residents were cooperative, would vacate the area of the day room where the process group was meeting, and the chairs and tables would be rearranged to create a separate section for the session. (Dr. Main Dep. at 95:7–8 & 122:18-123:21).

The process group did not formally assemble between mid-May 2011 and mid-September

44

2011; nonetheless, the group members were "called out" at least nine times during this period. (Lanigan Resp. to Pl. SUMF ¶ 71; DHS Defs. Resp. to Pl. SUMF ¶ 66; June 2011–Sept. 2011 Weekly Grp. Participation Notes at DHS977–98). The "call-outs" were conducted by treatment providers, who asked members how they were doing and invited them to discuss any issues they may have experienced. (Pl. Resp. to DHS Defs. SUMF ¶ 93; Lanigan Resp. to Pl. SUMF ¶ 71; DHS Defs. Resp. to Pl. SUMF ¶ 71).

According to Plaintiff, the infrequent and informal call-outs were not considered to be process groups. (Oral Arg. Tr. at 49:1–16, 50:23–51:12). However, as Plaintiff acknowledges, the call-outs were meant to ensure that the group members were able "to process" any issues necessary to advance in treatment, thereby satisfying the key function of the formal "process" group sessions. (Pl. Resp. to DHS Defs. SUMF ¶ 93).

Defendants contend that the temporary treatment modifications made following the move to EJSP were supported by the professional judgment of STU staff. (Lanigan Reply Br. at 32–34 & 37; DHS Defs. Reply Br. at 35–37). In *Youngberg v. Romeo*, 457 U.S. 307 (1982), the Supreme Court explained that "courts must show deference to the judgment exercised by a qualified professional," *id.* at 322. "[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323 (footnotes omitted). DHS Defendants argue that they exercised their professional judgment in determining "the reasonableness of the decisions to hold process groups in the day room pending completion of the treatment rooms and to individually call out residents during construction on the South Unit." (DHS Defs. Mov. Br. at 36–37 (citing Dr. Main Dep. Vol I 53:19–25, 118:13–18, 120:11–13,

45

123:4–13, 151:13–24 & 159:22–160:3)). They further assert that, because Plaintiff has not presented an expert, he cannot establish that the temporary and reasonable modifications made following the EJSP transfer interfered with his ability to continue progressing toward release. (*Id.* at 17–18).

According to Plaintiff, the prescribed treatment plan of two process group meetings and a module remained unchanged; in his October 2014 Opinion, Judge Debevoise "declined to grant Defendants any presumption that 'a valid medical judgment had in fact been directing reduction or elimination of Plaintiff[']s medical treatment,'" and "there is no evidence of a medical assessment of the sort that the October 2014 Opinion mandated before modifying or reducing the prescription. (Pl. Moving Br. at 31 (quoting *Thomas*, 55 F. Supp. 3d at 580 n.32)). Plaintiff contends that an expert is unnecessary to answer the purely factual question whether his prescribed treatment of two process groups per week and a module was reduced for non-medical reasons. (*See* Oral Arg. Tr. at 44:11–16). Furthermore, Dr. Main testified that, "[a]lthough I would be hard pressed to argue that once weekly Process group [sic] in the day room would be adequate, twice weekly with the individual contacts as are noted in a lot of the progress note [sic] where [sic] the therapists are going out to ask everyone and sit down if they had any issues that are coming up is adequate, but it's disruptive." (Dr. Main Dep. Vol. I at 151:18–24). Plaintiff notes that the evidence shows that the group members were not called out twice a week. (Pl. Reply Br. at 8 n.5). Dr. Iser further indicated that, in his personal opinion, the "call-out" arrangement was neither ideal nor adequate because of the confidentiality and noise issues raised by the non-therapeutic setting, which the psychologist described as "cages." (*See* Dr. Iser Dep. at 82:21–83:8 & 85:5–88:12).

Nevertheless, as Dr. Main succinctly explained at his deposition, the "therapists made it [the process groups conducted in the day room] work quite well" (Dr. Main Dep. Vol. I at 123:4–

46

7), and "the amount of treatment being provided was still there for him [Plaintiff] to do the work" (*id.* at 159:22–24). In short, based on the professional opinion of the STU's Clinical Director, and the other evidence considered above, such as the number of process group sessions that were conducted, the (temporary) treatment changes following the transfer to EJSP did not result in a substantial reduction in prescribed treatment. Plaintiff does not present evidence indicating that the decisions made by Dr. Main and other mental health professionals regarding these temporary modifications to the STU treatment were such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the persons responsible for Plaintiff's treatment did not base their decision on such a judgment. *See Youngberg*, 457 U.S. at 322–23. In fact, when asked whether he was offering a personal as opposed to a professional opinion that holding process groups in the day room was inadequate treatment, Dr. Iser acknowledged that it was his "personal opinion."[10] (Dr. Iser Dep. at 133:17–134:1). Dr. Iser also admitted that he could not remember any residents "hanging out" by the cages to eavesdrop on the sessions or recall that residents complained too much about the setup. (*Id.* at 83:18–84:2).

Based on the foregoing analysis, the Court concludes that Plaintiff has failed to provide sufficient proof of a substantial reduction in treatment. Admittedly, it is undisputed that the treatment changes at issue in this case are more severe than the temporary and incidental reductions considered in *Pines* and the other New Jersey district rulings cited by Defendants. *See Sarboukh*, 2023 WL 5425622, at *5 (plaintiff merely alleged that he received two, as opposed to, four weeks of individual treatment in August 2022); *Fladger*, 2021 WL 1345906, at *4 ("Plaintiff also asserts,

---

[10]     Plaintiff indicates that "[w]hether or not [Dr. Main] believes the [modified] treatment was working well has no bearing on whether the treatment being provided was Mr. Thomas's prescribed treatment, which between October 2010 and September 2011, it was not." (Oral Arg. Tr. at 69:18–21). However, the professional opinion of the STU's Clinical Director that his clinical staff made the prescribed process group sessions they temporarily provided in the day room "work" is relevant to the question of whether there was a substantial reduction in this prescribed treatment.

however, that his required sex offender treatment has been interrupted by his frequent placement in restrictive custody. Plaintiff does not provide sufficient information to contextualize this allegation – he neither explains *why* he was placed in restrictive custody, nor how frequently he has been so placed."); *Pines*, 2020 WL 4345312, at *5 (plaintiff stated that treatment interruptions were not frequent and occurred only "every once in a while"); (Oral Arg. Tr. at 68:10–16). But, as the Court has explained, the record contains evidence showing that that Plaintiff's process group formally convened in the day room on multiple occasions from May 2010 through May 2011; when the group was unable to assemble from May 2011 to September 2011, the members were "called out" to "process" their issues; and Dr. Main opined that the day room sessions were made to "work" with the cooperation of other residents, and the treatment was still "there" for Plaintiff if he chose to "do the work." Given this record evidence, and the deficiencies in the evidence cited by Plaintiff (including Dr. Iser's testimony), Plaintiff has failed to present sufficient evidence permitting a reasonable jury to find there was a substantial treatment reduction.[11]

### b.    Treatment Refusal

In any event, Plaintiff repeatedly refused to participate in the treatment that was offered to him at EJSP in 2010 and 2011. In 2011, Plaintiff stated he was not interested in taking any module, and he did not enroll in any module at EJSP until September 2012. (Sept. 2011 TPRC Rep. at DHS374; June 2011–Sept. 2011 Weekly Grp. Participation Notes at DHS998; DHS Defs. SUMF ¶ 86; Lanigan SUMF ¶ 35; Pl. Resp. to Lanigan SUMF ¶ 35; Pl. Resp. to DHS Defs. SUMF ¶ 86). He missed twenty process group sessions between May 2010, when he was transferred from

---

[11]    Given the foregoing circumstances, Plaintiff has not presented record evidence substantiating his allegations in the FAC that "his prescribed amount of therapy was first reduced down to one-third," then was changed to "a lower-level of advancement," and "finally all his mental treatment became denied." *Thomas*, 55 F. Supp. 3d at 581; *see also Berckeley Inv. Grp., Ltd.*, 455 F.3d at 201 (stating that summary judgment is essentially "put up or shut up" time for the non-moving party).

48

Kearny to EJSP, and the issuance of the annual 2009–2010 TPRC report on September 10, 2010. (DHS Defs. SUMF ¶ 100; Pl. Resp. to DHS Defs. SUMF ¶ 100). From October 2010 until the end of the year, he attended only one out of twelve sessions. (DHS Defs. Resp. to Pl. SUMF ¶¶ 57–59; Weekly Grp. Participation Notes at DHS942–53). Between the beginning of 2011 and mid-May 2011, he attended thirteen out of twenty-six sessions. (Lanigan SUMF ¶ 36; DHS Defs. Resp. to Pl. SUMF ¶¶ 61–65; Weekly Grp. Participation Notes at DHS961–62).

In total, from October 2010 to May 2021, Plaintiff only went to fourteen of the thirty-eight process group sessions, or approximately 37% of the sessions. In the twelve-month period following his transfer (May 2010–May 2011), he missed at least forty-four process group sessions. Plaintiff also refused almost every invitation to participate in the summer 2011 "call-outs," attending only two of nine call-outs (i.e., approximately 22% of the alleged replacement sessions). (Lanigan Resp. to Pl. SUMF ¶ 71; DHS Defs. Resp. to Pl. SUMF ¶ 66; June 2011–Sept. 2011 Weekly Grp. Participation Notes at DHS977–98).

Plaintiff argues that, among other things, he was never placed on either treatment refusal or treatment probation either while at Kearny or during the relevant time period after his transfer to EJSP; he was commended for his more active participation in treatment in the months immediately preceding the transfer; he attempted to re-engage with treatment shortly after his move; his struggle to participate in treatment following the transfer was the result of the changes in the form of the treatment being provided (which either took place in the day room or in informal call-outs that no treatment provider considered a real process group); and his reluctance to participate in such problematic "treatment" sessions resulting from Defendants' own actions should not be held against him. (*See* Pl. Mov. Br. at 32–33; Oral Argument Tr. at 56:24–57:23).

However, the evidence cited by Plaintiff is insufficient to raise a genuine issue of material

fact with respect to Plaintiff's pattern of treatment refusal. Dr. Main testified that Plaintiff suffered a setback in treatment, but the Clinical Director indicated that this setback was not due to inadequate treatment. (Dr. Main Dep. Vol. I at 161:25–162:14; *see also id.* at 158:18–19 (stating that Plaintiff experienced a "labelling effect" at EJSP in which he associated his South Unit placement with the fact that the unit housed residents who refused treatment and demonstrated other behavioral instabilities)). Furthermore, as the Court has noted, *see supra* Section III.D.2.a., the record evidence shows that, despite the fact that the process group sessions met in the day room, other residents were cooperative; the "call out" sessions provided an opportunity for "process" group members to "process" their issues, and Dr. Iser testified that he could not remember any residents "hanging out" by the cages to listen to the sessions or recall that residents complained too much about the setup. Plaintiff also has failed to rebut Dr. Main's professional opinion that the staff made the day room sessions "work" and the treatment was still "there" for Plaintiff if he chose to "do the work," which, given his refusal to participate in treatment, he failed "to do." According to the TPRC, Plaintiff did not take advantage of the treatment that was available to him in 2010-2011 and that his peers took the opportunity of the disruptions to engage with each other and, as a group, vent their feelings, seek solutions, and support each other. (Sept. 2011 TPRC Rep. at DHS380–381). Dr. Friedman (the STU Director of Psychology) similarly noted that Plaintiff "never availed himself of treatment offerings and has continued to decline to engage in the offerings that we are still currently providing." (Sept. 16, 2011 Emails at DHS1767). According to Dr. Friedman, "he [Plaintiff] is as close to being a TR [Treatment Refuser] as one can be, and arguably he should have been made a Treatment Refuser years ago." (*Id.*).

In *Carson*, the court concluded that "Plaintiff cannot establish a violation of the Fourteenth Amendment on these facts because it does not 'shock the conscience' that he was denied treatment

for four months after he refused treatment for nearly fifteen years," "declined to be interviewed by the [TPRC during the four-month period in which treatment was reduced or unavailable]," and "continued to refuse treatment [after the period ended]." *Carson*, 2016 WL 347041, at *3 (citation omitted). Although Plaintiff's history of treatment refusal is not as severe, Plaintiff similarly failed to participate in most of the treatment made available to him following his May 2010 transfer to EJSP. Before his transfer, Plaintiff accumulated approximately sixty-seven unexcused absences and twelve self-reported excused absences from his assigned process group, he refused to participate in several MAP/RAP group sessions, and he did not participate in any module until 2009. (DHS Defs. Resp. SUMF ¶¶ 37–39 & n.5, 41, 48–49; Pl. Resp. to DHS Defs. SUMF ¶¶ 37–39 & n.5, 41, 48–49). Subsequently, in 2013, Plaintiff was placed on Treatment Probation and then Treatment Refusal. (DHS Defs. SUMF ¶ 115; Pl. Resp. to DHS Defs. SUMF ¶ 115). Accordingly, the Court concludes that Plaintiff cannot establish that the Defendants' actions created "an unreasonable risk of a constitutional injury" or otherwise shocked the conscience under the Due Process Clause, *Carson*, 2016 WL 347041, at *3.[12]

For the foregoing reasons, Plaintiff's individual-capacity Section 1983 claim for damages for substantive due process violations fails because there is insufficient evidence to permit a reasonable jury to find that either his prescribed mental treatment was substantially denied, reduced, or changed for non-medical reasons, or that Plaintiff would have participated in the treatment if it had not been substantially denied, reduced, or changed.

---

[12]    As the Court has noted, *see* Section III.D.1.a., Judge Debevoise had no reason to consider the question of treatment refusal because Plaintiff did not allege in the FAC any instances of him refusing treatment. According to the 2014 Opinion, "Thomas asserts that he began and continuously kept receiving ten hours of individual and group therapy per week: for a *decade*," i.e., "5,200 hours of therapy," at Kearny. *Thomas*, 55 F. Supp. 3d at 580 & n.32 (emphasis in original) (citing FAC at 7–11). However, given the record evidence of Petitioner's pattern of refusing treatment at both Kearny and EJSP, this allegation that he received thousands of hours of treatment is not supported by record evidence.

51

### 3.    Defendants' Decision-Making and Deliberate Indifference

In addition to presenting sufficient evidence to permit a reasonable jury to find that Plaintiff's prescribed treatment was substantially reduced and that, if it had not been substantially reduced, Plaintiff would have participated in the treatment, Plaintiff must present evidence that Defendants: (i) made systemwide determinations; (ii) their systemwide determinations became the moving force behind the circumstances under which their subordinates effectively had no choice but to deny, reduce, or change Plaintiff's prescribed treatment for non-medical reasons; and (iii) such denial, reduction, or change in prescribed treatment was foreseeable given the systemwide determinations Defendants made, rendering Defendants liable to Plaintiff for the injuries caused by the treatment denial/reduction/change, provided that Plaintiff draws the requisite causal link by presenting facts establishing the Defendants' deliberate indifference to the risk of Plaintiff's injury. *See Thomas*, 55 F. Supp. 3d at 577. In other words, a plaintiff must show that the defendants (as supervisory officials): (i) "created an operational regime laden with an unreasonable risk of denial of (or reduction/change in) the [plaintiff's] mental care for non-medical reasons" and (ii) being aware that their decisions entailed such a risk, elected to proceed with the implementation of their decisions. *Id.* at 579–80.

The Court assumes for purposes of this Opinion that Plaintiff presents sufficient evidence to permit a reasonable jury to find that Defendants were personally involved in the decision-making process regarding the transfer of the STU and Plaintiff from Kearny to EJSP and the resulting "operational regime" at EJSP. However, Plaintiff's substantive due process claim fails because a reasonable jury could not find that Defendants knew their alleged systemwide determinations would perpetuate "an operational regime laden with an unreasonable risk of [a

52

substantial] denial of (or reduction/change in) the [Plaintiff's] mental care for non-medical reasons," *id.*

Plaintiff argues that it is factually undisputed that Defendants made decisions that they knew would compromise Plaintiff's prescribed treatment. (Pl. Mov. Br. at 34). Plaintiff asserts that the evidence shows that Lanigan (who became acting DOC Commissioner in early February 2010) was briefed on EJSP issues, was sought out for his approval for the project plan, was warned about potential space-related treatment issues, and was engaged in specific details regarding the budget related to the proposed treatment space. (*Id.* at 36–37). According to Plaintiff, this evidence confirms that Lanigan was not only aware that the STU would require "a particular layout before being treatment-ready, but also that he knew space requirements in the then-configured Ad Seg Unit [at EJSP] would need to be—but had not yet been, by the time of the move—adjusted to meet STU treatment needs." (*Id.* at 37).

More broadly, Plaintiff contends that, since they began to solicit and review proposals for a new site in 2001, Defendants understood the "obvious reality" that "the 'treatment and custodial requirements' of a treatment facility for individuals committed under the SVPA 'demand[ed] adequate physical plant space for staff to work, and for treatment programs to operate and to address custodial concerns.'" (*Id.* (citing Jan. 27, 2003 Mem. at DOC248)). According to Plaintiff, Defendants—despite their decade-long awareness of the physical limitations of EJSP as an adequate treatment space and the fact that this site had already been rejected twice because of the financial and logistical constraints of the facility—"orchestrated an entire relocation" of the STU without providing for any physical treatment rooms in the housing unit to which they sent Plaintiff or beginning the construction project to build this needed treatment space before the transfer occurred. (*Id.* at 41; Oral Arg. Tr. at 71:16–21). Plaintiff indicates that DHS employees kept him

53

confined in the South Unit after learning that his treatment there was "essentially non-existent." (Pl. Mov. Br. at 38 (citing D.E. No. 165-16, Ex. R. to Cert. of Counsel at Thomas-000349 (response to Plaintiff's November 2010 grievance stating that decisions regarding who should live in the South Unit are discussed regularly by the treatment staff and administration)); Sept. 16, 2011 Emails at DHS1767 (September 16, 2011 email from DAG noting that, according to the treatment notes, Plaintiff's process group had not met since May 2011 and that he seemed to recall that the South Wing offered limited programming compared to the rest of the STU)). In addition, in support of his claim that the reduction in the prescribed treatment was a foreseeable consequence of Defendants' decisions, Plaintiff cites to the September 2011 TPRC report, which includes statements explicitly attributing the reduction in treatment to ongoing construction, and the East Jersey State Prison Option, which states that "no real treatment space exists within the currently configured ADSEC unit" at EJSP. (Oral Argument Tr. at 90:21–91:1 & 93:6–16).

The Court concludes that evidence showing that Lanigan was "briefed" on the "East Jersey State Prison Option Sex Offender Facility," was copied on an email referencing the impact of the *Alves* settlement negotiations on space or funding, and asked Sherrer about relocation costs does not raise a genuine issue of material fact regarding Lanigan's alleged knowledge that his actions entailed risks of a substantial change or reduction in mental health treatment at the STU. (*See* Sherrer Jan. 29, 2010 Email at Supp_DOC00003; Jan. 29, 2010 Email at Supp_DOC00005; Feb. 4, 2010 DAG Email at Supp_DOC00006; Feb. 4, 2010 Lanigan Email at Supp_DOC00008). For instance, the evidence does not indicate what was discussed at the briefing or whether the relocation costs for staff and residents were related to the need to build the dedicated treatment rooms. (*See* Jan. 29, 2010 Email at Supp_DOC00005; Feb. 4, 2010 Lanigan Email at Supp_DOC00008). Furthermore, Lanigan was merely copied on the *Alves* settlement, and the

email does not indicate how the settlement negotiations could affect space or funding requirements. (*See* Feb. 4, 2010 DAG Email at Supp_DOC00006). The document also does not identify the space or fund requirements at issue, and there is no competent evidence to suggest that such requirements were related to the lack of dedicated treatment rooms at EJSP, or that the (temporary) lack of such treatment rooms or the disruption caused by construction to build the rooms could prevent STU staff from providing the prescribed treatment.[13] (*See id.*).

A reasonable finder of fact could not find that either Lanigan or the other Defendants knew their conduct would result in an unreasonable risk of a substantial denial or reduction in Plaintiff's prescribed treatment. EJSP was previously rejected as a location for the STU not because the facility lacked designated or adequate treatment space but because it was "considered too large." *Thomas*, 55 F. Supp. 3d at 556 (quoting *Cnty. of Hudson*, 2009 WL 1361546, at *5). Plaintiff cites to the January 27, 2003 Memorandum noting the importance of adequate space for staff and for treatment programs; however, the document does not assess or mention the EJSP location as a potential site, and there is no indication that this years-old document was ever seen by Defendants. (*See* Jan. 27, 2003 Mem. at DOC246–250). Plaintiff also cites testimony from the project manager establishing that the construction to build the new treatment rooms was not unexpectedly delayed

---

[13]    In the *Alves* litigation, a class was certified "to address the alleged overall inadequacy of mental treatment administered to all SVPs by the DOC, be it at Kearny or—during the last stages of the *Alves* class action—at the EJSP STU." *Thomas*, 55 F. Supp. 3d at 561 (citing *Alves v. Ferguson*, No. 01-0789). Judge Debevoise severed Plaintiffs' allegations regarding the overall inadequacy of mental treatment administered at the EJSP STU and consolidated them with the *Alves* class action. *See id.* "In contrast, the instant matters were 'reserved for . . . Plaintiffs' individualized[ ] lines of [constitutional] challenges . . . predicated on . . . the alleged [denial, change or] reduction in medical treatment Plaintiffs have been receiving [after the transfer].'" *Id.* at 562 (alterations in original) (quoting D.E. No. 17 at 2–3). *Alves* was settled in 2012, thereby extinguishing Plaintiffs' challenges regarding the overall inadequacy of treatment administered at either Kearny or EJSP. *Id.* at 561–62. However, as Judge Debevoise explained, "Plaintiffs' *individualized constitutional* claims reserved here remained unaffected by the *Alves* Settlement." *Id.* at 562.

Given the differences between Plaintiff's current claims regarding the STU's transfer from Kearny to EJSP and the resulting changes in prescribed treatment, on the one hand, and the claims in *Alves* challenging the overall adequacy of the treatment program at either Kearny or EJSP, on the other hand, the fact that Lanigan was copied on an e-mail regarding unspecified space issues with respect to the (extinguished) *Alves* claims is insufficient to raise a genuine factual issue in the current case.

or off schedule (and, on the contrary, "mov[ed] along rather well"), but this testimony does not show that Defendants knew that beginning construction after the transfer occurred risked causing a substantial treatment reduction. There is no evidence to show that Lanigan (or DHS Defendants) ever saw the "East Jersey State Prison Option" document. (*See* Oral Argument Tr. at 93:20–94:3 (Plaintiff's counsel admitted that "there's no evidence in the record" showing that Defendant Lanigan saw the East Jersey State Prison Option document)). Neither the January 27, 2003 Memorandum nor the East Jersey State Prison Option state that the lack of dedicated treatment space (i.e., "real treatment space" (East Jersey State Prison Option at DOC260)) could result in a substantial reduction of prescribed treatment. (*See* Jan. 27, 2003 Mem. at DOC246–50; East Jersey State Prison Option at DOC260).

Admittedly, the September 2011 TPRC attributed the reduction in process groups in November and December 2010 to construction on the South Unit. (Sept. 2011 TPRC Rep. at DHS371 ("It should be noted that few groups were held in November and December, due to construction on the South Wing.")). However, there is no evidence in the record showing that this construction (which apparently involved the placement of a large crane to move heavy objects on and off the roof (DHS Defs. Resp. to Pl. SUMF ¶ 68)) was anticipated by Defendants or was related to the anticipated project to build the dedicated treatment rooms. In addition, according to the treatment notes, two November 2020 sessions were not held because they fell on public holidays (Veteran's Day and Thanksgiving). (Weekly Grp. Participation Notes at DHS947 & 949). The TPRC also specifically attributed the cancellations of process group sessions in March 2011 to flooding in the day room. (Sept. 2011 TPRC Rep. at DHS371). At oral argument, Plaintiff, through counsel, acknowledges that "a flood prompting treatment modifications or temporary disruptions is not the type of situation Judge Debevoise was contemplating would give rise to a

deliberate indifference claim under his framework." (Oral Argument Tr. at 70:5–8; *see also id.* at 92:2 (acknowledging that flooding was not foreseeable)). As to the other cancellations of process group sessions in the time period from September 2010 until May 2011, Plaintiff does not cite to any evidence indicating the cause (or causes) of such reductions. As the Court has explained, *see supra* Section III.D.2.a., Dr. Main opined that, although not ideal, "the therapists made it [the process group sessions in the day room] work quite well" (Dr. Main Dep. Vol. I at 122:18–123:21), and Dr. Iser's "personal" opinions does not rebut this professional assessment.

It is undisputed that the construction to create the new treatment rooms caused the cancellation of formal process group sessions from mid-May 2011 until mid-September 2011. (*See* Sept. 2011 Rep. at DHS372; Grievance at DHS543; Sept. 16, 2011 Emails at DHS1766). Once the project to construct the treatment rooms commenced, the STU continued to provide substantially similar treatment by "calling out" the process group members. In fact, the documentation specifically cited by Plaintiff in support of his assertion that "his treatment there was essentially non-existent" shows that, as Dr. Friedman put it, Dr. Carlson (the process group facilitator) and Dr. Iser "have been on the South Unit during Mr. Thomas'[s] process group time every Wed[nesday] since construction began and have had [the] group called out and they have met with this process group each time." (Sept. 16, 2011 Emails at DHS1766).

Accordingly, given the record evidence regarding Defendants' knowledge of a risk of substantial treatment reduction at the time they made their decisions and the facts concerning the treatment that was provided following the transfer, Plaintiff has failed to raise a genuine issue of material fact as to whether Defendants knew their alleged systemwide determinations would result in an unreasonable risk of a substantial reduction in Plaintiff's prescribed treatment. For the reasons stated in this subsection, and, in Section III.D.2., *supra*, the Court grants Defendants'

57

summary judgment motions and denies Plaintiff's motion for summary judgment as to the individual-capacity Section 1983 claim for damages under the Substantive Due Process Clause of the Fourteenth Amendment in the First Cause of Action of the SAC.

> **E.** **The Individual-Capacity Section 1983 Claim for Damages for Violations of the Right to Procedural Due Process under the Fourteenth Amendment (Second Cause of Action)**

Defendants move for summary judgment on Plaintiff's individual-capacity Section 1983 claim for damages under the Due Process Clause of the Fourteenth Amendment. (*See* DHS Defs. Mov. Br. at 31–36; Lanigan Mov. Br. at 12–17; Pl. Mov. Br. at 37–41). In his October 2014 Opinion, Judge Debevoise determined that Plaintiff alleged a plausible procedural due process claim: "In light of these well-pled facts, there appears to be no doubt that [Plaintiff] stated a plausible procedural due process claim under *Durmer, Napoleon* and *Lanzaro*, and—under *Leamer*—he also stated a plausible substantive due process challenge." *Thomas*, 55 F. Supp. 3d at 581. He explained that, "when a *prescribed* medical treatment is denied, reduced or changed for *non-medical* reasons, including financial, administrative or logistical, the so-denied/reduced/changed treatment suggests an act of deliberate indifference and amounts to a violation of both procedural and substantive due process with regard to those mental patients whose sole hope for release hinges on obtaining their prescribed mental therapy." *Id.* at 576 (emphasis in original) (citing *Leamer*, 288 F.3d at 545–47).

Accordingly, to the extent that the Court concludes Plaintiff's prescribed treatment was *not* substantially changed, the procedural due process claim, which is based on this alleged reduction, is without merit. The Court grants Defendants' motions for summary judgment and denies Plaintiff's cross motion for summary judgment as to Plaintiff's individual-capacity Section 1983 claim for damages for procedural due process violations in the Second Cause of Action.

## F.    Qualified Immunity under Section 1983

Defendants argue that they are entitled to qualified immunity as to Plaintiff's individual-capacity claims for damages under Section 1983 in the First and Second Causes of Action. (*See* DHS Defs. Mov. Br. at 49–53; DHS Defs. Mov. Br. at 6–8). The Court agrees with Defendants.

Qualified immunity insulates government officials from the burdens of litigation and civil liability. *See Walter v. Pike Cnty.*, 544 F.3d 182, 190 (3d Cir. 2008). The burden of establishing entitlement to qualified immunity rests with the movant asserting the defense. *See Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014). The defense consists of two prongs: "the first prong being whether the facts, as viewed in the light most favorable to the plaintiff, show the violation of a [constitutional or] legal right, and the second being whether that right was clearly established." *Mack*, 63 F.4th at 227 (quoting *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021)). While both prongs are required, courts may address them in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Applying the second prong of the qualified immunity defense, Judge Debevoise concluded that "[t]he substantive issues implicated here are scalpel-narrow and have been subject to extensive 'practical guidance' that gave [Defendants] 'fair warning' for the period ranging from more than a decade, under *Leamer*, to longer-than-a-quarter century[,] under *Lanzaro*, *Napoleon* and *Durmer*." *Thomas*, 55 F. Supp. 3d at 587. He explained that:

> Nothing in the principles clearly established by those decisions could have led the DOC [sic] Defendants to believe that denying, reducing or changing Plaintiffs' prescribed mental treatment for non-medical reasons would be anything but a violation of Plaintiffs' constitutional rights, and there should have been not a shred of doubt in the DOC [sic] Defendants' minds that such violation would qualify as "conscience shocking" in addition to being an imposition of punishment without due process. And, under *Monell* [*v. Department of Social. Services*, 436 U.S. 658 (1978)], *Sample* [*v. Diecks*, 885 F.2d 1099, 1116 (3d Cir. 1989),] and [*Beers-Capitol v.*] *Whetzel*, [256 F.3d 120 (3d Cir. 2001)], as well as under *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005), the DOC [sic] Defendants had to know,

59

> for thirty, twenty, ten and five years, respectively, that legal liability would attach to them for the decisions/acts they would make with deliberate indifference to the risk of constitutional harm those decisions/acts would entail.

*Id.*[14]

Plaintiff argues that he is entitled to summary judgment on the issue of qualified immunity because this defense has been rejected in Judge Debevoise's October 2014 Opinion, the Third Circuit's ruling affirming the October 2014 Opinion, and this Court's denial of Defendants' motion to dismiss the SAC. (Pl. Mov. Br. at 50). According to Plaintiff, the prior qualified immunity holdings are the law of the case. (*Id.*).

However, in *Mack*, the Third Circuit specifically considered the applicability of the law of the case doctrine in the qualified immunity context and determined that the defendants and the district court did not properly define the right at issue under the second prong of the qualified immunity analysis because they ignored the applicable factual and procedural context by relying on their prior framing of the right at the pleading stage. *Mack*, 63 F.4th at 229.

Like in *Mack*, "[t]he record is different now, and so is the procedural posture. We are . . . ruling at summary judgment, with the benefit of a developed factual record." *Id.* Judge Debevoise explained that, according to the FAC's allegations, "[Plaintiff's] allegations, his prescribed amount of therapy was first reduced down to one-third . . .; then his treatment got changed to a lower-level of advancement . . .; and finally his mental treatment became denied." *Thomas*, 55 F. Supp. 3d at 581. But the "developed factual record," *Mack*, 63 F.4th at 229, viewed in the light most favorable to Plaintiff, shows that: (i) at least thirty-eight process group sessions were held from October 2010 to mid-May 2011 (Sept. 2011 TPRC Rep. at DHS371–72; Weekly Grp. Participation Notes at

---

[14]    The Third Circuit did not "attach significance to [Judge Debevoise's] reference to 'DOC defendants.'" *Thomas*, 655 F. App'x at 86 n.8 ("Although this short-hand reference was technically inaccurate, the District Court was plainly aware that Appellant were officials from different parts of state government with different responsibilities." (citation omitted)).

DHS950-53 & DHS960–62; Lanigan SUMF ¶ 36; Pl. SUMF ¶¶ 57–59, 61 & 63–64; Pl. Resp. to Lanigan SUMF ¶ 36; Lanigan Resp. to Pl. SUMF ¶¶ 57–59, 61 & 63–64; DHS Defs. Resp. to Pl. SUMF ¶¶ 57–59, 61 & 63–64); (ii) although the process group did not formally assemble between mid-May 2011 and mid-September 2011, the group members were "called out" at least nine times during this period (Lanigan Resp. to Pl. SUMF ¶ 71; DHS Defs. Resp. to Pl. SUMF ¶¶ 57–59, 61––66; June 2011–Sept. 2011 Weekly Grp. Participation Notes at DHS977–98); (iii) in the twelve-month period following his transfer, Plaintiff missed forty-four process group sessions (and between October and December 2011 he attended only one session) (DHS Defs. SUMF ¶¶ 57–59, 61–65 & 100; Lanigan SUMF ¶ 36; Pl. Resp. to DHS Defs. SUMF ¶ 100; Weekly Grp. Participation Notes at DHS950–53 & DHS961–62); and (iv) Plaintiff also refused almost every invitation to participate in the summer 2011 "call-outs," attending only two of nine call-outs (Lanigan Resp. to Pl. SUMF ¶ 71; DHS Defs. Resp. to Pl. SUMF ¶ 66). Even with the alleged reductions and deficiencies in the treatment being provided during this time period (*see supra* Section III.D.2.a.), it was not clearly established in 2010–2011 that such circumstances violated an SVP's due process rights under the Fourteenth Amendment. Accordingly, the Court concludes that Defendants are entitled to qualified immunity because the due process right at issue was not clearly established at the time the conduct occurred.

## IV.    CONCLUSION

For the forgoing reasons, Defendants' motions for summary judgment are **GRANTED**. Plaintiff's cross motion for summary judgment is **DENIED**. An appropriate Order follows.

Dated: October 23, 2025

s/ Esther Salas
**Esther Salas, U.S.D.J.**